```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEW JERSEY
 2
    _____
 3   THE HOMESOURCE, CORP.,        :  Civil Action No.
                                   :  1:18-cv-11970-JBS-KMW
 4           Plaintiffs,           :
                                   :
 5      vs.                        :
                                   :  Camden, New Jersey
 6   RETAILER WEB SERVICES, LLC    :  Wednesday, November 28, 2018
     and JOHN DOES 1-3,            :  11:03 a.m.
 7                                 :
             Defendants.           :
 8   _____

 9           TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
               BEFORE THE HONORABLE KAREN M. WILLIAMS
10                 UNITED STATES MAGISTRATE JUDGE

11

12   APPEARANCES:

13   For the Plaintiff:          Flaster/Greenberg, P.C.
                                 By:  ALEXIS ARENA, ESQUIRE
14                               Commerce Center, Third Floor
                                 1810 Chapel Avenue West
15                               Cherry Hill, NJ  08002-4609

16
     For Defendant Retail
17   Web Services, LLC:          McElroy, Deutsch, Mulvaney &
                                 Carpenter, LLP
18                               By:  MATTHEW A. LIPMAN, ESQUIRE
                                 1617 John F. Kennedy Boulevard,
19                               Suite 1500
                                 Philadelphia, PA 19103
20

21   Transcription Company:      KLJ Transcription Service, LLC
                                 P.O. Box 8627
22                               Saddle Brook, NJ  07663
                                 (201)703-1670
23                               www.kljtranscription.com
                                 info@kljtranscription.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

2

APPEARANCES (Cont.):

For Defendant Retail
Web Services, LLC:                    Taft, Stettinius & Hollister, LLP
                                      By:  ADAM WOLEK, ESQUIRE
                                      111 E. Wacker Drive, Suite 2800
                                      Chicago, IL 60601

                                      Taft, Stettinius & Hollister, LLP
                                      By:  WILLIAM C. WAGNER, ESQUIRE
                                      One Indiana Square, Suite 3500
                                      Indianapolis, IN 46204

1                            I N D E X

2

3  RE:  PRODUCTION OF IP ADDRESSES:                    PAGE

4  Colloquy with Mr. Wagner. . . . . . . . . . . 6, 18, 21, 24

5  Colloquy with Ms. Arena.. . . . . . . . . . . 10, 21, 22, 25

6  Order.. . . . . . . . . . . . . . . . . . . . . . . . 32

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Conference commenced at 11:03 a.m.)

2          THE COURT:  We're here, good morning, in the case

3    HomeSource versus Retailer Web Services, Case -- Civil Docket

4    Number 18-11970.  We are on the record.  Will you please enter

5    your appearances, please?

6          MS. ARENA:  Your Honor, my name is Alexis Arena and

7    I represent the plaintiff, The HomeSource Corp.

8          MR. LIPMAN:  Good morning, Your Honor.  Matthew

9    Lipman, along with William Wagner and Adam Wolek.  We

10   represent the defendant in this matter, and I believe that Mr.

11   Wagner will handle the proceedings this morning.  Both he and

12   Mr. Wolek are admitted *pro hac vice* to this matter.

13         MR. WAGNER:  Your Honor, this is Bill Wagner.  We

14   also have on the phone RWS's expert witness, Jennifer Bayuk.

15   Spelled B-A-Y-U-K.  Ms. Bayuk is available to answer any of

16   Your Honor's questions about the expert conference.  We

17   thought it would be valuable to have her available to answer

18   any of your questions.  If you do not want her to participate

19   though, she can drop off.

20         THE COURT:  It may be useful to have her on.  I'm

21   fine.  Is there any objection?

22         MS. ARENA:  Your Honor, we can proceed, but just

23   with the understanding that I didn't know she would be on

24   before this morning and, therefore, did not have our expert

25   on.

Colloquy                                                          5

1          THE COURT:  Okay.  Do you want to get your expert on?

2          MS. ARENA:  I don't think there's a need for either

3    expert to be on.  And I don't think there's a question here

4    that's relevant that I couldn't answer today based on my

5    extensive conversations with the expert and the client.

6          THE COURT:  All right.  So, you know, you're all

7    going to have to explain your positions to me a little bit

8    better.  Let me start though by saying, if I understand the

9    issue that's ripe for me to address during this call, it's the

10   issue of the production of the IP addresses from defendants.

11         MS. ARENA:  Yes, Your Honor.

12         THE COURT:  We have had two prior phone conferences

13   on this.  The parties, in accordance with plaintiff's document

14   number 30 have had numerous exchanges about this, yet there

15   seems to be some question remaining about what the defendant

16   is supposed to produce and when.  I say all that so that you

17   all understand where I'm coming from and why we're on the

18   record.

19         As soon as I see these kinds of disputes about who

20   said what when, we're no long going to do informal

21   conferences, because counsel have now indicated to me that

22   that's not appropriate and we're going to have to put you on

23   the record so that we have a record of what's being said.

