# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE HOMESOURCE, CORP.<br><br>                Plaintiff,<br><br>   vs.<br><br>RETAILER WEB SERVICES, LLC,<br>LOCAL RETAIL SOLUTIONS, LLC,<br>RETAILER WEB SERVICES II, LLC, and<br>JOHN DOE,<br><br>            Defendants. | Case No. 1:18-cv-11970 |

## <u>SECOND AMENDED COMPLAINT</u>

1.      Plaintiff The HomeSource, Corp. ("HomeSource") amends its Complaint pursuant to Federal Rule of Civil Procedure 15 to assert claims against the related entities Retailer Web Services, LLC, Local Retail Solutions, LLC, and Retailer Web Services II, LLC (collectively "RWS").

2.      HomeSource filed its initial complaint against Retailer Web Services, LLC for false advertising, defamation, tortious interference with commercial relationships, and unfair competition.  Both HomeSource and RWS provide competitive technology services, including but not limited to operating websites for the same types of retail store customers.

3.      In late 2017, HomeSource launched a product that directly competes with RWS's product and began to quickly acquire RWS customers.  On July 16, 2018, for example, HomeSource moved approximately 200 customers from RWS's platform to HomeSource's platform.

4.      The same day, RWS began a smear campaign designed to unfairly disparage HomeSource and deceive its customers.  RWS published false and misleading statements about

HomeSource in newsletters distributed via email over the next few days to HomeSource's customers and potential customers.  RWS further contacted HomeSource's customers and potential customers by telephone regarding the same issues.

5.      On or about July 19, 2018, RWS misrepresented security vulnerabilities of HomeSource's data and intellectual property to third parties.  RWS emailed HomeSource notice of a "security hole" in HomeSource's software at 11:59 p.m., and then uploaded a video at 1:33 a.m. just hours later advertising the "security hole" to the public.

6.      On July 20, 2018, RWS sent out the newsletter attached as Exhibit A to the parties' customers and potential customers.  This lawsuit followed on July 23.

7.      Between August 9, 2018 and September 5, 2018 (after the filing of HomeSource's Amended Complaint), HomeSource was the victim of various cyberattacks, as explained more fully below.

8.      HomeSource brings this second amended complaint against RWS for tortious interference with commercial relationships, false advertising, defamation, unfair competition and violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

9.      As a result of RWS's unlawful actions and John Doe's unlawful actions, HomeSource has lost customers and its reputation has been unfairly damaged in an amount to be determined at trial.

## PARTIES

10.      Plaintiff HomeSource is a New Jersey corporation with its principal place of business at 420 Ganttown Road, Sewell, NJ 08080.

11.      Defendant Retailer Web Services, LLC is an Arizona limited liability company with a principal place of business at 15615 N. 71ST Street, Suite 205, Scottsdale, AZ 85254.

7100687 v3

12.     Defendant Retailer Web Services II, LLC, is a Delaware limited liability company with a principal place of business at 15615 N. 71ST Street, Suite 205, Scottsdale, AZ 85254.

13.     Defendant Local Retail Solutions, LLC, is a Delaware limited liability company with a principal place of business at 15615 N. 71ST Street, Suite 205, Scottsdale, AZ 85254.

14.     Thus far, discovery has revealed that Local Retail Solutions, LLC, and Retailer Web Services II, LLC, are related entities to Retailer Web Services, LLC.  Discovery is continuing as to the exact relationships between these three entities.

15.     At this time, HomeSource does not know the identity of John Doe, who is the person(s) who conducted the DDoS attacks against HomeSource's websites.

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction over HomeSource's federal claims pursuant to 28 U.S.C. §§ 1331, 1338(a).

17.     This court has personal jurisdiction over defendants RWS because RWS is engaged in the systematic and continuous conduct of business in the State of New Jersey. RWS's conduct in connection with the State of New Jersey required it reasonably to anticipate that it would be subject to the jurisdiction of the courts in the State of New Jersey.

18.     Upon information and belief, this court has personal jurisdiction over defendant John Doe because Doe expressly aimed tortious conduct at HomeSource, a New Jersey corporation, via the internet such that defendant could reasonably anticipate being haled into district court in New Jersey due to his or her tortious conduct.

