IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HOMESOURCE, CORP., | Civil Action No.: 1:18-cv-11970-JBS-KMW |
| Plaintiff, | |
| v. | Hon. Eduardo C. Robreno (EDPA) |
| | Hon. Karen M. Williams |
| RETAILER WEB SERVICES, LLC, et al., | |
| Defendants. | Motion Day: March 16, 2020 |

DEFENDANT RETAILER WEB SERVICES, LLC'S REPLY
IN SUPPORT OF ITS MOTION TO HOLD PLAINTIFF
THE HOMESOURCE, CORP. IN CONTEMPT AND FOR SANCTIONS

Dated: March 9, 2020

Respectfully submitted,

*/s/* Matthew A. Lipman
Matthew A. Lipman, Esq.
Monica T. Holland, Esq.
Melissa A. Ruth, Esq.
MCELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1617 John F. Kennedy Boulevard,
Suite 1500
Philadelphia, PA 19103
Tel.: (215) 557-2900
mlipman@mdmc-law.com
mholland@mdmc-law.com
mruth@mdmc-law.com

Adam Wolek (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
Tel.: (312) 836-4063
Fax: (312) 966-8598
awolek@taftlaw.com

William C. Wagner (*pro hac
vice*)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
wwagner@taftlaw.com

*Counsel for Defendant Retailer
Web Services, LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................ ii

INTRODUCTION................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND............................ 2

    A.  HomeSource's Revised Damages Spreadsheet Fails to Identify
        Its Lost Customers and the Resulting Damages From Each .. 2

    B.  HomeSource Failed to Produce the Documentation For Its
        Expert's Damages Analysis ............................... 4

    C.  HomeSource Failed to Produce Each Executed Contract For
        Its Alleged "Lost Customers" ........................... 6

    D.  HomeSource's CEO's Declaration Proves HomeSource Has Been
        Withholding Information ................................. 7

    E.  HomeSource Failed to Produce the Mirror Image of Its
        Database or Meet and Confer on RWS's Proposed Search
        Protocol ............................................... 9

        1.  HomeSource's claims that confidential "third-party
            data" would be compromised is misguided and baseless 11

    F.  HomeSource's Allegations Of Bad Faith Are Unwarranted .. 11

LAW AND ARGUMENT............................................. 13

CONCLUSION.................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Dawson v. Ocean Twp.*, No. CIV.A. 09-6274 JAP, 2011 WL 890692
  (D.N.J. Mar. 14, 2011) ....................................... 12

*Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir.
  1995.) ..................................................... 14

*Hickman v. Taylor,* 329 U.S. 495 (1947)....................... 12


**Statutes**

28 U.S.C. § 1927.......................................... 13, 15


**Rules**

Fed. R. Civ. P. Rule 11....................................... 13

Fed. R. Civ. P. Rule 26............................. 5, 10, 12, 14

Fed. R. Civ. P. Rule 37................................... 14, 15

## INTRODUCTION

For over a year and half, HomeSource has falsely accused RWS of having attacked its own former customers' websites (now operated by HomeSource). Yet whenever RWS has asked HomeSource to show its proof, HomeSource has dodged its discovery obligations and blamed RWS for "aggressive and over-the-top litigation tactics." (Opp'n [Dkt. 155] p. 1.) HomeSource's opposition continues this charade. Asking for HomeSource's evidence is not an attempt to "intimidate, bully, and harass," but what the Federal Rules require. It is what the Court ordered. Indeed, RWS is the defendant. If HomeSource claims RWS attacked it, it must prove it. If HomeSource claims RWS damaged it, it must prove that too. "Take our word for it" is not what the Federal Rules permit, which is why the Court ordered HomeSource to show its "proof." (Order [Dkt. 129].) Yet HomeSource continues to dodge its obligations and the Court's Order.