24         Let me hear from Mr. Wagner as to why these IP

25   addresses have still not yet been produced.

1          MR. WAGNER:  Yes, Your Honor.

2          Your Honor, during our last conference, we took Your

3   Honor's instruction to have the experts work together and

4   decide how the evidence would be produced and analyzed.  It's

5   not simply just producing RWS's IP addresses, it's running

6   those addresses against the HomeSource logs of their Websites

7   and the people that were trying to access those Websites.

8   There should be a log listing the computer addresses, the IP

9   addresses for the folks who were trying to access those

10  Websites.

11         And we have expressed concerns that HomeSource would

12  manipulate its data if it was not a simultaneous production.

13  And when we all were together, you said, you know, I envision

14  this as both experts talking to each other in a room or on a

15  phone and working out not only how the production would be

16  made, but how the analysis would be done.  And we arranged

17  that conference for November 14 and the experts participated

18  in that conference for an hour-and-a-half.

19         We, RWS, gave the list of the IP addresses to our

20  expert, Jennifer Bayuk, the day before that conference took

21  place.  We expected to have a discussion that day about how

22  those addresses would be compared to the HomeSource logs.

23         Once you take a step back and you look at a forensic

24  investigation, the first thing that you have to do is look at

25  the logs of the company that was attacked.  HomeSource -- we

1   asked for the logs and had an agreement that HomeSource would

2   produce those logs two days after it filed its amended

3   complaint.  They filed their amended complaint on September 4.

4   We had an agreement on September 6 that they would produce

5   their information of the attacks.  On September 7 they

6   reneged.  And we expected to work through this process where

7   our expert and their expert would get together to decide what

8   information has to be exchanged and actually do the analysis.

9           If you look at HomeSource's Exhibit A, it's at

10  Docket 30-1, on page 12 of the 15 page attachment there's an

11  email at the bottom that says -- it's from counsel for

12  HomeSource to Mr. Wolek.  The second paragraph says:

13          "We will bring the IP logs that will be compared to

14      the RWS IP addresses against those and it will be

15      attorneys' eyes only HomeSource information."

16          If you look at page 11, at the top there's an email

17  again between counsel where it says a HomeSource employee will

18  bring a HomeSource laptop and software to my office and will

19  perform the search at that time.  Well, we had designated the

20  IP addresses as attorneys' eyes only and --

21          THE COURT:  What's the reason for that designation?

22          MR. WAGNER:  The reason is that RWS considers the IP

23  addresses as highly sensitive business information.  The

24  release --

25          THE COURT:  Why?

1          MR. WAGNER:  -- of which would cause significant

2   harm.  And -- and if I could explain?

3          THE COURT:  Sure.

4          MR. WAGNER:  So, the IP addresses, there are

5   approximately 1,100 or more than 1,000 IP addresses.  Many of

6   those addresses are registered to RWS, but there are a

7   significant number that are not.  They're registered to a data

8   center, they're registered to Amazon Web Services, they're

9   registered to an Internet service provider.  And RWS uses

10  those IP addresses -- have use those IP addresses to conduct

11  market research.

12          So, when we had our last meeting, you gave an

13  example of Web crawlers.  You know, how does Macy's

14  (indiscernible) price that JCPenney charges for pantyhose?

15  You know, some of those IP addresses relate to our market

16  research.  So, if HomeSource employees knew of RWS's IP

17  addresses, they could block those access -- IP addresses from

18  accessing the Websites of their clients.

19          And to put this into perspective, RWS is the largest

20  Website platform used by independent appliance retailers in

21  North America.  And HomeSource, by its own complaint, is a

22  direct competitor.  They took, according to their complaint,

23  200 of RWS's customers away.  If they -- if their employees or

24  their president and CEO is -- who counsel for HomeSource would

25  like to designate to do this search -- got the list of IP

1   addresses, they could block those addresses from being able to

2   conduct market research not just on one Website, but on all

3   those Websites.  They all -- the IP addresses can also be

4   scanned for intelligence about the future business plans of

5   RWS and its customers, which is valuable information to a

6   competitor, and RWS keeps its IP addresses private to protect

7   against malicious attacks.

8           The way HomeSource would have to search for these IP

9   addresses from its logs would be to go entry by entry and

10  enter it into an IP lookup tool, and for some of those

11  addresses it will come back Retailer Web Services.  And for

12  many of those addresses, it will come to these other sources,

13  either the data center, Amazon Web Services, or an Internet

14  service provider.

15          So, we consider this, especially because the parties

16  are direct competitors, especially because HomeSource's key

17  executives, the persons who would do the search, according to

18  Ms. Arena, are James and Greg White, the CEO and president.

19  There's high animosity between the parties.  They claim that

20  RWS caused the attack and they want these executives to do the

21  search.