19.     Venue in the District of New Jersey is proper under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.     HomeSource and RWS**

20.     HomeSource provides software and data solutions for retailers and manufacturers.

3

21.     HomeSource's proprietary software aggregates large amounts of data – including item numbers, product specs, training videos, and more – into one single, usable platform, which allows retailers and manufacturers to streamline various processes such as printing customized quotes, providing accurate shipping times, and real-time updating of sizes, colors, and options so dealers always have current and accurate information at their fingertips.

22.     Upon information and belief, RWS offers a competitive tool called "RetailDeck/WebFronts."  Prior to HomeSource's competitive tool, RWS had a virtual monopoly in this area.

23.     Around August 2017, GridIron Capital ("GridIron"), and Nationwide Marketing Group ("Nationwide"), considered investing in HomeSource, and all three parties entered into a non-disclosure agreement ("NDA").

24.     Through the due diligence process, GridIron and Nationwide acquired a great deal of sensitive, proprietary information about HomeSource, its software, financial information, and legal history.

25.     GridIron and Nationwide ended up not investing in HomeSource, but they did invest in RWS, according to a press release from February 24, 2018.

26.     Upon information and belief, GridIron, Nationwide and RWS are now all related entities.

27.     In 2018, HomeSource moved hundreds of customers from RWS's platform to HomeSource's platform.

28.     These customers are predominantly local retailers that sell appliances, electronics, and furniture through a brick and mortar store and a website.

29.     HomeSource provides these customers with e-commerce solutions for their websites through its pricing-lookup tool and software.

30.    Upon information and belief, RWS has delayed and/or ignored requests from RWS's former/current customers to have their domains released so they can be transferred to HomeSource's platform.

**B.    RWS's False and Misleading Advertising and Tortious Interference**

31.    On or about July 20, 2018, RWS's CEO Jim Kane and COO Jennie Gilbert emailed a newsletter to HomeSource's customers and potential customers which contained materially false and misleading statements about HomeSource.  *See* July 20th Newsletter, attached as Exhibit A to HomeSource's Complaint.

32.    Under the heading, "Has HomeSource ever done anything like this before?", RWS stated, "The White family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them.  They were found guilty of making **negligent misrepresentations about the capabilities of their software in a federal lawsuit** (Civil Action NO. 3:12-CV-0090)."

33.    The text "Civil Action NO. 3:12-CV-0090" contains a hyperlink to Judge Graham Mullen's Order ("Graham Order") on a motion for attorney's fees in the case of *Furniture Distributors, Inc. v. Software Support-PMW, Inc.* ("Furniture Lawsuit").

34.    HomeSource was not a party in the Furniture Lawsuit and was not found "guilty" of making negligent misrepresentations about the capability of their software.

35.    No member of the White family was a party in the Furniture Lawsuit, and no member of the White family was found "guilty" of making negligent misrepresentations about the capability of their software.

36.    RWS further misrepresented: "The judge later deemed the counter-claims they alleged along the way 'totally meritless' and ordered them to pay Furniture Distributors, Inc.

5

fifty thousand dollars to reimburse attorney fees in addition to the four hundred fifty thousand dollars already awarded them at trial."

37.     RWS's use of "they" implies that HomeSource and the White family filed these counterclaims, but once again, they were not parties to the lawsuit, and it was actually Software Support-PMW, Inc. who filed these counterclaims in the action.

38.     The Graham Order does not mention HomeSource or the White family at all.

39.     RWS's newsletter misleadingly and falsely implies that HomeSource and/or its owners were found "guilty" of negligent misrepresentations, but they are not even parties to this lawsuit, and the Graham Order deals with a motion for attorney's fees.

40.     RWS goes on to state in the newsletter: "Despite the ruling, **Furniture Distributors Inc sued Homesource again when Homesource failed to make any of the payments ordered** (Case 3:15-CV-00313)."

41.     The text "Case 3:15-CV-00313" contains a hyperlink to a Complaint filed in the United States District Court for the Western District of North Carolina, *Furniture Distributors, Inc. v. James R. White, Jr.; James R. White, Sr.; Phyllis M. White; Gregory L. White; Courtney Murnane; Software-Support PMW, Inc.; The Homesource, Corp.; BBJ Corp., and Centerspec, LLC*.