HomeSource's antics assuredly arise because it cannot identify the hackers — *a fact HomeSource has conceded and known* for more than a year. (SAC [Dkt. 54-2] ¶¶ 59-61.) The truth is apparent: HomeSource never had evidentiary support for its claims against RWS. Such conduct and gamesmanship should not be tolerated. Because HomeSource has flouted the Court's Order, HomeSource should be held in contempt and sanctioned.

1

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    HomeSource's Revised Damages Spreadsheet Fails to Identify Its Lost Customers and the Resulting Damages From Each**

This Court ordered HomeSource to "identify each customer it allegedly lost and the purported damages HomeSource incurred as a result of each lost customer." (Order p. 3 ¶ 1.) HomeSource still has not identified each of its lost customers, let alone the resulting damages from each. Despite adding dollar signs and new headings, HomeSource's damages spreadsheet [Dkt. 155-5] remains unhelpful. It provides no further insight into which listed company is a "lost customer," or the purported damages from each. In fact, when Ms. Arena offered to add dollar signs to the spreadsheet to make it less confusing, the Court said that was not enough. (Oct. 7, 2019 Disc. Conf. Tr. 29:20-21.) To this end, "the Court encourage[d] plaintiff to consolidate the information in one document that clearly sets forth the name of each customer and damages asserted as to each customer." (*Id.*) HomeSource refused.

HomeSource's new spreadsheet [Dkt. 155-5] still does not identify which customers, if any, it lost or the damages per customer. It only lists ██████████████████████, totaling ████████████ but it's still impossible to tell ████████████ ██████████ were its lost customers, who was lost because of RWS's newsletter, or the purported damages from each. For example, ████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████    ████████████████████████████████████

████████████████    And HomeSource didn't identify who those lost customers were.

In addition to the math not adding up, the list also includes

████████████████████████████████████████████████████

██████████████████[1] So it's impossible to tell who HomeSource claims as a lost customer from the spreadsheet or the damages allegedly resulting from each. Simply put, the spreadsheet fails to meet the Court's directive for a lost customers' document to "be able to stand on its own." (Oct. 7, 2019 Disc. Conf. Tr. 44:17-19.)

The only conclusion that can be drawn is that HomeSource's refusal to provide its lost customers has been intentional. After HomeSource produced its new spreadsheet in December 2019, RWS informed HomeSource that its spreadsheet did not comply with the Order or the Court's statements during the October 7, 2019 discovery conference. And now — 20 months since it filed suit - HomeSource steadfastly refuses to identify its lost customers and damages. HomeSource should be held in contempt and sanctioned for having to bring this matter before the Court again.

---

[1] *See*, *e.g.*, ████████████████████████████████████████

████████████████████████████████

██████████████████████████████    last visited March 6, 2020.

**B.   HomeSource Failed to Produce the Documentation For Its Expert's Damages Analysis**

In its initial response to the Court's Order that "HomeSource shall produce any and all documents and records that form the basis of its experts' damages calculations (Order p. 3 ¶ 2), HomeSource first claimed that it had nothing to produce because it was orally transmitted.[2] Now, HomeSource says its expert "reviewed customer contracts and customer sign-up sheets that include pricing." (Opp'n p. 5.) As the Court previously stated, "[w]hatever documentation was utilized to extract these numbers, ***all of the supporting financial documentation must be produced.***" (Oct. 7, 2019 Disc. Conf. Tr. 80:14-16.)(emphasis supplied) This means HomeSource must produce documentation to support its alleged damages for each lost customer. Such proof must indicate that *but for* the newsletter, each customer would have bought each service for each month that HomeSource claims as damages. HomeSource has failed to do this, and is evading the Court's orders and its discovery obligations; these games should not be tolerated.

Second, despite not tying any contracts to any "lost customer," ████████████████████████████████

---

[2] "HomeSource discussed the financial figures set forth in the [Excel spreadsheet] through phone calls with its financial expert, and no documents were transmitted to the expert." (Dkt. 155-1 p. 1.)