22          Under the Court's discovery order, which is Docket

23  20, it states that even if this were confidential information,

24  not attorneys' eyes only, confidential material may only be

25  disclosed to the party executives who are required to

1  participate in decisions with reference to the lawsuit.  And

2  that's at section 4(g) in the discovery confidentiality order.

3  It says nothing about their executives acting as investigators

4  to do the search.

5           And according to counsel for HomeSource, she

6  envisions that HomeSource's president and CEO would walk into

7  our office with a laptop of the logs of their data and would

8  then take our list of IP addresses, put those into the laptop

9  computer and compare the two.  If that process occurs, the

10 HomeSource employees will have a copy of RWS's IP addresses,

11 which we believe is protected as attorneys' eyes only

12 material, certainly confidential, and that is not what this

13 part of the discovery confidentiality order would allow.

14          There is nothing in there about allowing your direct

15 competitors to act as investigators and to perform the search

16 and then, at the end of that search, have a copy of all those

17 IP addresses on a HomeSource laptop or to have that

18 information to then go back and block all of our Websites.  Or

19 all of our IP addresses.

20          THE COURT:  Okay.  I understand.

21          Mr. -- I'm sorry.  Ms. Arena?

22          MS. ARENA:  Yes.

23          THE COURT:  What's your response to that?

24          MS. ARENA:  Well, he mentioned a couple things, so I

25 guess I'll go through them and respond one by one.

1          He is focused first on the cyber attacks, these DDoS

2    attacks, but just to be clear, that's not the only claim that

3    we have. That's not the only issue to investigate in discovery

4    in this litigation.  Another claim is that RWS employees may

5    have posed as HomeSource customers using fake identities to

6    gain confidential and propriety information of HomeSource and

7    engage in unfair competition.  So, they have admitted now in

8    discovery that one of their sales employees used a fake name

9    and identity and called HomeSource posing as a HomeSource

10   customer.

11         So, when we go through these logs of who did what in

12   HomeSource's system and we search for RWS's work IP addresses

13   against those logs, it's possible that we'll find that RWS

14   employees are logging in using fake identities, fake names,

15   posing as HomeSource customers, doing things they shouldn't be

16   doing in the system.  And I don't know if that's what he's

17   referring to as market research here, but we're certainly

18   entitled to discovery to find out if that's what's happened.

19         So, their proposal, from what I understand, is that

20   HomeSource doesn't ever find (indiscernible) IPs, is not

21   involved at all, doesn't know what RWS did at any time in

22   their system.  The experts get together, they get a subset of

23   the data that RWS's expert is trying to limit, and they search

24   it and maybe they'll find that RWS committed these cyber

25   attacks, because maybe they haven't given us the IP that was

1    used to do it.  That's just not sufficient.  That's trying to

2    prevent us from determining whether or not unlawful behavior

3    occurred.

4             What we want to do is take our logs of all Websites,

5    all data -- these are terabytes and terabytes of data, tons of

6    irrelevant information.  There's maybe hundreds of customers'

7    Websites and every time someone or anything -- even, like, an

8    automated bot -- goes to that Website, visits it, there should

9    be, like, a log entry, a request was made of the Website with

10   an IP, the Website, the date and time.  We don't have any way

11   of sorting through this easily, separating the good traffic

12   from the bad that easily.  That's not something that's been

13   done.

14            But we've -- I am trying to work with them, believe

15   it or not.  I have proposed that, you know, their expert can

16   come to my office, their expert can come somewhere else that's

17   convenient, we could do a screen share for their expert's

18   convenience.  We can all sit in the room.  We will preserve

19   our data fully.  I've sent out -- I've taken all the measures

20   that I can think of to take to preserve data.  I've sent out

21   the litigation hold notice.  We've both sent out preservation

22   letters.  I've asked them to back up their data repeatedly and

23   save it and store it.

24            So, this whole argument that we don't have to

25   produce discovery because you might manipulate evidence, I

1    mean, that's not a reason to not produce discovery.  That's a

2    -- that's a --

3         THE COURT:  Well, that's not the reason that I'm

4    hearing.  The reason I'm hearing is -- and that's why I asked

5    him why is this attorneys' eyes only.

6         MS. ARENA:  Mm-hmm.

7         THE COURT:  And their argument, which is at this

8    point compelling, is the individuals that you have going

9    through the IP addresses are the executive decision makers.

10   There's something innately --

11        MS. ARENA:  Well, let me respond to that.  Let me

12   respond to that.  I am very flexible on who does that.  The

13   only reason that I said the executive decision makers was --

14   was because that's what they wanted in the protective order.

15   So, they said we don't want them to be public, we want them to

16   be attorneys' eyes only.  And I said, well, I'll agree to a

17   confidential designation.  And they said, well, you can't have

18   any executives or HomeSource employees look at it under the

19   confidential designation.  And I said, well, wait.  How

20   confidential is defined, the executives can look at it.