42.     RWS falsely states that HomeSource was sued for a second time by Furniture Distributors, Inc., but HomeSource was not a party to the original Furniture Lawsuit.

43.     RWS falsely states that HomeSource failed to make any of the payments ordered, but HomeSource was not ordered to make any payments and it was not a party to the prior lawsuit.

6

44.     RWS misrepresented that HomeSource failed to make payments in order to intentionally disparage HomeSource's business and damage its relationship with its customers and potential customers.

45.     RWS further misrepresented that Martin Salas was a consultant hired by HomeSource, but HomeSource never hired or entered into any contract with Martin Salas directly.

46.     Upon information and belief, after HomeSource filed the initial complaint in this action, RWS continued to make false, misleading, and/or defamatory statements about HomeSource to HomeSource's customers, potential customers, and third parties.

**C.     RWS Misrepresented Security Vulnerabilities and Tried to Pose as a Customer to Acquire Access to HomeSource's Systems**

47.     On July 19, 2018, at 11:58 p.m., Jim Kane, CEO of RWS, emailed HomeSource and Ken Miele, of ADC, to point out a potential security hole and vulnerability in HomeSource's systems.

48.     Less than two hours later, RWS emailed the July 20th Newsletter to HomeSource's customers which states: "Our investigation unearthed a possible major security concern with HomeSource sites."  *See* Exhibit A.

49.     The July 20th Newsletter contained a link to a short video where Jim Kane explains how he believes one could hack into HomeSource's system, and he provides the steps one could take in order to do it.

50.     The video misrepresents the security of customers' files and alleges that they are publicly available, when in fact, HomeSource does not store customer information in this "bucket" or online folder.

7100687 v3

51.     A RWS employee left a voicemail for HomeSource in which he posed as a potential customer named Tony Bosco, who claimed to be opening a store for furniture and appliances called Kensington Appliance and Furniture, in order to deceive HomeSource and gain access to their data and methods.

**D.     John Doe Launched DoS and/or DDoS Attacks against HomeSource's Customers' Websites**

52.     Beginning in August 2018, John Doe deployed several DoS and DDoS attacks through the use of bots and/or programs that only targeted HomeSource's customers who also used to be customers of RWS.

53.     In these DoS and DDoS attacks, the bots and/or programs would continually view the websites and run hundreds and thousands of searches in an effort to overload HomeSource's computer systems and software and crash the websites.

54.     Upon information and belief, John Doe's attacks came out of Scottsdale, Arizona, the same location as defendants RWS, due to the exponentially disproportionate volume of traffic coming out of the location.

55.     John Doe hid its operating system, browser, and many parts of its digital fingerprint when launching the attacks in order to conceal its identity.

56.     John Doe also deployed bots which are programmed to continually send hundreds and thousands of requests for service upon a single website in order to crash it, or at the very least, severely slow it down for other consumers trying to use the site.

57.     John Doe has launched thousands of DoS and/or DDoS attacks against HomeSource's customers since the beginning of August 2018.

58.     The only HomeSource customers that have been victimized by these attacks were all former customers of RWS, as HomeSource's remaining customers were not targeted.

8

59.     HomeSource subpoenaed GoDaddy in an attempt to identify John Doe, because John Doe used a GoDaddy account to deploy the DDoS attacks.

60.     GoDaddy has informed HomeSource that GoDaddy cannot identify John Doe, because the GoDaddy account used was compromised at the time the attacks occurred.

61.     Upon information and belief, John Doe hacked a GoDaddy account and then used that GoDaddy account to commit the DDoS attacks.

**E.      RWS Used HomeSource's Customer Names and Passwords to Log in to HomeSource's Systems as a HomeSource Customer, Without Authorization.**

62.     HomeSource has given usernames and passwords to certain of its customers, who pay for access to HomeSource's services.

63.     HomeSource only provides this access after each customer agrees to its Terms and Conditions, which require that the customer keep the username and password secure, and not provide the username and password to any other party.

64.     RWS has used the username and passwords of two HomeSource customers without authorization.

65.     RWS has logged into HomeSource's websites and obtained HomeSource's proprietary information without authorization, under the false pretense that RWS was logging in as a HomeSource customer.