████████████████████████████████ (Ex. A.)[3] ███████

███████████████████████████████████████████

(per HomeSource004077), which is not reflected in the spreadsheet. In sum, HomeSource keeps playing "hide the ball" with its damages discovery, and its spreadsheet is even inconsistent ███████████ ████████████████.

Third, HomeSource argued that "since the consulting expert only prepared a discounted case flow analysis and did not review HomeSource's balance sheets or cash flow statements" (Opp'n p. 5), it should not have to produce any other documents in response to the Order. Not only does this violate the Order, but it was required to produce the documents on which its damages are based "without awaiting a discovery request" as part of its initial disclosures. Fed. R. Civ. P. ("Rule") 26(a)(1)(A)(iii). These same records also should have been produced in response to RWS's requests for production. (Dkt. 76-1 PageID: 1107-14.) RWS requested leave multiple times in which to file a motion to compel HomeSource's discovery responses. (*See, e.g.,* Dkts. 55-1, 76-1, 105-1, and 110-1.) Yet HomeSource has failed to provide its

---

[3] According to its spreadsheet, █████████████████████ █████████████████████████████████████████████ ███████ ███████ █████ ████ ██████ ████ ██████████ ██████ █████████████████████████████████████████████ ███████ per HomeSource004075.

financial records[4] or customer payment histories necessary for RWS to evaluate the claims. Nor has HomeSource produced support for its claim that it incurred at least the threshold $5,000 in damages to support its Computer Fraud and Abuse Act claim. (SAC [Dkt. 141-1] ¶ 134.)

Finally, HomeSource tries to blame RWS for its failure saying the Court told RWS to revise its request. This is a red herring because the Court told RWS to revise only its more general catch-all request for communications with HomeSource's expert and not the specific request for financial records. (Oct. 7, 2019 Disc. Conf. Tr. 80:17-22; Order p. 3 ¶ 2.)

**C.   HomeSource Failed to Produce Each Executed Contract For Its Alleged "Lost Customers"**

The Court ordered that "HomeSource **shall produce each executed contract** of the customers it contends were lost to RWS based on the conduct RWS allegedly engaged in that forms the basis of the instant lawsuit." (Order p. 3 ¶ 3) (emphasis added.) However, HomeSource failed to do so. While it claims on one hand that its

---

[4] HomeSource claims that RWS's request for financial statements and records is improper. (Opp'n p. 5.) HomeSource forgets that RWS sought leave to compel production of these documents, which are material to its alleged damages and have not been produced. (*See, e.g.* Dkt. 110-1 PageID: 1951) ("HomeSource has not produced customer contracts (as discussed above), nor has it provided the financial statements or tax documents needed for RWS to verify and rebut this analysis."). In any event, the Court's instruction that HomeSource provide "supporting financial documentation" encompasses these records.

customers did not sign contracts, that is belied by HomeSource's documents that show it required 

. (*See* HomeSource004067, attached as Ex. B) ("

") Not only did HomeSource not produce all signed contracts, but it did not even produce one completed questionnaire,

(*Id.*) Again, HomeSource is playing games and violated the Court's Order.

**D.   HomeSource's CEO's Declaration Proves HomeSource Has Been Withholding Information**

The Order directed HomeSource to provide a certification detailing two things: ***first***, "detailing ***all*** information it possesses concerning the alleged hacking and/or cyber-attacks and/or denial of service ('DOS') and/or distributed denial of service ('DDoS') attacks." (Order p. 4 ¶ 6) (emphasis added); ***second***, it must "further confirm that any and all information concerning the alleged cyber and/or hacking attacks has been produced to RWS." (*Id.*) HomeSource's CEO's, James White, declaration fails on both counts.