21        So, that's why I selected the executives, but it

22   doesn't have to be the executives, it could be anybody else at

23   the company.  The thing that -- that I --

24        THE COURT:  Why can't it -- no.  Why are you not

25   answering why it cannot -- why it's inappropriate to be

1   attorneys' eyes only?  That's the --

2            MS. ARENA:  Okay.  Yes.  The --

3            THE COURT:  -- the question.

4            MS. ARENA:  Yeah, I'm sorry.  That's what -- I was

5   trying to get there.

6            And so the thing about an IP address is you can

7   change it tomorrow.  They cost pennies.  They just get a new

8   one.  Apparently, RWS is also an ISP and it's got thousands of

9   IP addresses.  So, it -- all of his arguments as to why it's

10  AEO are HomeSource can't block us in the future, HomeSource

11  can't know what we're doing in the future.  They can just

12  change all of their IPs tomorrow.  All we care about is what

13  happened in the past on our Websites.

14           THE COURT:  All right.  Here's what I just -- maybe

15  I'm not maybe as savvy enough, I'm not sure what's happening

16  with my understanding of this.  I'm going back to what I

17  thought would happen.

18           MS. ARENA:  Mm-hmm.

19           THE COURT:  Plaintiff's expert would show up --

20           MS. ARENA:  Mm-hmm.

21           THE COURT:  -- with the log of who improperly

22  accessed, --

23           MS. ARENA:  Mm-hmm.

24           THE COURT:  -- defendant's expert would show up with

25  its list of IP addresses --

1          MS. ARENA:  Yes.

2          THE COURT:  -- and the two experts would compare and

3    analyze the information.  I don't know why that can't happen.

4          MS. ARENA:  That can happen, except that the logs

5    are so large, and they're HomeSource's, and they're in binary

6    raw format, they're not files.

7          THE COURT:  Someone has to do it.  Someone has to do

8    it.

9          MS. ARENA:  Well, --

10         THE COURT:  HomeSource has to do it.

11         MS. ARENA:  Agreed.  So -- so, the solution is we

12   have a HomeSource employee there, too, to assist the experts

13   in doing it.  And that's what I've been asking for.

14         THE COURT:  Why would the expert need -- let me tell

15   you something.  We have cases in this courthouse -- and I

16   don't know if you've heard about this -- I won't say the name

17   of them -- but these companies who people go after folks who

18   are improperly accessing their proprietary information,

19   downloading -- I guess the most generic thing is downloading a

20   movie without --

21         MS. ARENA:  Yes.

22         THE COURT:  -- without access.

23         MS. ARENA:  Yes.

24         THE COURT:  Right?

25         MS. ARENA:  Very familiar with those cases.  The --

1          THE COURT:  Okay.

2          MS. ARENA:  -- John Doe.

3          THE COURT:  It's not a big deal.  It's not a big

4    deal for the experts to do that.  And we're talking about --

5    and, you know, cases that far exceed what we're talking about

6    here.

7          MS. ARENA:  So, Your Honor, I -- there -- this is

8    not that case.  This is not that -- that type of situation,

9    because what we are comparing RWS's IP addresses against is

10   like a warehouse of documents.  Like, if it was in paper, it

11   would take up a city block.  And most of that paper is private

12   third-party data that's completely irrelevant to this case.

13   So, we can't give them our city block of paper --

14         THE COURT:  You're telling me the experts can't

15   devise an algorithm to run one set of IP addresses against

16   another in, like, minutes?  You're telling me --

17         MS. ARENA:  They can.

18         THE COURT:  You're --

19         MS. ARENA:  They can, but what they're asking us to

20   do is give us their city block of paper to use -- to do with

21   it what they will and that's what we're saying we're not going

22   to do.  You can come in and inspect, you can be involved in

23   the process, we'll listen to all your concerns about

24   fabrication of evidence and preservation evidence and -- and

25   manipulation of data, we'll hear you on all that, we -- we --

1   we don't want to fabricate data or manipulate data.  However,

2   we're not going to turn over all this private third-party

3   material to you, because we can't do that.

4             THE COURT:  And they're not --

5             MS. ARENA:  And we --

6             THE COURT:  -- turning over theirs to you.  That's

7   why we have experts involved.  The experts, as experts --

8   right?

9             MS. ARENA:  Right.

10            THE COURT:  They -- I hope they have agreements with

11  your experts about their utilization of this proprietary

12  information.  Right?

13            MS. ARENA:  Well, our expert --

14            THE COURT:  And --

15            MS. ARENA:  -- doesn't have it yet.  Neither of the

16  -- and I don't have it yet.  No one has it yet, except for

17  HomeSource.

18            THE COURT:  All right.  I'm going to go back to what

19  I -- what I need to ask.  HomeSource experts show up with its

20  list, RWS experts show up with its list, the experts talk

21  about how they're going to do the match, and then the match is

22  done and out comes a list of matches or not.  That list then --

23  so, that's all you all want is the ultimate matches.