**F.      RWS Designed and Deployed Software (Spiders or Crawlers) Specifically to Monitor and Download Information From HomeSource's Websites, For the Purpose of Disrupting HomeSource's Business and Gaining an Unfair Competitive Advantage.**

66.     RWS concealed its identity when visiting HomeSource's websites through the use of a proxy server and virtual private network.

67.     Through discovery, HomeSource learned that RWS designed and deployed software ("spiders" or "web crawlers") to monitor and download information from

HomeSource's websites for the purpose of disrupting HomeSource's business and to gain an unfair competitive advantage.

68.     RWS engaged in this conduct despite knowing that it was unlawful and expressly prohibited.

69.     This conduct did cause damage to HomeSource's websites.

**G.     RWS Conspired to Hack HomeSource's Websites.**

70.     Three HomeSource websites were hacked on August 13, 2018.

71.     HomeSource was scheduled to meet with one of RWS's largest customers the next day on August 14, 2018, and RWS was aware that this meeting was going to occur.

72.     Around the time of the hack on August 13, 2018, RWS ran a spider script against the three hacked websites.

73.     In the days just prior to August 13, 2018, RWS was monitoring those three websites in a manner that would alert RWS when the websites were altered.

74.     Based on RWS's internet activity on those three sites, RWS was aware that the websites were going to be hacked before those websites were actually hacked on August 13.

**<u>Count I – False and Misleading Advertising under the Lanham Act, 15 U.S.C. § 1125 (a) against RWS</u>**

75.     HomeSource repeats and incorporates all other paragraphs of this Complaint as if fully set forth herein.

76.     Section 1125(a) of Title 15 of the United States Code states, in pertinent part, the following:

> Any person who, on or in connection with any good or services, … uses in commerce any word, term, name, symbol, … or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact… which – in commercial advertising or promotion, misrepresents the nature, characteristics, qualities… of another person's goods, services, or commercial

10

activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

77.     RWS's use of "HomeSource" in connection with materially false and misleading statements about HomeSource's reputation, legal history, security, and the quality of its goods and services, constitutes commercial advertising that misrepresents the nature, characteristics, and qualities of HomeSource's goods, services, and commercial activities.

78.     RWS's conduct in disseminating emails and newsletters and placing phone calls to HomeSource's customers and potential customers with materially false and misleading statements about HomeSource constitutes false advertising and unfair competition.

79.     RWS's conduct constitutes false and misleading advertising in violation of 15 U.S.C. § 1125(a).

80.     HomeSource has no adequate remedy at law.  RWS's conduct has caused, and if not enjoined, will continue to cause irreparable damage to the rights of HomeSource, its brand, reputation and goodwill.

81.     As a result of RWS's conduct, HomeSource has been damaged.

**Count II – Defamation against RWS**

82.     HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

83.     By engaging in the above-described conduct, RWS defamed HomeSource including, without limitation, by directly publishing and distributing emails and newsletters that deliberately, or at the very least negligently, (i) contain statements that are defamatory in nature and character; (ii) were published and disseminated by RWS to third parties, including HomeSource's customers and potential customers; (iii) were understood by their recipients to

apply to HomeSource and to be defamatory; and (iv) caused special harm to HomeSource by virtue of such publications.

84.     RWS's statements contained in the emails and newsletters impute both civil offenses and business and professional misconduct to HomeSource – including, but not limited to, allegations that HomeSource was found liable of negligent misrepresentation and allegations that HomeSource failed to pay a prior customer despite a court order.

85.     RWS's statements contained in the emails and newsletters are the kind that would be particularly harmful to a business involved in e-commerce.

86.     The statements contained in the emails and newsletters have caused and will continue to cause substantial pecuniary and reputational harm to HomeSource.

87.     As a result, RWS is liable to HomeSource for damages caused by RWS's conduct.

### Count III – Tortious Interference with Prospective Economic Advantage against RWS

88.     HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

89.     HomeSource had a protected interest in its reasonable expectation of economic advantage, as it relates to HomeSource's prospective economic interests with potential customers of its goods/services.

90.     RWS willfully, maliciously, and intentionally interfered with HomeSource's prospective economic advantage by publishing materially false and misleading statements about HomeSource in newsletters and emails that RWS sent to HomeSource's potential customers, HomeSource's customers, and its customers' buyers.