While the CEO conceded that HomeSource's logs are the "primary evidence" of the attacks, HomeSource hasn't produced them. Moreover, the CEO's declaration confirms that HomeSource cherry-

picked the limited information and documents it has produced. (White Decl. [Dkt. 152-9] ¶ 5) ("However, if we believe that data may contain irrelevant, private third-party personal data, we have not produced that information"). HomeSource tries to justify withholding relevant records by now claiming that third-party data was not omitted from what it produced. (Opp'n p. 9.) But this is a smokescreen, as HomeSource's CEO conceded that HomeSource intends to produce only some of its evidence, and importantly, it is withholding the actual logs, i.e. its "primary evidence."

HomeSource again tries to excuse its failures, claiming that its CEO, Mr. White, did not swear that all evidence had been produced, specifically because he claims "he would have no way of knowing if a bad actor had visited HomeSource's websites at some time other than the hacking and/or cyberattacks." (Opp'n p. 9.) But that excuse is baseless as HomeSource's proposed SAC *identifies the timeframes* when it was allegedly attacked so the timeframe is known. Indeed, HomeSource claims it was attacked in August and September 2018, and again in September 2019. (SAC [Dkt. 141-1] ¶¶ 57, 71, 73.) The Order only required HomeSource to identify the facts and evidence *relating to this case*, not every attack that has ever occurred. Yet the games continue: it still stonewalled and evaded fully disclosing its evidence and producing its logs. Accordingly, HomeSource's CEO *has not* certified that all evidence of its claims has been produced in violation of the Court's Order.

8

**E.    HomeSource Failed to Produce the Mirror Image of Its Database or Meet and Confer on RWS's Proposed Search Protocol**

Even though the Court ordered production of the mirror image of HomeSource's database for inspection (Order p. 4 ¶ 5), and HomeSource's CEO testified that the server logs are the "primary evidence of the cyberattacks" (White Decl. ¶ 5), HomeSource continues to refuse to allow RWS to inspect it. HomeSource's stonewalling is preventing RWS from defending itself against HomeSource's sensational allegations that RWS attacked its former customers. Indeed, in its fifth complaint, HomeSource continues to allege that RWS attacked it, and its unfair competition, CFAA, and other claims. (*See generally* SAC [Dkt. 141-1].)

After it stonewalled RWS's request to meet and confer on HomeSource's search, RWS submitted Dr. Jennifer Bayuk's proposed search protocol to HomeSource to reach an agreement as to RWS's review of the logs. (Copies of Dr. Bayuk's protocol and HomeSource's response are attached as Exhibits C and D.) Contrary to HomeSource's assertions, Dr. Bayuk's proposed searches are tailored to HomeSource's factual allegations and claims. Her searches are not beyond the scope of the Court's order (again, the Court stated that Dr. Bayuk could run the search she believed proper), nor are they outside the bounds of discovery. Rather, Dr. Bayuk seeks to test the allegations HomeSource's has repeatedly made against RWS. This is standard expert discovery and within

Rule 26.[5]

HomeSource's arguments that RWS "does not wish to cooperate" in expert discovery and "only appears interested in filing motions for sanctions" are ironic. (Opp'n p. 8.) RWS has sought these logs for over a year and a half, had scores of telephone and court conferences relating to HomeSource's logs and the experts' searches,[6] and tried to broker expert discussions at least 7 times for a proposed framework to search HomeSource's logs. (Dkt. 152-7 p. 3). Despite the Court's October 16, 2019 Order, **_HomeSource delayed until January 17, 2020_** to make its expert available. (_Id._) Even when he appeared, HomeSource hadn't provided him critical information, like where HomeSource's logs came from, when they were collected, where they were stored, or what HomeSource's alleged search results represented. (_Id._ pp. 3-4.) Because of HomeSource's stonewalling this key information, RWS was forced to expend additional resources to prepare a protocol without its benefit. (Ltr. encl. Protocol [Dkt. 152-12].) At all times, RWS has attempted to resolve this matter without Court intervention,

---

[5] HomeSource does not contest that Dr. Bayuk should be permitted to run the search ran by HomeSource's expert. (Opp'n p. 8.)