24            MS. ARENA:  But, Your Honor, we don't have a list to

25  give them though.  We have, like, a warehouse of paper.  So,

1   how do we -- we can't even get that to them.

2            THE COURT:  How -- so, how do you plan on getting

3   their IP addresses and figuring out if any of their IP

4   addresses hit your information?

5            MS. ARENA:  You have both experts come with the list

6   of RWS IP addresses and sit there and use software, as you've

7   discussed, to compare it against the system, but they're not

8   taking home a copy of the system with them.

9            THE COURT:  No.  The only thing anybody gets at the

10  end of the day are the matches.

11           MS. ARENA:  Correct.  Yeah, we agree with that.

12  They just don't want to either give us the IP addresses,

13  because they -- once you run it against the system, some

14  HomeSource employee will have some copy of their IP addresses

15  in the logs and they're making this -- what -- what I -- I'm

16  sorry -- is a ridiculous argument about IP addresses being

17  AEO, because it -- it -- they -- they say, they've admitted

18  they're using masked IP addresses to go in our system.

19           THE COURT:  Well, wait, and I'm not dealing with

20  that right now.

21           MS. ARENA:  Okay.

22           THE COURT:  Why can't that be done?  Who do you need

23  a copy of it, Mr. Wagner?

24           MR. WAGNER:  Your Honor, there are a couple reasons.

25  One, we asked for -- if you look at our letter, it's document

1   31, Docket 31, on page 3 the experts spoke about this for an

2   hour-and-a-half and at the end of that conference they said

3   that they need three sets of data.  They need all of those IP

4   addresses, and then they need a subset of data deemed to be

5   evidence of malicious activity, and they need a representative

6   sample of the data that's just benign activity.

7          So they have other -- in their complaint, they said

8   that there were specifically two DDoS attacks and a hacking

9   attempt, so I just want to talk about the DDoS attacks right

10  now.  They said that they're -- they had normal traffic, which

11  we're calling benign traffic, and then they had malicious

12  traffic where someone was wasting their resources.  And when

13  you look at the attachment that we submitted with our

14  documents, it's a guide to DDoS attacks.

15         This multistate agency identifies ten different

16  types of DDoS attacks and that they occur through different

17  means and you can't just say, well, you're -- you're an IP

18  address that's on their list, therefore you caused the attack.

19  No, you have to go back -- if you look at that document that

20  we provided, Docket 31, on page -- let me just grab it.  On

21  page 9 it says:

22         "While the main purpose behind a DDoS attack is

23      malicious consumption of resources, different attacks --

24      attackers may use different techniques to generate

25      traffic necessary for an effective DDoS."

1          And if you look at page 10, under the

2    recommendations it says:  "To identify a SYN Flood," -- which

3    is a type of DDoS -- you investigate the network logs and you

4    locate the TCP SYN flag and then you go on from there.

5          On page 12, a UDP Flood.  To identify a UDP Flood,

6    you investigate the network logs and look for a large amount --

7    large number of inbound UDP packets.

8          And then page 14 it says to identify an ICMP Flood,

9    you investigate network logs and look for a significant amount

10   of inbound ICMP traffic from a large number of sources.

11         And I won't go through all of them, but there's

12   another one that says, on page 17, to identify a NTP

13   Reflection Attack with an amplification, and you investigate

14   your network logs and look for inbound traffic with a source

15   port of 123/UDP.

16         So, as you go through this document, it also says

17   that you have to look at the source port.  You know, it's not

18   just that you have someone entering in on your Website that

19   will cause a DDoS attack, you know they have to be using your

20   resource in an inappropriate manner.  The Websites are set up

21   so that they get multiple hits during the day.  You're going

22   to have a lot of benign traffic.

23         But what HomeSource is  saying is that there was a

24   DDoS attack, that there was  actually malicious traffic that

25   negatively impacted the ability of their Websites -- their

1    customers' Websites to operate.  So you have to look at the

2    malicious activity and you have to have a representative

3    sample of the non-malicious activity, the benign activity, to

4    compare the two.

5           THE COURT:  All right.  So, Ms. Arena, does your

6    expert agree with this stuff?

7           MS. ARENA:  So, everything he just said relates to

8    our cyber attacking claim, which is one of four different

9    claims in this case at issue which we're trying to get

10   discovery on.  So, my expert agrees that for the cyber

11   attacking claim the experts have to at some point come

12   together and discuss malicious traffic versus non-malicious

13   traffic.  However, if RWS's IPs are searched in the system and

14   we see that those IPs are going boom, boom, boom, boom every

15   second for 48 hours, I think we can all say, okay, this looks

16   malicious, this doesn't look like normal Internet activity.