91.     RWS further willfully, maliciously and intentionally interfered with HomeSource's prospective economic advantage by engaging in the various unlawful cyber activities set forth above.

92.     RWS willfully, maliciously and intentionally interfered with HomeSource's prospective economic advantage by logging into HomeSource's websites using other companies' usernames and passwords, without authorization from HomeSource.

93.     RWS's conduct was without justification.

94.     RWS's conduct caused HomeSource a loss of prospective economic gain.

95.     As a direct and proximate result of RWS's conduct, HomeSource has been and continues to be damaged.

96.     By reason of the foregoing, HomeSource is entitled to injunctive relief, treble damages, attorneys' fees and costs, and further relief as the Court deems just and proper.

**Count IV – Tortious Interference with Contract against RWS**

97.     HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

98.     RWS was fully aware of the contractual relationship existing between HomeSource's customers and HomeSource, including the fact that a valid and enforceable contract existed between these parties, and RWS was a not a party to this contractual relationship.

99.     RWS willfully and intentionally interfered with the contractual relationship by publishing materially false and misleading statements about HomeSource in newsletters and emails that RWS sent to HomeSource's customers, and its customers' buyers.

13

100.    RWS further willfully, maliciously and intentionally interfered with HomeSource's contractual relationships with its customers by engaging in the various unlawful cyber activates set forth above.

101.    RWS willfully, maliciously and intentionally interfered with HomeSource's contractual relationship with its customers by logging into HomeSource's websites using customers' usernames and passwords, without authorization from HomeSource.

102.    RWS's conduct is without justification.

103.    As a direct and proximate result of RWS's conduct, HomeSource has been and continues to be damaged.

104.    By reason of the foregoing, HomeSource is entitled to injunctive relief, treble damages, attorneys' fees and costs, and further relief as the Court deems just and proper.

### Count V – Common Law and Federal Unfair Competition against RWS

105.    HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

106.    RWS's conduct constitutes unfair competition, in that RWS is attempting to benefit commercially by stealing HomeSource's customers through publishing materially false and misleading statements about HomeSource.

107.    RWS's wrongful conduct arises directly out of and is connected to its advertising activities.

108.    RWS's conduct further constitutes unfair competition because RWS engaged in the various unlawful cyber activities set forth above.

109.    RWS's conduct in logging into HomeSource's websites using other companies' usernames and passwords, without authorization from HomeSource, also constitutes unfair competition.

14

110.    RWS's conduct in pretending to be a potential HomeSource customer and HomeSource customers constitutes unfair competition.

111.    RWS's conduct in conspiring to hack and/or promoting the hacking of HomeSource's websites constitutes unfair competition.

112.    The aforementioned acts constitute unfair competition against HomeSource under 15 U.S.C. § 1125.

113.    HomeSource has been and continues to be damaged by RWS's activities and conduct.  Accordingly, HomeSource is entitled to recover its damages, pursuant to 15 U.S.C. §1117(a).

114.    Unless RWS's conduct is enjoined, HomeSource and its goodwill and reputation will suffer irreparable injury which cannot be adequately calculated or compensated solely by money damages.

115.    By reason of the foregoing, HomeSource is entitled to injunctive relief, treble damages, attorneys' fees and costs, and further relief as the Court deems just and proper.

### Count VI – Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) against RWS

116.    HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

117.    The Computer Fraud and Abuse Act ("CFAA") prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use.  It creates criminal and civil liability for whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer." 18 U.S.C. § 1030(a)(2)(C).

15

118.    A defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly.

119.    RWS never had permission from HomeSource to log in to HomeSource's systems and review non-publicly available information as a HomeSource customer, using the username and password of another company.

120.    HomeSource requires its customers to proactively agree to its Terms before logging in, which prohibit giving out the customers' username and password.

121.    RWS logged in to HomeSource's websites using another company's username and password, despite understanding that such conduct was expressly prohibited and unauthorized.