[6] _E.g._, court conferences were held 11/28/18, 12/17/18, 3/12/19, 4/8/19, and 10/7/19. The experts exchanged over 10 emails and spoke in December 2019 and January 2020. Counsel exchanged more than 30 emails, 6 letters, and had multiple phone calls on the topic over the past year. The parties also submitted at least 7 filings to the Court on the issue of HomeSource's logs.

but HomeSource has delayed or blocked each instance. HomeSource's claim attempts to mask its own inactions.

### 1. HomeSource's claims that confidential "third-party data" would be compromised is misguided and baseless

HomeSource continues its unsupported claim that it should not have to produce its logs "due to the concern over private, third-party data." (Opp'n p. 9.) HomeSource's claim is senseless: it cannot claim the logs are the "primary evidence" for its claims then not produce them. The information is nevertheless not privileged, and would be protected by the Court's Confidentiality Order if so. Indeed, the websites sell washing machines, refrigerators, microwaves, and so on. The logs thus presumably consist of visitor IP addresses, what product they viewed and its page, and the time, date, and duration of each visit. Thus, the server logs are unlikely to contain visitors' confidential information, such as credit card numbers.[7] HomeSource even undercuts its own "confidentiality" claims by stating that "IP addresses change over time and do not provide any further identifying information aside from a series of numbers." (*Id.*) So there is no reason this information should not be produced.

### F. HomeSource's Allegations Of Bad Faith Are Unwarranted

HomeSource cannot accuse RWS of having perpetrated criminal

---

[7] Again, even if they did contain confidential information, the Confidentiality Order protects such information, which Dr. Bayuk is bound by.

cyberattacks and then ignore the Court's Order and hide information relevant to proving or disproving its claims. *See* Rule 26(b)(1); *see also Dawson v. Ocean Twp.*, No. CIV.A. 09-6274 JAP, 2011 WL 890692, at *12 (D.N.J. Mar. 14, 2011) ("Review of all relevant evidence provides each party with a fair opportunity to present an effective case at trial."); *Hickman v. Taylor,* 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation... [and] either party may compel the other to disgorge whatever facts he has in his possession"). Yet HomeSource has done just that.

HomeSource can't have it both ways. On the one hand, HomeSource's CEO testified that "the primary evidence of the cyberattacks that we possess is contained in our logs of all traffic to our websites." (White Decl. ¶ 5.) On the other hand, HomeSource refuses to produce the logs that allegedly contain such "primary evidence of the cyberattacks." Last year, HomeSource sought to avoid disclosing its server logs by arguing that "perhaps ninety-nine percent (99%) of the [server log] records are irrelevant to this case." (Dkt. 56 p. 1.) HomeSource further argued, in response to RWS's expert's claim that she needed to review the logs to separate the benign from the malicious traffic, that "there is no way for her to do that." (*Id*. p. 3.) Now, HomeSource argues that its logs are irrelevant because "a hacker/bad actor could have accessed HomeSource's websites on some

date other than the date of the hacking/cyberattacks." (Opp'n p. 9.) Either the logs have evidence of the attacks or they do not. The CEO's declaration shows the relevance, despite counsel's statements otherwise, so RWS's efforts to inspect the logs are not in bad faith.

To be sure, HomeSource conceded it cannot identify the hackers, a fact that it has known for over a year (SAC [Dkt. 54-2] ¶¶ 59-61), yet continues to blame RWS for the attacks (SAC [Dkt. 138] ¶¶ 63-65). This indicates that HomeSource knows it never had evidentiary support for its claims. For this reason, RWS has on three separate occasions notified HomeSource of its intention to pursue Rule 11 and 28 U.S.C. § 1927 sanctions for its baseless accusations, and unreasonably and vexatiously multiplying the proceedings. RWS also has exchanged numerous letters with HomeSource and participated in multiple calls to discuss discovery issues. Each has been unproductive. Repeated meet and confers hit dead ends when HomeSource repeatedly refused to produce evidence to support its claims and stonewalled RWS's discovery on these issues. In short, these efforts were necessitated by *HomeSource's* "attempt[s] to intimidate, bully, and harass" RWS by asserting baseless claims and then refusing to provide supporting evidence.