17          Now, because I don't have the IPs, they haven't

18   given us IPs, I don't know.  But, no, we wouldn't need to go

19   through all of these hoops at all depending on what the search

20   results were.

21          THE COURT:  How about a sample?  How about a sample?

22          MS. ARENA:  It's --

23          THE COURT:  How about you all agree on a sample?

24          MR. WAGNER:  Your Honor, this is Bill Wagner.

25          THE COURT:  A statistically significant sample.

1           MR. WAGNER:  Your Honor, that was the agreement at

2    the -- during the experts' discussion.  Mr. Tuten, Kevin

3    Tuten, who is HomeSource's expert, was going to go back to

4    HomeSource and see whether they could narrow down their data

5    to produce these two samples and do so in a manner that they

6    could have a chain of custody to prove that it was an

7    authentic set.  We --

8           MS. ARENA:  Well, --

9           MR. WAGNER:  And when we had the conference, our

10   expert said, you know, it's just data.  We can run an

11   algorithm, we can pull out the IP addresses, we can then

12   compare the IP addresses to RWS addresses.  It's simple stuff.

13   Just like you said, it can be done in an afternoon.

14          We were hoping that Mr. Tuten -- we would have a

15   follow-up call on the call 15th -- the expert meeting was on

16   the 14th.  We were hoping for a call on the 15th to say, yes,

17   we can get these two sample datas or we'll have an -- or no we

18   can't and let's figure out what's next.

19          But our expert believes that --

20          MS. ARENA:  May I -- may I --

21          MR. WAGNER:  -- they can -- they can narrow the --

22   the data down and run the algorithm in a day.

23          THE COURT:  All right.  Ms. Arena?

24          MS. ARENA:  Yes.  So, I think that what they wanted

25   to do is only run the RWS IPs against the sample.  So, our --

1  the DDoS attack sample.  And we're not just interested in only

2  the DDoS.  We're also interested in everything else RWS may

3  have done in the system.  So we want to run the RWS IPs

4  against the entire data set, which --

5       THE COURT:  Yes, but that may be the end game, but I

6  think at this stage you have to show some significance to it.

7  Because what I'm hearing is, I mean, this is -- so, you have

8  to have proportionality.  That's what I'm hearing.  There's a

9  big proportionality issue with this.  One of the ways to

10  address proportionality is by do sample sizes -- a sampling.

11       MS. ARENA:  So, just to step back for a second.  If

12  RWS lied and said they were a HomeSource customer and claimed a

13  HomeSource username and password as a customer without

14  authorization and was logging into our system from their

15  offices, that's legally actionable, that falls within the

16  scope of our complaint, that would not show up in the sample.

17  Why can't we have discovery to know if they did that or not?

18       THE COURT:  Because it does not seem proportional

19  given the breadth and scope of what's at issue here.  I'm not

20  saying you don't get it eventually, but I think you have to

21  make a showing that such a thing happened.

22       MS. ARENA:  Well, they already admitted that they --

23  that their sales employee called and used a fake identity

24  asking for access to the HomeSource system.

25       THE COURT:  How many sales people did that?

1          MS. ARENA:  Well, we have a voice recording of one

2     that we've produced to them in this litigation and they've

3     acknowledged he used a fake name and identity.

4          THE COURT:  That's (indiscernible) --

5          MR. WAGNER:  (Indiscernible) --

6          THE COURT:  -- the voice?

7          MS. ARENA:  That's what?

8          THE COURT:  That doesn't answer my question at all.

9     Unless you're telling me it's only one.  And I wasn't only

10    asking that question of you, I was asking them, because you

11    said -- prefaced that statement by they have already admitted.

12         So my question mainly is to Mr. Wagner.  How many

13    salespeople have engaged in this behavior?  If you don't know,

14    say you don't know.  I'm not looking for an explanation.  Yes,

15    no, or I don't know.  Those are the only three answers I want

16    to hear.

17         MR. WAGNER:  My answer is I don't know.  I believe

18    that Alexis is correct that one -- there was one employee that

19    said he posed as a potential customer.  I have not heard of

20    anyone posing as an actual customer and using access.

21         But be that as it may, the issue really goes back to

22    attorneys' eyes only.  If their -- if we disclose our list of

23    IP addresses to their expert, their expert could use it for

24    discovery, but, you know, that -- we do not want our IP

25    addresses being disclosed to RWS [sic], their employees --

1          THE COURT:  And that's the short answer, isn't it,

2   Ms. Arena?  For now?

3          MS. ARENA:  Yes, but I think they can just change

4   their IP addresses tomorrow and then there's no issue.  I

5   think HomeSource is entitled to know what they did in their

6   system.

7          THE COURT:  I'm confused by that.  I don't -- not

8   confused.  I don't understand that.