122.    RWS's conduct caused damage to HomeSource and violated the CFAA.

## Count VII – Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A) against Defendant John Doe

123.    HomeSource repeats and incorporates each paragraph of this Complaint as if set forth fully herein.

124.    John Doe coordinated several DoS and DDoS attacks against HomeSource's computers systems and HomeSource's customers' websites that were designed to interfere with interstate commerce by dramatically slowing down and/or crashing the websites.

125.    Through his or her conduct, John Doe knowingly caused the transmission of a program, information, code, or command with the intent to cause damage, without authorization, to a protected computer system.

126.    HomeSource's computer system and customers' websites are a protected computer under the CFAA because they are used in interstate commerce.

127.    As a direct result of John Doe's conduct, HomeSource has suffered at least $5,000 in damages in the past year through analyzing, investigating, and responding to the hacking, DoS, and DDoS attacks.

128.    By reason of the foregoing, HomeSource is entitled to injunctive relief, damages, attorneys' fees and costs, and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HomeSource prays for relief and judgment, and requests that the Court:

(A)    enter judgment against RWS and John Doe and in favor of HomeSource with respect to each claim for relief alleged in this Complaint;

(B)    award HomeSource injunctive relief, treble damages and its costs and attorneys' fees, pursuant to the Lanham Act; and

(C)    award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff, The HomeSource, Corp., hereby demands a trial by jury for all issues that are so triable.

Respectfully submitted,

**FLASTER/GREENBERG P.C.**

Dated: February 8, 2019               By:   */s/ Alexis Arena*
                                            Alexis Arena, Esq.
                                            Eric R. Clendening, Esq.
                                            1810 Chapel Avenue West
                                            Cherry Hill, NJ 08002
                                            (856) 661-1900
                                            Fax:  (856) 661-1919
                                            alexis.arena@flastergreenberg.com
                                            *Attorneys for Plaintiff*

# EXHIBIT A

**From:** RetailDeck <info@RetailerWebServices.com>
**Date:** July 20, 2018 at 1:33:39 AM EDT
**To:** ▮▮▮▮▮▮▮▮▮▮
**Subject: another update: what's happening with RetailDeck and ADC**

A lot has happened in just a few short days. Here are the latest developments from today, July 19th.

Email not displaying correctly?
View it in your browser.

2





**Breaking News: new communication from ADC**

As of this evening, we still haven't received any communication directly from Ken Miele. We are still anxious to receive an answer to those three simple and important questions.  But we did receive this email from the ADC office:

*"ADC has turned the Retail Deck Inventory Feed files back on for all dealers.  RWS should receive files for each dealer in the next scheduled run at 12:15PM.*

*Please feel free to, not only populate the dealers websites with the information but,  reestablish all Retail Deck account access as well."*

## Your RetailDeck account has been reinstated.

Our team has been busy monitoring the feeds, reinstating RetailDeck accounts and testing all integrations. Every ADC member should now have access to RetailDeck with current inventory/pricing information. If you cannot log into your account or see anything amiss, please contact us right away by responding to this email or calling 800-417-2799 ext 1 for support.

## RetailDeck will warn you if your feed is not current:

When you log into RetailDeck (store owner and store admin accounts only), you will see a

yellow bar across the top of your screen *if we have not received a feed for your store within the last 60 minutes.* It would look like this:



If you do not see a yellow warning bar, that means all is well and your data is current. This automated warning system will remain in place moving forward for your continued peace of mind.

## We've been asked a lot of questions about the images with "Plessers.com" on HomeSource websites:

One of the videos we shared last night (this one specifically) showed HomeSource websites displaying product images with a Plessers.com watermark. Plessers is a NECO member that makes their own website. Here are the most common questions we received today about that and the facts to answer them.

## Q: Are those images still there...and how many are there?

We did a little digging and found a *lot* more than we expected; see what we found in this 6 minute video about  these images.

## Follow Up: Our investigation unearthed a possible major security concern with HomeSource sites. We have alerted ADC and HomeSource.

You can learn more about it in the same video from above.

## Q: Has HomeSource ever done anything like this before?

Public trials are part of the public record; anyone can view the official documents and transcripts of the lawsuits a company and their officers have been involved in. The White family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them.