## LAW AND ARGUMENT

HomeSource does not dispute that a contempt finding is appropriate if a valid court order existed, HomeSource knew of the

13

order, and HomeSource disobeyed the order. (Opp'n p. 12.) Each requirement is thus met here. HomeSource knew of the Order and that it was valid. Yet HomeSource disobeyed the order for the reasons set forth above and in RWS's opening brief.

HomeSource did not dutifully fulfill its obligations. To show it had, HomeSource must have established that it "in good faith [made] all reasonable efforts to comply" with the Order. *Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995.) HomeSource cannot do so because it has:

- failed to clearly identify each alleged lost customer by name, and the claimed damages associated with each (required by paragraph 1 of the Order);

- withheld documents and records relating to its claimed damages (required by paragraph 2 of the Order; RWS's first set of document requests, and Rule 26(a)'s mandate for initial disclosures);

- delayed and stonewalled RWS's efforts to confer and develop a mutually-agreeable search protocol for the mirror image (required by paragraph 5 of the Order);

- refused to produce its logs and the mirror image, which it claims are its primary evidence of its claims, so that RWS and its expert may test HomeSource's claims (required by paragraph 5 of the Order); and

- wordsmithed the CEO's declaration to conceal HomeSource's withholding of its logs (required by paragraph 6 of the Order).

None of these actions suggests good faith by HomeSource, let alone their "reasonable efforts to comply" with the Order. A finding of contempt is thus warranted for HomeSource's bad faith. *See* Harris at 1324; Rule 37(b)(2). Sanctions are also appropriate

14

because HomeSource's discovery antics include the failure to produce documents and an unreasonable and vexatious multiplication of the proceedings. *See* Rules 26(g) and 37(b); 18 U.S.C. § 1927. The requested relief is thus necessary.

## CONCLUSION

For these reasons, as well as those in RWS's opening brief, the Court should issue an order precluding HomeSource from presenting any evidence on the topics covered by the October 16, 2019 Order (Dkt. 129]. In the alternative, the Court should find HomeSource in contempt and order it to respond fully to the October 16, 2019 Order within fourteen (14) days of the issuance of the order finding HomeSource in contempt. In either case, the Court should enter an order for appropriate sanctions to redress HomeSource's refusal to comply with the Court's Order, and award RWS its attorney's fees and costs relating to this dispute, and any other relief the Court deems appropriate.

Dated: March 9, 2020

Respectfully submitted,

*/s/* Matthew A. Lipman
Matthew A. Lipman, Esq.
Monica T. Holland, Esq.
Melissa A. Ruth, Esq.
MCELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1617 John F. Kennedy Boulevard,
Suite 1500
Philadelphia, PA 19103
Tel.: (215) 557-2900
mlipman@mdmc-law.com
mholland@mdmc-law.com
mruth@mdmc-law.com

Adam Wolek (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
Tel.: (312) 836-4063
Fax: (312) 966-8598
awolek@taftlaw.com

William C. Wagner (*pro hac
vice*)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
wwagner@taftlaw.com

*Counsel for Defendant Retailer
Web Services, LLC*

16

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2020, a true and correct copy of the foregoing was served via electronic mail upon the following counsel for the Plaintiff:

FLASTER/GREENBERG P.C.
Kenneth S. Goodkind, Esq.
Eric R. Clendening, Esq.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
Tel.: (856) 661-1900
Fax: (856) 661-1919

*Counsel for Plaintiff*
*The HomeSource, Corp.*

/s/ Matthew A. Lipman
Matthew A. Lipman, Esq.
Monica T. Holland, Esq.
Melissa A. Ruth, Esq.

*One of the attorneys for*
*Defendant Retailer Web*
*Services, LLC*

26860750

17