9          MS. ARENA:  So, all we want to do is see what RWS

10  did on HomeSource's Websites in the past.  And that's all --

11         THE COURT:  Right.

12         MS. ARENA:  -- that the IP addresses would tell us.

13  So, all they -- all RWS is producing is -- it's not a warehouse

14  of data, it's just a list of IPs.

15         THE COURT:  Right.

16         MS. ARENA:  That's all that we're getting from them.

17  And all -- we could have some low-level HomeSource employee

18  search the warehouse of documents and say, well -- with the

19  experts there -- this is where RWS's IPs came up, this is what

20  they did in the system in the past.  And then RWS could change

21  all of its IPs going forward very easily.

22         THE COURT:  So what?  So what?  I'm confused.

23  Because I can't deal with future, perhaps, if that happens.

24  Right?  We're talking about discovery based on allegations in

25  a complaint that has already been filed.

1          So tell me why, if they go tomorrow and take -- if

2   they go tomorrow and change IP addresses how that hinders the

3   complaint in some way.

4          MS. ARENA:  It doesn't.  I think -- my point is that

5   he's arguing that we cannot have the IPs, because we could use

6   them nefariously in the future.

7          THE COURT:  Okay.

8          MS. ARENA:  And my response is they're not AEO, he

9   could just change them.  There's nothing prevent --

10         THE COURT:  But, no, they're going to be AEO,

11   because I can't resolve this in any other way that makes sense

12   to me.  The only way we move this forward now, rather than

13   waste an incredible amount of additional time, is designate

14   this information as attorneys' eyes only through the experts.

15   Through the experts.  Right?

16         So, inherently, obvious -- well, obvious to me

17   anyway.  Sometimes things aren't so obvious to everybody.  But

18   obvious to me, is that the experts really have to be engaged

19   in this data search, for lack of a better word for me.

20         MS. ARENA:  Okay.  I -- I mean, I have to -- I have

21   to respond to that, because we can't -- first of all, I hope

22   that you're not saying we're going to give them the warehouse

23   of data, because then I've got to deal with am I violating all

24   these privacy agreements with third parties.

25         THE COURT:  Tell, me how the -- excuse me.  You're

Colloquy                                    27

1    going to get IP addresses from RWS.

2            MS. ARENA:  Right.  A list.

3            THE COURT:  A list.  RWS's expert shows up wherever

4    with HomeSource's expert.

5            MS. ARENA:  Right.

6            THE COURT:  The two of them run this match, whatever

7    it is, --

8            MS. ARENA:  Right.

9            THE COURT:  -- and then out comes data hits.

10           MS. ARENA:  Yes.

11           THE COURT:  This is really what we're after.

12           MS. ARENA:  Yes.

13           THE COURT:  Whatever those data hits are is

14   ultimately the information you want, that for now will be

15   attorneys' eyes only.

16           MS. ARENA:  Yes.  So, if they're --

17           THE COURT:  Right?

18           MS. ARENA:  -- not going to take --

19           THE COURT:  The RWS expert and the HomeSource expert

20   will not disclose this information to anyone.

21           MS. ARENA:  So, then they search the RWS IPs,

22   there's going to be a record of that in the system that

23   HomeSource can see.

24           THE COURT:  How is HomeSource going to see it if its

25   expert doesn't tell them?

1          MS. ARENA:  Because it's their data.  So, when they

2    search for it --

3          THE COURT:  Oh, yes, HomeSource can see.  Yeah, but

4    how is --

5          MS. ARENA:  HomeSource.

6          THE COURT:  -- RWS going to know?

7          MS. ARENA:  RWS won't know and I -- and I don't

8    think we should give them the logs.  I think we should do it

9    exactly as you're describing right now.  That -- that we --

10   basically, it's akin to when the client has a warehouse of

11   paper and the opposing party gets the right of inspection and

12   you bring the opposing party over and experts are there and

13   you say, hey, look through my warehouse --

14         THE COURT:  Right.

15         MS. ARENA:  -- and review that, and then they go

16   home.

17         THE COURT:  Okay.

18         MS. ARENA:  But RWS doesn't want that.  Right?

19         MR. WAGNER:  Your Honor, Bill Wagner again.  The

20   hiccup seems to be that HomeSource's counsel wants the

21   inspection to occur on a HomeSource computer.  And this is the

22   same laptop that they were going to bring to their office with

23   the IP logs.  We don't want --

24         THE COURT:  Well, computer data -- I'm sorry.  I'm

25   sorry.  I just had this thought and I apologize I'm cutting

1   you off.

2          Is there a way to mirror image, and that way it's

3   not -- HomeSource won't be able to see?