They were found guilty of making **negligent misrepresentations about the capabilities of their software in a federal lawsuit** (Civil Action No. 3:12-CV-0090). In a unanimous decision, the jury awarded their customer – Furniture Distributors Inc, a chain of furniture stores – $450,000. The judge later deemed the counter-claims they alleged along the way "totally meritless" and ordered them to pay Furniture Distributors Inc fifty thousand dollars to reimburse attorney fees in addition to the four hundred fifty thousand dollars already awarded them at trial. The honorable Judge Graham C. Mullen wrote:

*"Defendant failed to offer any evidence in support of this proposition. Defendant argues that it believed it had a basis for these claims at the time they were brought, but certainly it discovered that they were meritless at some point before trial. Its persistence in pressing these claims through discovery and depositions—and submitting them as issues for trial— amounts to a bad faith prosecution of the claims and justifies an award of attorney fees in this case."*

Despite the ruling, **Furniture Distributors Inc sued Homesource again when Homesource failed to make any of the payments ordered** ([Case 3:15-CV-00313](#)). In this federal lawsuit, their former customer alleged the White family **fraudulently transferred assets** to prevent having to pay the judgement and **engaged in unfair and deceptive trade practices**.

Their 2nd suit against the Whites cited **yet another federal lawsuit Homesource was involved in** at the time ([Case 3:15-CV-00122](#)). This suit was filed by Martin Salas, a consultant Homesource hired after the previous judgement to sell their products and assist in the transferring of assets, when he alleges Homesource failed to pay his outstanding compensation of $10,000/month and document the ownership stake he was promised in the White family entities. You can read his account in [Exhibit B](#).

**The ownership of the Homesource app software itself appears to be in question throughout these cases.** During these federal lawsuits, the Whites alleged it is really owned by their retired school-teacher mother, Phyllis White. They produced 2 short and unsophisticated documents outlining a fifty thousand dollars per year plus 20% of sales royalty agreement. During Phyllis' deposition she did not know or could not recall:

- the name of the software
- what the software does
- when she acquired it
- who developed it
- if whoever gave it to her had the right to do so
- who drafted the license agreement
- how long the agreement is
- where the agreement is

- or what the agreement entailed.

And despite the signed license agreements that were furnished during these cases, in lines 3 – 7 of page 59 of her deposition, Phyllis states she was not aware of even executing any agreement to license her app or accounting software to Homesource and its president Greg White.

| FURNITURE DISTRIBUTORS, INC. v. JAMES R. WHITE, JR., ET AL. | | |
|---|---|---|
| Phyllis White on 12/11/2015 | | Page 59 |

```
1   business.  I had nothing to do with any kind of

2   licensing or anything else.

3        Q    Well, are you aware that you executed

4   a licensing agreement with Greg White?

5        A    No.

6        Q    You are not aware of that?

7        A    I said no.
```

These matters are far from ancient history as they were just recently resolved; the last document is dated August 30th, 2016.

## Q: Did ADC know about HomeSource's checkered legal history?

We have tried diligently to keep these communications strictly factual. We have no facts to share with you on this one. But we do have an opinion:

*\*\*\*Opinion Editorial by Jim Kane\*\*\**
*In my opinion, I think the likelihood ADC leadership was aware of HomeSource's past legal transgressions is very small. I find it hard to believe that anyone aware of this legal history would choose to place this company and these individuals in the position of high trust that goes along with operating eCommerce websites or a platform that handles sensitive and confidential information. Also, although this information is a matter of public record, it did take quite a bit of effort to locate. I believe they were unaware of these facts.*

## Several ADC members have asked for help connecting with other members that have concerns about the events of this week:

We don't want to presume, overstep or share contact information without your explicit permission. If you would like to be connected with other concerned members, click the button below and supply your contact information. We'll let you connect without us in the middle.

**Connect Me**

## We would be thrilled to work with ADC:

The last few days have been challenging, but let us be clear. We would be thrilled to work

with ADC on deeper ordering integration, improvements to RetailDeck, the introduction of AdRocket to power vendor-funded digital advertising like we have done to great success with Intercounty, and any other projects that will help ADC members succeed in this rapidly changing retail environment. Our door is open. The welcome mat is out.

## If you have more questions for us:

You are welcome to respond to this email or call us.

*- Jim Kane, CEO and Founder of RWS*
*- and Jennie Gilbert, COO*

unsubscribe from all emails