4                      (Extended pause)

5          THE COURT:  So, if the expert takes a mirror image

6   of all this data, --

7          MS. ARENA:  Mm-hmm.

8          THE COURT:  -- downloads it onto a laptop, --

9          MS. ARENA:  Mm-hmm.

10          THE COURT:  -- that expert brings that laptop with

11   the mirror image of the data, RWS's expert brings its stuff

12   with a mirror image of its data, they then run the algorithms,

13   whatever the tech they are, and the matches come out or not.

14   Right?  The matches are the matches.  So, the algorithm --

15   assuming there are matches.  Maybe there aren't any.  Right?

16          MS. ARENA:  Mm-hmm.

17          THE COURT:  But any overlapping information will be

18   identified as a result of that.  So, you're not on the

19   HomeSource mainframe or whatever they call that now, and

20   you're not on the RWS mainframe, whatever they call that now,

21   you're actually running the data against mirror images.

22          MS. ARENA:  I can see if that can be done.  I can --

23          THE COURT:  You have an expert on the phone.  Ask

24   the expert on the phone.  Ms. Bayuk?

25          MS. BAYUK:  Yes, yes.  Of course that can be done.

Colloquy                                                    30

1        MS. ARENA:  The only -- so, I'm sorry, just to

2   clarify it.  So Your Honor is not proposing that they're going

3   to take home our data.  They're not going to take home our

4   warehouse.

5        THE COURT:  Nobody is taking home anything.  The

6   experts will -- one expert will come with the mirror image of

7   this -- all right.  Let me be more specific because we are on

8   the record.

9        RWS's expert will show up somewhere of your choosing

10  with a laptop that contains a mirror image of all the IP

11  addresses of RWS.  HomeSource's expert is going to show up,

12  same place, same time, same church, same pew, with a laptop

13  with a mirror image of all of HomeSource's data.  The experts

14  will then -- I assume in the same room.  And when I say same

15  room, I'm not talking physically; right?  Will then run the

16  algorithms to see if there are matches between IP addresses

17  from RWS and the IP addresses HomeSource is concerned about,

18  look for hacking and improper access.  Those algorithms run,

19  and all things being equal, the equation ends with these are

20  the matches.

21                      (Extended pause)

22        THE COURT:  Two individuals will have that on their

23  laptops.  It will be subject to attorneys' eyes only.  For

24  everybody.  And the resultant search will also be subject to

25  attorneys' eyes only.

1          MS. ARENA:  So, Your Honor, I -- just to clarify.

2    You're proposing that RWS's expert get all of our data on the

3    laptop or just see it?  Just inspect it.  Is it an inspection

4    or is it to get it, receive it as for production?

5          THE COURT:  You're the one telling me it's a 500

6    block radius of --

7          MS. ARENA:  Right.  I know.

8          THE COURT:  How is -- how is that going to happen?

9    You know he has to see it.  But this is an expert, not an

10   employee of RWS, who you all have to engage in a process where

11   they don't share the information.  The ultimate information.

12   They come out -- the two experts have to come up with a way to

13   do this.  There is no other way.  There's no other way.

14         But it's a mirror image.  Right?  Then you're not

15   accessing at the same time the warehouse.  You've actually

16   taken a photograph of the warehouse.

17         MS. ARENA:  I just want to clarify that their expert

18   isn't keeping the photograph of the warehouse.

19         THE COURT:  No, but -- all right.  And -- and then

20   now we're talking mission impossible and the laptops explode

21   when this is done.  I don't know -- I don't know how that

22   happens.  But after they're done, the proprietary information

23   of both parties, RWS and HomeSource, is now no longer

24   available and the experts have to assure each other that their

25   own client's information is no longer available to the other

1   side.

2         MS. BAYUK:  This is Jennifer Bayuk.  I am confident

3   that Kevin Tuten, the HomeSource expert, and I can come up

4   with a procedure that we could in advance lay out that would

5   satisfy those requirements.

6         THE COURT:  Thank you.  It takes some time and takes

7   some thinking.  I know you can do this.  And this is from a

8   criminal aspect -- side of work that I do.  That's why I know

9   it can be done.

10                    (Extended pause)

11        THE COURT:  There's your charge.  I'm done.

12        Protocols to be identified and come to by the

13  experts and signed off by the parties prior to the search.

14        Have a good day.

15        MR. WAGNER:  Thank you, Judge.

16        MS. ARENA:  Thank you.

17        MR. LIPMAN:  Thank you, Judge.

18               (Conference adjourned at 11:48 a.m.)

19                    * * * * * * * * *

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2            I, TERRY L. DeMARCO, court-approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter recorded on November 28, 2018 from 11:03:57

6    a.m. to 11:48:14 a.m.

7

8

9    _____12/04/18_____            *S / Terry L. DeMarco*_____

10          Date                       Terry L. DeMarco, AD/T 566

11                                     KLJ Transcription Service

12

13

14

15

16

17

18

19

20

21

22

23

24

25