## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HOMESOURCE, CORP., | Civil Action No.: 1:18-cv-11970 |
| Plaintiff, | Hon. Eduardo C. Robreno |
| v. | |
| RETAILER WEB SERVICES, LLC, et al., | |
| Defendants. | |

## BRIEF IN SUPPORT OF RETAILER WEB SERVICES II, LLC'S[1] MOTION TO DISMISS AND SEVER THE SECOND AMENDED COMPLAINT

Dated: June 15, 2020

Respectfully submitted,

*/s/ Ethan Hougah*
Louis R. Moffa
Ethan Hougah
Alexandra S. Jacobs
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, New Jersey 08002
(856) 488-7700

Adam Wolek (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP

---

[1] This motion is joined in full by Defendant Retailer Web Services, LLC because the arguments made herein are equally applicable to that party. This motion is joined by Nationwide Marketing Group, LLC to the extent it applies to the causes of action in which it was directly (Counts VIII, IX, and X) or indirectly (Counts I-V) named or involved. Because the claims related to the Computer Fraud and Abuse Act do not involve Nationwide Marketing Group, LLC, it does not adopt those portions of this brief.

111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
Tel.: (312) 836-4063
Fax: (312) 966-8598
awolek@taftlaw.com

William C. Wagner (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
wwagner@taftlaw.com

*Counsel for Defendant Retailer Web Services II,
LLC; Retailer Web Services, LLC; Nationwide
Marketing Group, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ vi

INDEX OF EXHIBITS .................................................................... x

    i.    Exhibit A:  FDI Complaint against Software ........................ x

    ii.   Exhibit B:  FDI Order on Attorney's Fees ......................... x

    iii.  Exhibit C:  Amended Complaint in Second FDI .................... x

    iv.  Exhibit D:  Salas – Martin Salas Complaint ...................... x

    v.   Exhibit E:  Salas – HS's Amended Answer ......................... x

    vi.  Exhibit F:  Salas – HH's Amended Answer (part 2) ................ x

    vii.  Exhibit G:  Newsletters Attached ............................... x

    viii. Exhibit H: Video ............................................... x

    ix.  Exhibit I:  Transcript of Video ................................ x

INTRODUCTION ......................................................................... 1

Factual BACKGROUND ................................................................... 2

    A.   The White Family and their companies. ............................ 3

        1.  Litigation Involving the White Family Enterprise. ........... 3

        2.  Martin Salas sues the White Family and HomeSource. ......... 4

    B.   RWS discussed this litigation history with citations to public court records included, and informed customers of deficiencies in HomeSource's websites. ........................................... 5

    C.   HomeSource alleges that a July 16, 2018 newsletter contained misstatements. ................................................... 9

    D.   HomeSource alleges that RWS "crawled" its customers' public websites. ..................................................... 10

    E.   HomeSource claims John Does attacked its customers' websites. ......... 10

Legal Standard and Argument.................................................................10

I. RWS's alleged statements in the Newsletter and video do not support any of HomeSource's asserted counts. ...........................................................11

   A. The defamation claim (Count II) fails; each alleged statement was true or an opinion; and HomeSource lacks standing. ...........................................12

      1. The Newsletter never said that HomeSource "stole" Plessers' images, but truthfully reported on them. ...................................14

      2. Pointing out that HomeSource-designed websites' files were public is not actionable because it was true. ...............................15

      3. HomeSource lacks standing to assert the White Family's claims; regardless, the statements were substantially true. .....................17

      4. The statements that HomeSource was sued a second time and that it failed to make payments are not actionable because they were truthful and privileged. ........................................................19

      5. The reference to the Salas suit was true and privileged. .............21

      6. RWS's statement about Nationwide is not actionable...............21

   B. The False Advertising claim (Count I) should be dismissed because it does not allege a false or misleading statement of fact about a product, service, or commercial activity. ...................................................................22

      1. HomeSource's claim fails because it did not allege that RWS made false or misleading statements...........................................22

      2. The statements were not about a product, service, or commercial activity.......................................................................23

      3. HomeSource did not allege facts showing that RWS's actions deceived RWS's intended audience, were material, or caused injury. ...............................................................................24

   C. The tortious interference Counts (III & IV) are inadequately pled. .......25

      1. The tortious interference claim does not identify any lost contracts or business opportunities. .............................................25

      2. RWS did not act maliciously.......................................................26

iv

3. HomeSource failed to allege any proximate damages from the alleged tortious interference..........................................................27

D. HomeSource's common law and federal unfair competition fails for similar reasons as above and because it is protected.................................28

II. RWS's alleged "web crawling" and other cyber activities do not provide HomeSource with any viable claim.......................................................30

A. The CFAA claim (Count VI) fails because HomeSource does not have standing to assert its customers' claims; and its allegations do not meet the statute's "without authorization" or damages requirements. ............30

1. HomeSource does not have standing because the affected websites belonged to its customers, not HomeSource...............30

2. HomeSource's does not allege lack or exceeding of authorization. .................................................................31

3. HomeSource never alleges that RWS sustained damages and losses under the CFAA................................................32

B. For the same reasons, RWS's alleged cyber activity does not support any of the other claims alleged by HomeSource...............................34

III. The civil conspiracy claim fails because there are no underlying torts, and no agreement. ......................................................................35

IV. The John Doe claims are unconnected and should be severed......................36

CONCLUSION......................................................................38

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) .............................. 33

*Adv. Fluid Sys., Inc. v. Huber*, 28 F.Supp.3d 306 (M.D. Pa. 2014) ......................................... 33

*Adv. Oral Tech., LLC v. Nutrex Res., Inc.,* No. 10–5303, 2011 WL 1080204 (D.N.J. March 21, 2011) ....................................................................................................................... 26

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696-CRB, 2013 WL 3460707 (N.D. Cal. July 9, 2013) ........................................................................................ 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 10, 22, 25, 28, 35

*Banco Popular N. Am. v. Gandi*, 184 N.J. 161 (2005) ............................................................. 36

*Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007) ................................................................. 11

*Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)* ......... 25

*Beverly Hills Motoring, Inc. v. Morici*, No. 14-756, 2015 WL 248352 (D.N.J. Jan. 20, 2015) . 14

*C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super. 168 (Law Div. 1989) ............................. 29

*Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563 (D.N.J. 2010) ........... 27, 29, 35

*Castrol v. Pennzoil,* 987 F.2d 939 (3d Cir. 1993) ................................................................... 24

*Chas. S. Winner, Inc. v. Polistina*, No. 06-4865, 2007 WL 1652292 (D.N.J. June 4, 2007) ... 34

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. CIV. 09-2751, 2010 WL 4224473 (E.D. Pa. Oct. 22, 2010) ..................................................................................... 33

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747 (D.N.J. 1995 ..... 29

*Consulting Prof. Res., Inc. v Concise Techs. LLC*, No. 09-1201, 2010 WL 1337723 (W.D. Pa. Mar. 9, 2010) .................................................................................................... 33

*Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125 (1986) ................................................. 15

*DeAngelis v. Hill*, 180 N.J. 1 (2004) ................................................................................ 12, 18

*Dello Russo v. Nagel*, 358 N.J. Super. 254 (App. Div. 2003) .................................................. 35

*DirecTV, Inc. v. Leto*, 467 F.3d 842 (3d Cir. 2006) ................................................................. 38

*Diversified Indus., Inc. v. Vinyl Trends, Inc.*, 2014 WL 4199059 (D.N.J. Aug. 22, 2014) ...27, 30

*Dragon Quest Prods., LLC v. John Does 1-100*, No. CIV. 12-6611 JHR/AMD, 2013 WL 2949407 (D.N.J. June 14, 2013) ........................................................................... 39

*Durski v. Chaneles*, 175 N.J. Super. 418 (App. Div. 1980) ....................................... 17

*Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460 (D.N.J. 1998) ............................ 25

*EP Henry Corp. v. Cambridge Pavers, Inc.*, 383 F. Supp. 3d 343 (D.N.J. 2019) ....................... 23

*F.T.C. v. Endo Pharm., Inc.*, No. 16-1440, 2016 WL 6124376 (E.D. Pa. Oct. 20, 2016) ..... 38

*FDIC v. Bathgate*, 27 F.3d 850 (3d Cir. 1994) ......................................................... 11

*G.D. v. Kenny*, 411 N.J. Super. 176 (App. Div. 2009), *aff'd* 205 N.J. 275 ................. 13, 18, 21

*Garelli Wong & Assoc., Inc. v. Nichols*, 551 F. Supp. 2d 704 (N.D. Ill. 2008) ................... 33, 34

*Graco Inc. v. PMC Global, Inc.*, 2012 WL 762448 (D.N.J. Feb. 15, 2012) ............................ 28

*hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) ................................ 31, 32

*Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140 (App. Div. 1995) ......................................................................................................... 27, 29

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ........................ 2

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ....................................... 2

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125 (3rd Cir. 1994) ............................................................................ 11, 22, 24

*Kotlikoff v. The Community News*, 89 N.J. 62 (1982) ................................. 13, 14, 15, 19

*Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285 (2001) ...................................... 27

*Laufgas v. Speziale*, No. 04-cv-1697, 2006 WL 2528009 (D.N.J. Aug. 31, 2006) ................. 38

*Levia v. Secretary of Dep't. of Homeland Sec.*, 230 F. Supp. 3d 406 (D.N.J. 2017) ....................... 2

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (U.S. 2014) ............ 23, 29

*LoBiondo v. Schwartz*, 323 N.J. Super. 391 (App. Div. 1999) ................................... 14

*Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152 (1999) ..................................................... 13

*Marin v. Landgraf*, No. CIV.A. 11-690, 2013 WL 356623 (Jan. 29, 2013) ........................... 26

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362 (D.N.J. 2004) ...........................12, 22

*Miflinburg Telegraph, Inc. v. Criswell*, 277 F.Supp.3d 750 (M.D. Pa. 2017) ............................ 33

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406 (3d Cir. 2003) ................................................................................................................. 36

*N.J. Physicians Un. Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298 (D.N.J. 2015) .................................................................................................................25, 26

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002) ...........................................................................................22, 24

*Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*, No. 07–5945, 2008 WL 4911868 (D.N.J. Nov. 13, 2008) ................................................................................................................. 26

*Petro-Lubricant Testing Labs., Inc. v. Adelman*, 233 N.J. 236 (2018) .....................................20, 21

*Picozzi v. Connor*, No. CIV. 12-4102, 2012 WL 2839820 (D.N.J. July 9, 2012) .................. 38

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ................................................. 22

*Pruden v. SCI Camp Hill*, 252 F.App'x 436 (3d Cir. 2007) ...................................................... 37

*Roberts v. Mintz*, No. A-1563-14T4, 2016 WL 3981128 (App. Div. 2016) ........................... 14

*Salanzo v. N.J. Media Grp., Inc.*, 201 N.J. 500 (2010) ....................................17, 19, 20, 21, 24

*Singer v. Beach Trading Co.*, 379 N.J. Super. 63 (App. Div. 2005) ........................................... 27

*SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055 (3d Cir. 1980) ................................ 35

*Sky v. Haddonfield Friends Sch.*, No. 14-5730, 2016 WL 1260061 (D.N.J. Mar. 31, 2016) ... 16

*Soldinger v. Football Univ.*, LLC, 2014 WL 2178465 (N.J. Super. Ct. App. Div. May 27, 2014) .................................................................................................................................. 28

*Soobzokov v. Lichtblau*, No. 2:15-CV-6831, 2016 WL 614411 (D.N.J. Feb. 16, 2016), *aff'd*, 664 F. App'x 163 (3d Cir. 2016) ........................................................................................ 17

*St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. 04-4540, 2005 WL 1199045 (D.N.J. May 18, 2005) ............................................................................................ 7, 14, 16

*Tennile v. Quintana*, 443 F. App'x 670 (3d Cir. 2011) ........................................................... 36

*Toolasprashad v. Grondolsky*, 570 F. Supp. 2d 610 (D.N.J. 2008) ............................................ 37

*Tris Pharma, Inc. v. UCB Mfg.*, No. A-5808-13T3, 2016 WL 4506129 (N.J Super. App. Div. Aug. 29, 2016) ..................................................................................................................... 30

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914 (3rd Cir. 1990) .................. 23

*Varrallo v. Hammond Inc.*, 94 F.3d 842 (3d Cir. 1996) ........................................................ 25, 28

*Victaulic Co. v. Tieman*, 499 F.3d 227 (3d Cir. 2007), *as amended* (Nov. 20, 2007) .................. 2

*Ward v. Zelikovsky*, 136 N.J. 516 (1994) ........................................................................... passim

*Woloshin v. N.J. Trans. Bus Ops.*, 2016 WL 5660427 (D.N.J. Nov. 3, 2014) ......................... 25

## Statutes

15 U.S.C. § 1125 ........................................................................................................ 22, 28, 29

18 U.S.C. § 1030 ............................................................................................................ passim

## Other Authorities

Black's Law Dictionary (11th Ed. 2019) .................................................................................. 19

*generally* Working with Amazon S3 Buckets, Amazon.com https://docs.aws.amazon.com/AmazonS3/latest/dev/UsingBucket.html (accessed May 31, 2020) ....................................................................................................................... 6

HomeSource, https://www.homesourcesystems.com/about (last visited June 11, 2020) . 3

Restatement (Second) of Torts § 566 cmt. d (1977) ............................................................... 20

Webster's II New Coll. Dictionary (1st Ed. 1995) .................................................................. 19

## Rules

Fed. R. Evid. 201(b) ............................................................................................................... 2

F.R.C.P. 8(a)(2) ................................................................................................................... 11

F.R.C.P. 12(b)(6) ................................................................................................................. 25

F.R.C.P. 20 .......................................................................................................................... 37

F.R.C.P. 21 ..................................................................................................................... 37, 38

## INDEX OF EXHIBITS

i.      Exhibit A:  FDI Complaint against Software

ii.     Exhibit B:  FDI Order on Attorney's Fees

iii.    Exhibit C:  Amended Complaint in Second FDI

iv.     Exhibit D:  Salas – Martin Salas Complaint

v.      Exhibit E:  Salas – HS's Amended Answer

vi.     Exhibit F:  Salas – HH's Amended Answer (part 2)

vii.    Exhibit G:  Newsletters Attached

viii.   Exhibit H: Video

ix.     Exhibit I:  Transcript of Video

## INTRODUCTION

One of Defendant Retailer Web Services II, LLC's ("RWS") newsletters relayed truthful statements and opinions about past lawsuits involving the owners of The HomeSource Corp.'s ("HomeSource") and their predecessor companies; and critiqued a potential security issue in a website HomeSource designed. HomeSource sued the next business day, claiming defamation and false advertising, and that the newsletter tortiously interfered with unspecified contracts and opportunities. HomeSource's amended complaints further alleged a conspiracy with new defendants, that RWS viewed websites without permission, and that unidentified John Does cyberattacked and hacked its websites. HomeSource's claims fail as a matter of law for four main reasons.

First, RWS's statements, all of which are substantially true or opinion, provide HomeSource with no actionable legal claim (whether styled as defamation, false advertising, tortious interference, or unfair competition). HomeSource seeks to maintain these claims by misconstruing the contents of RWS's statements. But RWS's statements are incorporated into the pleading, and the Court can judge those statements directly.

Second, HomeSource's Computer Fraud and Abuse Act ("CFAA") claim fails to allege an actionable legal claim because, even assuming RWS monitored HomeSource's public customers' websites, the CFAA does not prohibit visiting websites, it prohibits hacking and other actions akin to breaking and entering.

Third, HomeSource's conspiracy claim fails for lack of any underlying tort or any agreement between RWS, Nationwide Marketing Group, LLC ("Nationwide") and Gridiron Capital, LLC ("Gridiron") to commit any unlawful act.

Finally, the misjoinder rules require that HomeSource's unrelated "buckshot claims"

1

against unknown John Does for hacking and DDoS attacks to its customers' websites be severed from this action, particularly because there is no plausible connection to RWS.

For the reasons below, RWS, RWS II, Nationwide (and separately, Gridiron[2]) move to dismiss all of the claims in which they were named, and to sever HomeSource's unrelated CFAA claim against unnamed John Does (Count VII).

## FACTUAL BACKGROUND

The pleading rules require HomeSource to allege sufficient facts to maintain its legal claims. In addition to failing this standard, HomeSource has attempted to maintain its legal claims through omission of the relevant factual background. This attempt to plead through omission fails, as most of this background—other legal proceedings, indisputable facts about the identity of HomeSource's owners, and materials cited by and integral to D.E. 164—is judicially noticeable at the Rule 12 stage. Fed. R. Evid. 201(b); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them"); *Levia v. Secretary of Dep't. of Homeland Sec.*, 230 F. Supp. 3d 406, 409 n.2 (D.N.J. 2017) (noticing proceedings from other courts of record); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may take judicial notice of documents "integral to or explicitly relied upon in the complaint"); *but see Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007) (court cannot judicially notice website for fact-sensitive determination of reasonableness of covenant not to compete).

---

[2] Gridiron has adopted this brief to the extent it applies to the causes of action in which it was directly (Counts VIII, IX, and X) or indirectly (Counts I-V) named or involved. Because the claims related to the Computer Fraud and Abuse Act do not involve Gridiron, it does not adopt those portions of this brief.

The following facts (assumed true from the pleading or otherwise not subject to reasonable dispute) and are thus properly before the Court.

## A.    The White Family and their companies.

HomeSource brings a defamation claim against RWS, but many of RWS's alleged statements concern non-party legal entities and individuals. D.E. 164 ¶¶ 28-49. Thus, some judicially-noticeable background is in order.

### 1.    Litigation Involving the White Family Enterprise.

In 2011, Greg White founded HomeSource. Greg is the President and COO, his brother James White, Jr. the CEO (collectively, "Greg and James Jr.").[3] In 2012, Furniture Distributors, Inc. ("FDI") sued another company owned by Greg, James Jr., and their parents (collectively, the "White Family"), called Software Support-PMW, Inc. ("Software Support"), for making negligent misrepresentations about the capabilities of their software. Ex. A. James Jr. was Software Support's President, and Greg was its Chief Technical Officer. In 2013, a jury entered a verdict in favor of FDI for $450,000, against White-Family-owned Software Support. Ex. B. FDI was awarded attorney's fees, and the court rebuked Software Support's counterclaims as "totally meritless" and in bad-faith. *Id.*

FDI filed suit again in 2015 against the White Family and their various companies, including HomeSource. Ex. C. FDI alleged the White Family caused Software Support to cease operations to fraudulently transfer the company's assets to avoid paying FDI's

---

[3] These facts are not subject to reasonable dispute, as RWS expects HomeSource will concede. *See* HomeSource, https://www.homesourcesystems.com/about (last visited June 11, 2020) ("Jim White. As CEO of HomeSource, Jim is responsible for supervising the sales team and managing the direction of the company with his brother Greg … Greg has a number of roles at HomeSource. Officially, he's President, founder, and COO of the company").

judgment. *Id.* ¶¶ 48, 64. FDI claimed the White Family transferred the company assets to HomeSource. *Id.* ¶ 80. FDI alleged fraud and alter ego theories in detail against the White Family enterprise [*id.* ¶¶ 64–127], asserting "Software Support and HomeSource have operated in each other's names" [*id.* ¶ 122], and that Software Support, not HomeSource, was marketing and receiving revenues from the HomeSource-branded app. *Id.* ¶ 66.

FDI registered the judgment and sought post-judgment discovery in the District of New Jersey; Judge Simandle ordered the White Family's company to respond. *Id.* ¶ 59. FDI claimed that HomeSource was merely the White Family's alter ego and sued for fraudulent transfer, piercing the corporate veil, successor liability, civil conspiracy, and unfair and deceptive trade practices. *See generally id.* The case was settled and dismissed in 2016.

## 2. Martin Salas sues the White Family and HomeSource.

In 2015, HomeSource and the White Family were sued by Martin Salas, their former consultant. Ex. D. Mr. Salas alleged that the White Family failed to pay him his full compensation and refused to give him a promised ownership stake in their company. *Id.* ¶¶ 23, 52. In its answer, HomeSource admitted that it contracted with Mr. Salas's solely-owned company. Ex. E, ¶ 23. HomeSource also filed a counterclaim in which it admitted that it negotiated with Mr. Salas for his company to perform services. Ex. F, ¶ 9.

Like FDI, Mr. Salas said the White Family used HomeSource and their companies as alter egos; and that the White Family, HomeSource, and the White's other companies comingled assets and liabilities, transferred corporate assets to avoid creditors, and intentionally fractured their operations. Ex. D ¶ 40. He observed, the White Family were the major shareholders and directors of each of their companies, including HomeSource. *Id.* ¶¶ 3–6, 72. The matter was settled out of court and dismissed by stipulation.

**B.    RWS discussed this litigation history with citations to public court records included, and informed customers of deficiencies in HomeSource's websites.**

Moving to the operative pleading before the Court, HomeSource alleges that RWS was once the only company in its market. D.E. 164 ¶ 21. HomeSource launched its product to compete against RWS in late 2017. *Id.* ¶ 22.

On July 20, 2018, RWS sent a newsletter (the "Newsletter") to members of ADC—an independent appliance dealer industry group serviced by RWS and HomeSource.[4] *See id.* ¶ 33. The Newsletter said that certain HomeSource-designed websites were displaying photographs with a competitor's (Plessers.com) watermark. Ex. G p. 4. The Newsletter asked, "[a]re those images still there … and how many are there?", and linked to a video showing the Plessers images with a voice over by RWS's CEO. *Id.*[5] The video showed one HomeSource customer website with the Plessers images and said,

> We are getting a lot of questions today about how many images there are from Plessers inside of the HomeSource Solutions and are there images that may be – may have been inappropriately taken from other competitors and used on Home Source sites. So I tried to do a little bit of investigating, and I found a couple of interesting things when I did that.

Ex. H; Ex. I, p. 2:14-20. HomeSource concludes that this statement "falsely implied" that HomeSource "'stole'" the Plessers images [D.E. 164 ¶ 48], but no accusation occurs in the Newsletter or video. No derivation of the word "stole" occurs in either, which makes

---

[4] HomeSource's pleading [D.E. 164] omitted the Newsletter, previously filed at D.E. 138-1. Preferring substance over form, and for convenience, this Motion refers to the previously filed version attached as Exhibit G.

[5] This video is referenced and is integral to HomeSource's claims [D.E. 164 ¶¶ 53–54], so it is judicially noticeable at this stage. A copy of the video is submitted as Exhibit H. RWS will also submit a transcript as an aid for discussion of the video, which is attached as Exhibit I. Insofar as the Court finds that the transcript is not judicially noticeable, RWS respectfully requests that the Court only rely on the statements in the video itself, since the video *is* judicially noticeable.

HomeSource's decision to put the word "stole" in quotation marks particularly troubling. *Id.* RWS said that it had received questions about the Plessers watermarked images, that Plessers is a NECO member with its own website, and that RWS "did a little digging and found a lot more than we expected." Ex. G. HomeSource does not allege that any of these statements are false. [D.E. 164.] The video says many images "are from Plessers", Ex. I, p. 2:14-20, and HomeSource likewise has not denied using images "from Plessers."

The Newsletter noted a "possible major security concern," of which RWS notified HomeSource. Ex. G. RWS found that when HomeSource created its websites, it left its S3 buckets open and publicly available.[6] RWS never stated HomeSource's customers' data were insecure. Exs. G; H. Rather, the video accompanying the Newsletter clearly stated that, while HomeSource did not secure an S3 bucket—which HomeSource does not dispute—RWS did *not* find public customer information in the unsecured S3 bucket:

> You know, all of these articles make reference to these huge data breaches that have been started because of these public S3 buckets. You know, a hacker or somebody can use the openness of the bucket to start browsing through all the files. And if you're on an E-Commerce website, it's possible that you have some inoffensive and unimportant content like your images and stuff in there, but it's theoretically possible that somewhere in that bucket there's also customer data and, you know, things of that nature. **Now I didn't find any of that.**

Ex. I, p. 5:12-22; *see* Ex. H: 05:09-46. HomeSource disagrees that this constitutes a "major security concern" and claims "[t]he video misrepresents the security of customers files and alleges that they are publicly available, when in fact, HomeSource does not store

---

[6] S3 buckets are file folders known as "Simple Storage Service" by Amazon Web Services. They are where websites store their backend information, and allows for uses like storage for Internet applications, backup and recovery, disaster recovery, data archives, data lakes for analytics, and hybrid cloud storage. *See generally* Working with Amazon S3 Buckets, Amazon.com   https://docs.aws.amazon.com/AmazonS3/latest/dev/UsingBucket.html (accessed May 31, 2020).

information or files in this 'bucket' or folder." D.E. 164 ¶¶ 52, 54. Again, the video itself says the opposite: that RWS "didn't find any of that," i.e. "customer data," in this folder. Thus, HomeSource's allegation that RWS stated that customer files were was public [D.E. 164 ¶ 54], is unambiguously contradicted by the Newsletter and video themselves.

HomeSource alleges the video explained how RWS "believes one could hack into HomeSource's system" [D.E. 164 ¶ 53]; again, the video itself unambiguously contradicts that allegation. The video never explained how anyone could "hack" any website, let alone HomeSource's "system." Ex. H. RWS *did* opine that HomeSource should "lock down" and secure the S3 bucket. Ex. I, p. 5:8-10 ("[J]ust put everything in buckets and don't make them public."). On all of these issues, HomeSource's attempt to maintain its claims by alleging facts that contradict the contents of the Newsletter and accompanying video should not be accepted. *See St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*, No. 04-4540, 2005 WL 1199045, at *3 (D.N.J. May 18, 2005) ("To the extent that Plaintiffs allegations are contradicted by the documents attached to the Complaint upon which its claims are based, the Court need not accept such allegations as true.").

The Newsletter also discussed the FDI litigation:

> Q: Has HomeSource ever done anything like this before? Public trials are part of the public record; anyone can view the official documents and transcripts of the lawsuits a company and their officers have been involved in. The White Family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them.

> They were found guilty of **making negligent misrepresentations about the capabilities of their software in a federal lawsuit** (Civil Action No. 3:12-CV-0090). In a unanimous decision, the jury awarded their customer – Furniture Distributors Inc, a chain of furniture stores – $450,000. The judge later deemed the counter-claims they alleged along the way 'totally meritless' and ordered them to pay Furniture Distributors Inc fifty thousand dollars to reimburse attorney fees in addition to the four hundred fifty thousand dollars already awarded them at trial. The honorable Judge Graham C. Mullen wrote:

> Defendant failed to offer any evidence in support of this proposition. Defendant argues that it believed it had a basis for these claims at the time they were brought, but certainly it discovered that they were meritless at some point before trial. Its persistence in pressing these claims through discovery and depositions—and submitting them as issues for trial— amounts to a bad faith prosecution of the claims and justifies an award of attorney fees in this case.

Ex. G. The Newsletter linked to the order awarding attorneys' fees. *Id.*; Ex. B.

HomeSource alleges that it and Greg and James Jr. were not parties to the lawsuit [D.E. 164 ¶¶ 36–37], and claims the Newsletter "implies" HomeSource and Greg and James Jr. made negligent misrepresentations when they were not parties to the case. *Id.* ¶¶ 83, 41. But the Newsletter's comments were directed toward "The White Family, owners of HomeSource and similar other business" and "their business relationships." Ex. G. The White's "similar other business," Software Support, *was* found liable on FDI's claim. And White Family individuals were directly involved in the case; James Jr. (HomeSource's CEO) was deposed at length about the basis for his company's counterclaims, which the court found to be "totally meritless." Ex. B.

The Newsletter stated that FDI sued HomeSource, the White Family, and their companies after they failed to pay the judgment. Ex. G. The Newsletter linked to FDI's complaint, which named the White Family and their companies. *Id.*; Ex. C. HomeSource claims this statement was wrong because the Newsletter stated HomeSource was sued "for a second time" by FDI, when it was only a formally named party once, and because the Newsletter "misrepresented that HomeSource failed to make any of the payments ordered," when "HomeSource was not ordered to make any payment, and it was not a party to the prior lawsuit." *Id.* ¶¶ 44–46.

The Newsletter also discussed the Salas case. Ex. G. RWS hyperlinked to Mr. Salas's

complaint against HomeSource, the White Family, and their companies. *Id.*; Ex. D. HomeSource claims the Newsletter "misrepresented that Martin Salas was a consultant hired by HomeSource, but HomeSource never hired or entered into any contract with Martin Salas directly." D.E. 164 ¶ 48. But HomeSource admitted that it contracted with Mr. Salas's company in its answer. Ex. E, ¶ 23. Mr. Salas alleged that he negotiated and had an agreement with HomeSource and the White Family. Ex. D ¶¶ 20–21, 66.

HomeSource claims the Newsletter was defamatory and tortiously interfered with its existing and prospective customer contracts. D.E. 164 ¶¶ 98–114. HomeSource concludes generally that RWS "caused HomeSource a loss of prospective economic gain" and "HomeSource has been and continues to be damaged." *Id.* ¶¶ 104–105, 113. HomeSource alleges no loss of any specific customers or contracts. *See id.* ¶¶ 98–114.

HomeSource alleges, with no further factual detail, that RWS continued to make "false, misleading, and/or defamatory statements about HomeSource to HomeSource's customers, potential customers, and third parties" after this lawsuit was filed. *Id.* ¶ 49.

## C.    HomeSource alleges that a July 16, 2018 newsletter contained misstatements.

HomeSource claims that another RWS newsletter, dated July 16, 2018, was "false and misleading, given the relationship between Nationwide and RWS":

> 'RWS is its own separate and privately held company,' and 'We have a legal and binding confidentiality agreement in place with all of NECO that would strictly prohibit RWS from sharing any of this sensitive information with anyone at Nationwide, or any other buying group . . . . With or without that agreement, sharing trade secret information would violate several laws. That's a line we would never cross and a risk we would never take. And doing so would be unethical.'

D.E. 164 ¶¶ 31–32. HomeSource does not explain why this statement was untrue, or how it could be actionable regardless of whether it was true or false. *See id.*

9

**D.   HomeSource alleges that RWS "crawled" its customers' public websites.**

Without providing support, HomeSource alleges RWS used "spider" or "web crawler" software to monitor and download information from the public websites of HomeSource's retail store customers in violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030(a)(2)(C). D.E. 164 ¶¶ 19, 79. HomeSource claims such activities were "prohibited" [*id.* ¶¶ 81, 132], but does not describe how or why, and claims that RWS "slow[ed] the functionality of the websites." *Id.* ¶ 82.

**E.   HomeSource claims John Does attacked its customers' websites.**

Unrelated to HomeSource's claims against any named defendant, HomeSource also raises allegations against an unknown number of John Does. *See* D.E. 164 ¶¶ 13, 56–73. It claims that between August and September 2018, the John Does launched cyberattacks that "r[a]n hundreds and thousands of searches in an effort to overload HomeSource's computer systems and software and crash the websites." *Id.* ¶¶ 57–58. These alleged attacks allegedly originated from a GoDaddy account. To date, HomeSource has not identified the source of the attacks. *Id.* ¶¶ 56–66. HomeSource also claims these unknown John Does hacked three of its customers' websites on August 13, 2018. *Id.* ¶ 66. Without support, HomeSource makes the utterly speculative allegation that RWS knew the websites would be hacked [*id.* ¶ 70], even though HomeSource does not know who did the hacking.

## LEGAL STANDARD AND ARGUMENT

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). It must contain more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," or "labels and conclusions." *Id.* at 678 (citations omitted). Rather, a plaintiff must allege "sufficient factual matter" that, taken as

true, allows the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court is "not compelled to accept unsupported conclusions and unwarranted inferences," or "a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quotations omitted).

## I.  RWS's alleged statements in the Newsletter and video do not support any of HomeSource's asserted counts.

Plaintiff's principal claims turn on the Newsletter and video. But as a threshold matter, HomeSource's pleading does not provide notice as to which of RWS's alleged statements or conduct give rise to which count. The pleading rules require "a short and plain statement of the claim showing that the pleader is entitled to relief," F.R.C.P. 8(a)(2), and yet HomeSource's vague pleading leaves RWS and the Court to guess as to which allegations coincide with each legal claim. This fails the pleadings rules.

HomeSource's defamation count (Count II) does not identify the statements that allegedly constitute defamation, even though a defamation plaintiff "must plead facts identifying the defamatory words, their utter, and their publication"; vague or conclusory allegations are not enough. *FDIC v. Bathgate*, 27 F.3d 850, 875 (3d Cir. 1994). The false advertising claim requires that the defendant "made a false or misleading statement of fact." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3rd Cir. 1994). And while HomeSource's tortious interference claims state that RWS "publish[ed] materially false and misleading statements about HomeSource" [D.E. 164 ¶ 109], HomeSource does not identify the statements it claims interfered with its business relationships or contracts. HomeSource even alleges generally that after its initial complaint, RWS "continued to make false, misleading, and/or defamatory statements," [*id.*

11

¶ 49], with no notice as to what those statements were, when, or to whom they were made.

This failure of notice impacts HomeSource's Counts I–V, all of which allege generally that RWS "engaged in the above-described conduct" or made "false and misleading statements" [*see* D.E. 164 ¶ 88, 93, 100, 109, 116], but none of which provide notice as to which statement gives rise to which Count. All of these claims thus fail for lack of specificity, and accordingly should be dismissed. But beyond this general failure, each of these five Counts must be dismissed for more particular reasons described below.

### A. The defamation claim (Count II) fails; each alleged statement was true or an opinion; and HomeSource lacks standing.

As best as RWS can tell, HomeSource seems to assert the following as defamatory: (1) RWS allegedly "implied" that HomeSource "stole" images from Plessers; (2) RWS allegedly pointed to a "possible major security concern" and said customer information was public; (3) RWS's video allegedly "explains how [Mr. Kane] believes one could hack into HomeSource's system, and … provides the steps one could take in order to do it"; (4) the Newsletter imprecisely summarized the lawsuits; and (5) the July 16 email newsletter misstated the "relationship" between RWS and Nationwide. D.E. 164 ¶¶ 31–48, 52.

Defamation requires, in addition to damages, (1) a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to another; and (3) fault. *DeAngelis v. Hill*, 180 N.J. 1, 13 (2004). A defamatory statement must be both false and injurious to the plaintiff, or expose it to hatred or loss of goodwill. *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 372 (D.N.J. 2004).

The law of defamation seeks to balance protecting reputations while also protecting free speech. *Ward v. Zelikovsky*, 136 N.J. 516, 528 (1994). As part of this balance, a Court

faces a "threshold inquiry" of "whether the language used is reasonably susceptible of a defamatory meaning." *Id.* (*citing Kotlikoff v. The Community News*, 89 N.J. 62 (1982)). This is a question of law. *Kotlikoff*, 89 N.J. at 67. For this inquiry, courts must examine the statement's content, verifiability, and context. *Ward*, 136 N.J. at 529.

"True statements are absolutely protected under the First Amendment." *Id.* at 530. Indeed, "a statement can be 'fairly accurate' and still be considered the truth as a defense to a defamation claim." *G.D. v. Kenny*, 411 N.J. Super. 176, 197 (App. Div. 2009), *aff'd* 205 N.J. 275. "The law of defamation overlooks minor inaccuracies, focusing instead on 'substantial truth,'" and "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *G.D. v. Kenny*, 205 N.J. 275, 292 (2011). A court must consider the statement as a whole. *Id.* at 294.

A non-factual statement—one "generally not capable of proof of truth or falsity"— cannot form the basis of a defamation claim; rather, defamation claims can only be based on "reasonably specific assertions of fact." *Ward*, 136 N.J. at 531. "Loose, figurative or hyperbolic language is not likely to imply specific facts," so would not be actionable. *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 167–68 (1999). "Where an opinion is accompanied by its underlying nondefamatory factual basis … a defamation action premised upon that opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." *Kotlikoff*, 89 N.J. at 72–73. New Jersey courts protect a wide array of arguably distasteful commentary, including claims that persons were involved in a "huge coverup" and "conspiracy;" he "doesn't care to whom he lies;" his

"word was not good;" or that he was a "grifter" who ran a "fraudulent puppy mill ring."[7]

Finally, the court must consider "[t]he listener's reasonable interpretation, which will be based in part on the context in which the statement appears." *Ward*, 136 N.J. at 532.

> **1.      The Newsletter never said that HomeSource "stole" Plessers' images, but truthfully reported on them.**

The Newsletter's and video's statements about the Plessers images [D.E. 164 ¶ 48] could not defame HomeSource because they do not state any objectively false fact. The Newsletter and video truthfully reported that a HomeSource customer's website was displaying Plessers' images, which HomeSource does not deny. Exs. G; H.

HomeSource mischaracterizes the video by stating that RWS implied that HomeSource "stole" the images, but even at the Rule 12 stage, the Court need not accept that allegation, which is contradicted by the Newsletter and hyperlinked video (which, in turn, are incorporated by reference into HomeSource's pleading). *St. Matthew's*, 2005 WL 1199045, at *3. The Newsletter makes the following statements: RWS had been asked questions about images with "Plessrs.com" on HomeSource websites; the websites displayed images with the Plessrs watermark; and that after digging, RWS found "more than we expected." None of these statements are false (HomeSource never alleges otherwise); indeed, they are not defamatory whether true or false. Likewise, the video showed that Plessers images were present on the site and said the site was using images "from Plessers."

> We are getting a lot of questions today about how many images there are that are from Plessers inside of Home Source Solutions and are there images that may be -- may have been inappropriately taken from other competitors and used on the Home Source sites.

---

[7] *Kotlikoff*, 89 N.J. at 72; *LoBiondo v. Schwartz*, 323 N.J. Super. 391, 412 (App. Div. 1999); *Beverly Hills Motoring, Inc. v. Morici*, No. 14-756, 2015 WL 248352, at *5 (D.N.J. Jan. 20, 2015); *Roberts v. Mintz*, No. A-1563-14T4, 2016 WL 3981128, at *6 (App. Div. 2016)

Ex. I, p. 2:14–18; *see Kotlikoff*, 89 N.J. at 72–73 ("Where an opinion is accompanied by its underlying non-defamatory factual basis … a defamation action will fail, no matter how unjustified, unreasonable or derogatory the opinion may be.").

Nor can HomeSource rely on the adverb "inappropriately"—the question of whether conduct is appropriate or inappropriate is clearly a non-verifiable opinion, not actionable as a matter of law. *Ward*, 136 N.J. at 531. No accusation of unlawful infringement appears in the Newsletter or the video; but even if one impose such a meaning where it does not exist, the comment would *still* fall short of defamatory. *See, e.g.*, *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696-CRB, 2013 WL 3460707, at *5 (N.D. Cal. July 9, 2013) (defendant's blog posts suggesting that plaintiffs infringed the defendant's copyrights was not actionable as opinion expressing defendant's understanding of copyright law). Because the Newsletter and video truthfully reported the "underlying non-defamatory factual basis" that a HomeSource-designed site was displaying Plessers' images, and opined as to the images' significance, the Plessers statements are not actionable.

### 2.   Pointing out that HomeSource-designed websites' files were public is not actionable because it was true.

The Newsletter said HomeSource's website had a "possible major security concern." Substantial truth and opinions are complete defenses to defamation. *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125, 147 (1986) (opinions are absolutely protected).

Here, the Newsletter linked a video that showed that HomeSource's websites' S3 buckets were public. The video stated that while it was "*theoretically possible* that somewhere in that [public] bucket there's also customer data…**[RWS] did not find any of that**." Ex. I, p. 5:19-22. The video advises, "don't make them public." *Id.* p. 5:9. In fact, the video

only refers to "potential" or "possible" issues with making the information public. *See id.* pp. 5:17, 5:19, 6:1, 6:12; *see Sky v. Haddonfield Friends Sch.*, No. 14-5730, 2016 WL 1260061, at *6 (D.N.J. Mar. 31, 2016) (use of "we believe" in letter was opinion and not actionable).

The statement that a particular website design has a possible "security concern" does not constitute a verifiable statement of fact, and whether access to the S3 buckets is "concerning" is merely an opinion; neither characterization could "be proven true or false," so neither can be defamatory. *Ward*, 136 N.J. at 531. There is no objective or verifiable measure of "concerning" or "not concerning." The modifier "possibl[y] major" is likewise an opinion or protected hyperbole, because there is no objective or verifiable measure of "major," much less "possibly major." HomeSource may disagree with the opinion that public access to its website's data is "concerning," or a "possible major security concern," but HomeSource is not allowed to silence such opinions through a defamation suit. The only verifiable statement of fact on this topic is *that* the S3 buckets were public; but HomeSource never claims *that* statement was false. D.E. 164 ¶¶ 50–55.

Despite the clear language in the video, HomeSource pleads that the video explained to viewers how to "hack" HomeSource, and that the video says that "customers' files … are publicly available," [D.E. 164 ¶ 53–54]. That is simply false, and the Court need not credit allegations that are flatly contradicted by the video itself, which is incorporated by reference into D.E. 164. *St. Matthew's*, 2005 WL 1199045, at *3.

In sum, the Newsletter contains the statement of fact that a website's S3 buckets were public—which HomeSource does not and cannot allege was false—and then offered the opinion that such access was a "possible major security concern." The former is protected as the truth, the latter protected as opinion. Neither states a claim for defamation.

16

### 3. HomeSource lacks standing to assert the White Family's claims; regardless, the statements were substantially true.

Insofar as HomeSource's defamation claim relies on alleged statements about the White Family, it should be dismissed because HomeSource does not have standing to assert the White Family's defamation claims. D.E. 164 ¶¶ 34, 37–40; *Durski v. Chaneles*, 175 N.J. Super. 418, 420 (App. Div. 1980) ("An indispensable prerequisite to an action for defamation is that the defamatory statements must be of and concerning the complaining party"). "Under New Jersey law, a plaintiff cannot be defamed by statements made about other people." *Soobzokov v. Lichtblau*, No. 2:15-CV-6831, 2016 WL 614411, at *2 (D.N.J. Feb. 16, 2016), *aff'd*, 664 F. App'x 163 (3d Cir. 2016).

Here, HomeSource claims the Newsletter inaccurately stated that the White Family—the "they" referenced in the Newsletter—"appear[s] to have a history of their business relationships ending in lawsuits against them," "[t]hey were found guilty of making negligent misrepresentations about the capabilities of their software in a federal lawsuit," and they filed "totally meritless" counterclaims. D.E. 164 ¶¶ 34, 37–40. These are all "statements made about other people*," Soobzokov*, 2016 WL 614411, at *2, not HomeSource. Although preceded by "Has HomeSource ever done anything like this before," such a "headline is not to be considered in a vacuum." *Salanzo v. N.J. Media Grp., Inc.*, 201 N.J. 500, 524 (2010). The actual alleged statements of fact concern non-parties—the White Family—and HomeSource cannot be defamed by those statements. In any event, the question "Has HomeSource ever done anything like this before," is not a verifiable statement of fact capable of being proven true or false. *Ward*, 136 N.J. at 531.

HomeSource's claim that the Newsletter "implies" HomeSource was guilty of making negligent misrepresentations [D.E. 164 ¶ 37] takes the Newsletter out of context and fails

17

to "consider the fair and natural meaning that will be given [to the document] by reasonable persons of ordinary intelligence." *DeAngelis*, 180 N.J. at 13. The Newsletter refers to the White Family, not HomeSource, and further links to the verdict form so that a reader could see that Software Support was the culpable legal entity. *See Ward*, 136 N.J. at 538 ("A proper analysis of the alleged slanderous statement requires examination of the content of defendant's entire statement"). Because the context and court documents indicate this statement was not about HomeSource, it is not actionable.

Moreover, the Newsletter's statements are substantially true or opinions. Stating that "[t]he White Family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them" is both true and a protected opinion. Indeed, the White Family and their companies were sued multiple times by their business associates. And claiming that the family "appear[s]" to have a history of lawsuits is an opinion.

The statement that the White Family was "found guilty of making negligent misrepresentations about the capabilities of their software in a federal lawsuit" is also substantially true. The White Family owned and controlled Software Support, which was found liable for negligent misrepresentations. Ex. B. Any reasonable reader would tell that "the gist, the sting" of RWS's statement was that a company run by the White Family had received an adverse result in litigation brought by a customer; *that* charge was completely "justified," as confirmed by the verdict. *G.D.*, 205 N.J. at 292. Insofar as HomeSource takes issues with the use of "*guilty* of making...," guilty is also defined as "[r]esponsible for a civil wrong" or "[b]eing at fault." *See* GUILTY, Black's Law Dictionary (11th Ed. 2019); Guilty, Webster's II New Coll. Dictionary (1st Ed. 1995).

Suggesting the White Family, which owned and ran Software Support, was responsible for filing "totally meritless" claims is also substantially true. Again, the White Family owned and controlled HomeSource—Greg and James Jr. are its officers—and the judge in the FDI lawsuit held that their company's claims were "totally meritless."

At worst, RWS suggested that Software Solution's adverse litigation result should be attributed to the White Family and their other companies. Even if one finds that suggestion completely "unjustified, unreasonable, or derogatory," HomeSource's "defamation action [still] fail[s]" because RWS's statement was "accompanied by its underlying non-defamatory basis" of hyperlinked court documents. *Kotlikoff*, 89 N.J. at 72–73.

### 4. The statements that HomeSource was sued a second time and that it failed to make payments are not actionable because they were truthful and privileged.

HomeSource claims that the Newsletter is defamatory because it stated HomeSource was sued a second time by FDI when it was technically only sued once, and because it failed to make payments when it was not obligated to do so. D.E. 164 ¶¶ 44–45.

These statements must be viewed in context of RWS's full disclosure of information. RWS linked to the complaints, which clarified that the White Family's other company was sued in the first case, and that HomeSource was sued in the follow up suit. "The gist, the sting" of the statement was directed at the White Family's business dealings. The links in the Newsletter make any contrary misreading of the FDI litigation summary unreasonable, so it is not actionable. *Salzano v. N.J. Media Grp. Inc.*, 201 N.J. 500, 524 (2010) ("we presume that the public reads the entire article when we assess its fairness and accuracy").

New Jersey's fair report privilege also protects the Newsletter's characterizations. The privilege "protects the publication of defamatory matters that appear in a report of an

official action or proceeding." *Petro-Lubricant Testing Labs., Inc. v. Adelman*, 233 N.J. 236, 260 (2018). It extends to "[a] full, fair, and accurate report regarding a public document that marks the commencement of a judicial proceeding." *Id.* It applies regardless of "the truth or falsity of the initial allegations and defenses." *Id.* Even when a report is "not ... exact in every immaterial detail," the privilege applies when the account conveyed is "substantially correct." *Id.*; *see Salzano v. N.J. Media Grp.*, 201 N.J. at 523 ("technically precise language" is not required and a "rough-and-ready summary that is substantially correct" is sufficient). Colorful or even distasteful language receives protection in these contexts. Restatement (Second) of Torts § 566 cmt. d (1977) ("If all that the communication does is to express a harsh judgment upon known or assumed facts, there is no more than an expression of opinion of the pure type, and an action of defamation cannot be maintained."). The privilege is considered "one of the most powerful and frequently invoked common-law defenses." *Salzano* at 514.

Here, the Newsletter's accounts that HomeSource was sued a "second" time and failed to pay FDI were privileged because the characterization was based on a reading of the lawsuit, which further hyperlinked the actual court filings in the Newsletter, and had overlapping parties. Indeed, the court filings stated that the two companies—HomeSource and Software Support—operated in each other's names, and were alter egos. Ex. C. Moreover, RWS made clear that it was reporting on court cases in the public record, and hyperlinked the source material so that readers could see the contents for themselves. Ex. G. Thus the gist of the Newsletter's reporting of HomeSource's obligations for the judgment is based on a reading of the complaint and includes the actual court filings.

And in all events, the statement about when HomeSource was first named in the string

of lawsuits against entities controlled by the White Family could at most be a minor inaccuracies that fall under the substantial truth rule. *G.D.*, 205 N.J. at 292.

### 5. The reference to the Salas suit was true and privileged.

HomeSource alleges that the Newsletter incorrectly reported that it hired Mr. Salas when it really hired Mr. Salas's solely-owned company. Such hairsplitting does not give rise to any actionable claim. This statement is substantially true, as Mr. Salas is the sole owner and employee of his company. *G.D.*, 205 N.J. at 292. Even if this statement were utterly false, it would not be actionable. HomeSource offers no explanation for why hiring Mr. Salas individually versus hiring his company could injure HomeSource's reputation. The statement could not be defamatory as a matter of law, even if false. *Ward*, 136 N.J. at 529.

The reporting privilege also protects the statement because it fairly reports on the suit. *Petro-Lubricant*, 233 N.J. at 260 ("substantially correct" statements protected). The Newsletter accurately reported Mr. Salas' allegations that he had an agreement with HomeSource (and the other defendants), who failed to pay him or grant him ownership. Ex. D, ¶¶ 23, 66; Ex. G; *Salzano*, 201 N.J. at 523 ("rough-and-ready" summary privileged).

### 6. RWS's statement about Nationwide is not actionable.

RWS's July 16, 2018 newsletter stated that "RWS is its own separate and privately held company," that it had confidentiality agreement with NECO (a buying group), and that it would not share sensitive information with anyone at Nationwide. D.E. 164 ¶ 31. HomeSource baldly concludes that the newsletter was "false and misleading, given the relationship between Nationwide and RWS," with no explanation as to how the statement is false, or would be "injurious" to HomeSource regardless of the statement's truth. *Mayflower Transit*, 314 F. Supp. at 372; D.E. 164 ¶ 32. Such "a formulaic recitation of the

21

elements of a case of action will not do." *Iqbal*, 556 U.S. at 678.

**B.      The False Advertising claim (Count I) should be dismissed because it does not allege a false or misleading statement of fact about a product, service, or commercial activity.**

The false advertising claim likewise fails because there is no allegation that RWS made false or misleading statements of fact or that RWS's actions deceived its intended audience. D.E. 164 ¶¶ 85–91. False advertising requires (1) a false or misleading statement of fact in a commercial advertisement about a product (or service, or commercial activity); (2) that deceived or had the capacity to deceive a substantial segment of potential consumers; (3) the deception is material and is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured because of the statement. *Johnson & Johnson-Merck*, 19 F.3d at 129. A plaintiff must show "the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). The Lanham Act does not impose civil liability for just any misstatement or inaccuracy, but only on a false or misleading representation of fact which misrepresents the nature, characteristics, or qualities of another's "goods, services, or commercial activities." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107–08 (2014) (citing 15 U.S.C. § 1125(a)(1)).

Here, the Lanham Act claim fails because it never set forth a false or misleading statement of fact that deceived consumers about a product, service, or commercial activity.

**1.      HomeSource's claim fails because it did not allege that RWS made false or misleading statements.**

Like defamation, the false advertising claim fails for the threshold reason that the

statements in the Newsletter and video were either true or opinions. *See EP Henry Corp. v. Cambridge Pavers, Inc.*, 383 F. Supp. 3d 343, 349 (D.N.J. 2019) (facts, opinions, puffery, or bald assertions of superiority are not actionable under Section 43(a)); *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3rd Cir. 1990). HomeSource's claim appears to be based on the same statements underpinning its defamation claim. As discussed above, these statements were either true or opinions. Because truth and opinions are not actionable, the false advertising claim fails for the same reasons as the defamation claim.

## 2. The statements were not about a product, service, or commercial activity.

The claim independently fails because most of RWS's statements were not directed to any of RWS's or HomeSource's own products, services, or commercial activities. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (U.S. 2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations").[8] The following statements are not actionable because they do not relate to any product, service, or commercial activity that RWS or HomeSource engages in: (1) any statements regarding the White Family and their litigation history; (2) any statements regarding HomeSource and its litigation history; and (3) the reference to Mr. Salas as a consultant HomeSource hired.[9]

---

[8] HomeSource's Lanham Act claim references alleged "placing [of] phone calls to HomeSource's customers" [D.E. 164 ¶ 88] by RWS, but alleges no additional facts explaining who was supposedly called or what alleged misstatements were made on these calls. This allegation should be disregarded as conclusory.

[9] HomeSource's Lanham Act claim made no reference to the July 16 email newsletter. D.E. 164 Count I. As such, RWS understands that HomeSource is not asserting that it was false advertising. The claim would fail regardless because HomeSource does not allege that the

23

### 3. HomeSource did not allege facts showing that RWS's actions deceived RWS's intended audience, were material, or caused injury.

A false advertising claim requires "actual deception or at least a tendency to deceive a substantial portion of the intended audience." *Novartis v. Johnson & Johnson–Merck,* 290 F.3d at 594. A plaintiff "cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react." *Castrol v. Pennzoil,* 987 F.2d 939, 943 (3d Cir. 1993) (italics added). Here, HomeSource did not allege that RWS's alleged conduct likely or actually deceived any audience. This pleading failure alone warrants dismissal.

Moreover, the challenged statements, on their face, categorically were not deceptive. The July 20 Newsletter provided links to the case dockets and litigation documents referenced therein, providing recipients with a full and transparent opportunity to review and assess the lawsuits and their allegations themselves. Ex. G at 5-6; *Salzano,* 201 N.J. at 524 ("we presume that the public reads the entire article when we assess its fairness and accuracy"). Thus, even if a reader somehow badly misconstrued the Newsletter, RWS also provided full access to the source material such that there could be no such misunderstanding based on the complete disclosures made by RWS. Similarly, with respect to the "possible major security concern," the only statement of fact contained regarding this security issue related to the open S3 buckets, a statement HomeSource does not allege was false or deceptive. Likewise, while HomeSource recites that "[a]s a result of RWS's conduct, [Plaintiff] has been damaged," [D.E. 164 ¶¶ 28-55; 85–91], its pleading does not allege that how any alleged statements injured HomeSource or caused it to lose a single contract or prospective customer. Such a "formulaic recitation of a cause of action's

---

statements in the email, which relate to RWS and NECO, injured HomeSource. *See Johnson & Johnson-Merck*, 19 F.3d at 129.

elements will not do" and cannot survive a motion to dismiss. *See, e.g.*, *Woloshin v. N.J. Trans. Bus Ops.*, 2016 WL 5660427, at *2 (D.N.J. Nov. 3, 2014) (granting motion to dismiss pursuant to Rule 12(b)(6) for failure to plead facts suggesting "a causal relationship" between the alleged wrongdoing and an alleged injury).

### C.    The tortious interference Counts (III & IV) are inadequately pled.

Tortious interference claims require the plaintiff to show (1) a reasonable expectation of economic advantage from a prospective contractual or economic relationship; (2) the defendant intentionally and maliciously interfered with the relationship; (3) the interference caused the loss of the expected advantage; and (4) actual damages resulted. *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996). The plaintiff must identify the contracts or business relationships at issue. *N.J. Physicians Un. Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 309 (D.N.J. 2015) (plaintiff must "at least allege specific prospective contracts that were interfered with"). A "mere allegation of lost business does not suffice." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998).

The tortious interference claims fail because HomeSource did not: (1) name any lost customer or business opportunity; (2) show RWS acting with malice; or (3) plead damages.

#### 1.    The tortious interference claim does not identify any lost contracts or business opportunities.

The tortious interference claims fail because HomeSource never identified a single lost customer or business opportunity from RWS's alleged conduct. To withstand a motion to dismiss, HomeSource must identify specific contracts or opportunities interfered with or customers lost. *See N.J. Physicians Un.*, 141 F. Supp. 3d at 309. A plaintiff "must allege facts that show an existing or prospective economic or contractual relationship for **a mere**

**allegation of lost business does not suffice**." *Marin v. Landgraf*, No. CIV.A. 11-690, 2013 WL 356623, at *5 (Jan. 29, 2013) (emphasis added) ("claimed loss of unknown customers standing alone" is insufficient). The injury must be "more concrete than lost business of unknown, unsolicited, or hypothetical customers." *Adv. Oral Tech., LLC v. Nutrex Res., Inc.*, No. 10–5303, 2011 WL 1080204, at *4 (D.N.J. March 21, 2011).

HomeSource fails to identify, or even help identify, a single lost contract, customer or business expectancy, and thus fails to allege a viable tortious interference claim. *See Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*, No. 07–5945, 2008 WL 4911868, at *7 (D.N.J. Nov. 13, 2008) (dismissing claim where plaintiff failed to name one lost customer or business opportunity). HomeSource's assertion that it "has been and continues to be damaged" [D.E. ¶¶ 105, 113] at best amounts to "a mere allegation of lost business," which "does not suffice" under New Jersey law. *Marin*, 2013 WL 356623.

### 2. RWS did not act maliciously.

D.E. 164 lacks any allegation of malice, which in New Jersey "mean[s] that the interference was inflicted intentionally and without justification or excuse." *Singer v. Beach Trading Co.*, 379 N.J. Super. 63, 81 (App. Div. 2005). The conduct must be "injurious and transgressive of generally accepted standards of common morality or of law" with "[t]he line clearly … drawn at conduct that is fraudulent, dishonest, or illegal." *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 306–7 (2001) (internal quotes omitted). In contrast, "[a] party's actions in its own interest and for its own financial benefit will not rise to the level of malice," and a business-related explanation can justify both motive and means. *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 576 (D.N.J. 2010). Thus, "to provide truthful information … cannot rise to the level of malice, even if the action was intended

to interfere." *Id.*; *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140 (App. Div. 1995) ("There is no legal prohibition against targeting a specific competitor in the marketplace. Courts have held that this is, in fact, the very essence of competition.").

While HomeSource's recites that RWS's conduct was "without justification" [D.E. 164 ¶ 103, 112], it alleges that HomeSource and RWS competed for the same customers. *Id.* ¶ 19. Thus, even if RWS provided unflattering information about HomeSource's owners' previous business dealings and a negative opinion regarding its website security, fully intending to convince consumers to hire RWS over HomeSource, such a "business-related explanation" defeats the "malicious"/ "without justification" element as a matter of law. *Cargill*, 706 F. Supp. 2d at 576.

### 3.   HomeSource failed to allege any proximate damages from the alleged tortious interference.

To succeed on a tortious interference claim, a plaintiff must "allege facts leading to the conclusion that the interference caused the loss of the prospective gain." *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, 2014 WL 4199059, at *5 (D.N.J. Aug. 22, 2014) (quoting *Soldinger v. Football Univ.*, LLC, 2014 WL 2178465, at *3 (N.J. Super. Ct. App. Div. May 27, 2014). In other words, "[a] plaintiff must show that if there had been no interference, there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Id.* Additionally, a plaintiff must identify economic damages "with a certain degree of specificity." *Graco Inc. v. PMC Global, Inc.*, 2012 WL 762448, at *17 (D.N.J. Feb. 15, 2012). "Claimed loss of unknown customers is insufficient." *Id.* (internal quotation marks omitted).

Here, however, HomeSource failed to plead facts showing that any "actual damages"

27

resulted from RWS's conduct. *Varrallo*, 94 F.3d at 848. HomeSource only alleges that "[a]s a direct and proximate result of RWS's conduct, HomeSource has been and continues to be damaged." D.E. 164 ¶ 113. This conclusory and formulaic recitation of damages is insufficient and must be disregarded, particularly since HomeSource did not identify a single lost customer or contract. *Iqbal*, 556 U.S. at 678 ("a formulaic recitation of the elements of a cause of action will not do.").

### D.  HomeSource's common law and federal unfair competition fails for similar reasons as above and because it is protected.

HomeSource asserts—without elaboration—that a wide range of alleged conduct falls within common law unfair competition (Count V). D.E. 164 ¶¶ 115-25. Insofar as Count V relies on the conclusory allegation that RWS is "stealing HomeSource's customers through publishing materially false and misleading statements about HomeSource" [id. ¶ 116], it fails for the reasons described above. It further does not meet the pleading standards of federal unfair competition claims. Those stem from Section 1125(a) of the Lanham Act, which creates two bases for liability: false association under 1125(a)(1)(A) and false advertising under 1125(a)(1)(B). *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). HomeSource does not allege a "false association" claim. And HomeSource's false advertising claim fails for the reasons described above.

HomeSource's New Jersey common law unfair competition claims similarly fails. Beyond HomeSource's conclusory allegation, its operative allegations—including the document and video incorporated by reference into the pleading—show that none of RWS's alleged statements were materially false or misleading. Indeed, New Jersey fair market competition law permits such conduct, even if RWS's accurate statements

28

(hyperlinked to court documents in the public record) and opinions were unflattering. *Cargill*, 706 F. Supp. 2d at 576; *Ideal Dairy*, 282 N.J. Super. at 201 ("no legal prohibition against targeting a specific competitor in the marketplace. Courts have held that this is, in fact, the very essence of competition."); *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super. 168, 174 (Law Div. 1989) (a competitor has an absolute right to take away as much of his rival's business as he can take lawfully).

Although New Jersey's common law unfair competition doctrine has "boundaries [that] are, at a minimum, uncertain, courts applying New Jersey common law principles agree that it seeks to espouse some baseline level of business fairness." *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 786 (D.N.J. 1995). Providing substantially accurate, even if unflattering, commentary on a competitor's owners' prior business dealings is completely fair. Since this doctrine merely "incorporate[es] other causes of action, including tortious interference, breach of duties of good faith and fair dealing, misappropriation and defamation,"—and since HomeSource's allegations do not establish *any* of these claims, as shown above—Count V must be dismissed as well. *Id.* (where plaintiff "predicate[d] its unfair competition claims on the same factual allegations forming the gravamen of its tortious interference and breach of contract claims," but could not establish those claims, unfair competition count failed as well); *Diversified Indus.*, 2014 WL 1767471, at *6–7 (listing cases and dismissing claim as duplicative where the "factual basis for the unfair competition claim is the same as for the tortious interference count"); *also compare Tris Pharma, Inc. v. UCB Mfg.*, No. A-5808-13T3, 2016 WL 4506129, at *5 (N.J Super. App. Div. Aug. 29, 2016) ("no New Jersey precedent … supports [the] assertion that the common law tort of unfair competition encompasses … false advertising") *with* D.E. 164

¶¶ 116–17 (claiming false advertising constitutes unfair competition).

## II.    RWS's alleged "web crawling" and other cyber activities do not provide HomeSource with any viable claim.

Beyond the Newsletter and video, HomeSource alleges that RWS engaged in certain cyber activities like logging in to HomeSource's website [D.E. 164 ¶ 77] or deploying software to view or download materials from the website. *Id.* ¶¶ 78-84. Credited as true for purposes of this motion only, HomeSource's allegations do not state a claim.

### A.    The CFAA claim (Count VI) fails because HomeSource does not have standing to assert its customers' claims; and its allegations do not meet the statute's "without authorization" or damages requirements.

HomeSource's CFAA claim against RWS fails for three reasons: (1) it has no standing as to websites owned by HomeSource's customers; (2) Section 1030(a)(2)(C) does not prohibit web crawling and accessing public information does not otherwise constitute access "without authorization" or "exceeding authorized access" under the CFAA; and (3) HomeSource did not plead section 1030(g)'s requisite damage or loss requirements.

#### 1.    HomeSource does not have standing because the affected websites belonged to its customers, not HomeSource.

HomeSource claims that RWS crawled its customers' websites, which allegedly slowed their functionality. D.E. 164 ¶¶ 77, 82, 132-133. The CFAA imposes liability on a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains...information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). HomeSource, however, admits that the affected websites and the "protected computer" belong to its customers. *Id.* ¶ 133 ("HomeSource's…customers' websites are a protected computer under the CFAA…"). Because the alleged conduct would have only affected the customers' websites and their "protected computer," the claim belongs to

them, and HomeSource has no standing on this issue.

### 2. HomeSource's does not allege lack or exceeding of authorization.

HomeSource's claim that RWS violated 18 U.S.C. § 1030(a)(2)(C) of the CFAA fails as a matter of law because, even if true, (i) crawling public websites is not prohibited by the CFAA, (ii) HomeSource does not allege any conduct akin to hacking.

### i. Crawling public websites does not violate the CFAA.

HomeSource alleges that RWS used software to monitor its customers' public websites, but viewing or crawling publicly available websites is not "without authorization" under the CFAA.[10] 18 U.S.C. § 1030(a)(2)(C); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1003 (9th Cir. 2019) (noting "without authorization" is akin to breaking and entering, and drawing a distinction between public websites and non-public or "restricted" websites.) HomeSource merely concludes that such conduct was "expressly prohibited" [D.E 164 ¶ 81], but does not explain any applicable prohibition. True, the CFAA may be violated when a person circumvents rules regarding restricted access, such as "username and password requirements to gain access to a computer." *Id.* at 1003. But crawling a website that permits general public access (such as LinkedIn) is not "without authorization," even if the site's terms of use prohibit crawling. *Id.* at 992. "[W]hen a computer network generally permits public access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA." *Id.* at 1003.

HomeSource alleges, like *hiQ*, that RWS crawled public websites. HomeSource does not assert that the information was protected using an authorization system, like usernames

---

[10] HomeSource does not appear to allege that RWS exceeded authorized access.

or passwords to access the information. Simply put, this activity does not violate §
1030(a)(2)(C) even if, as in *hiQ*, the customers' Terms and Conditions prohibited website
crawling. In any event, no allegation supports that RWS agreed to any of HomeSource
customer's Terms and Conditions that prohibited crawling.

> ii.   **Logging in to a website with another's credentials does not violate the CFAA.**

HomeSource does allege that RWS got through a password-protected area of its website
by using a customer's credential and password. D.E. ¶¶ 74–77. No allegation suggests that
RWS stole or hacked this password; while formulaically reciting the words "without
authorization," HomeSource does not allege *whose* authorization RWS lacked. *Id.* ¶ 76.
Under the CFAA, that phrase is akin to breaking and entering, *hiQ*, 938 F.3d at 1003, and
HomeSource's allegation is completely consistent with RWS using a password voluntarily
provided by an unnamed customer. D.E. ¶ 74–77; *see A.V. ex rel. Vanderhye v. iParadigms,
LLC*, 562 F.3d 630, 645 (4th Cir. 2009) (CFAA "generally intended to deter computer
hackers"). As such, the allegation does not satisfy the "without authorization" term of art.

> 3.   **HomeSource never alleges that RWS sustained damages and losses under the CFAA.**

HomeSource alleges neither "damage" nor "loss" as defined by the CFAA.
HomeSource alleges that RWS disrupted its business and gained an unfair competitive
advantage. *Id.* ¶¶ 79-80. Under the CFAA, "the term 'damage' means any impairment to
the integrity or availability of data, a program, a system, or information." 18 U.S.C. §
1030(e)(8). Copying or downloading business information is not "damage" under the
CFAA. *See Garelli Wong & Assoc., Inc. v. Nichols*, 551 F. Supp. 2d 704, 710 (N.D. Ill. 2008)
("Allegations of trade secret theft and misappropriation do not suggest such a violation.");

*Adv. Fluid Sys., Inc. v. Huber*, 28 F.Supp.3d 306, 330 (M.D. Pa. 2014) (a "decrease in the competitive value of [plaintiff's] confidential information does not satisfy the damages requirement of § 1030(a)(5)(A).") (quoting *Consulting Prof. Res., Inc v Concise Techs. LLC*, No. 09-1201, 2010 WL 1337723, at *8 (W.D. Pa. Mar. 9, 2010)); *see also Miflinburg Telegraph, Inc. v. Criswell*, 277 F.Supp.3d 750, 793 (M.D. Pa. 2017) ("A violation of (a)(5)(A) is not determined by unauthorized access, rather, it is predicated on unauthorized damage.").

While HomeSource alleges that RWS obtained business information, it did not allege that its data was unavailable or impaired, as required to establish damage under 18 U.S.C. § 1030(e)(8). *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. CIV. 09-2751, 2010 WL 4224473, at *6 (E.D. Pa. Oct. 22, 2010) ("Here, Plaintiffs do not allege that the integrity of data was impaired … This claim does not allege damage for the purposes of the CFAA"). The only suggested "impairment" occurred when RWS's supposed web-crawling "slow[ed] the functionality" of HomeSource's customers' websites, but there is no allegation that this impaired the integrity of HomeSource's web data, and in any event, this alleged effect would have been felt by HomeSource's *customers*, not HomeSource. D.E. 164 ¶ 82. At its core, HomeSource's claim of visiting or copying sounds in trade secret misappropriation and not a CFAA claim. *Garelli Wong* 551 F. Supp. 2d at 710.

"Loss" is also not met. "[T]he term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(3)(11). "[T]he meaning of loss under the statute must pertain to 'a cost of investigating or remedying damage to a computer, or a cost

incurred because the computer's service was interrupted.'" *Chas. S. Winner, Inc. v. Polistina*, No. 06-4865, 2007 WL 1652292, at *4 (D.N.J. June 4, 2007).

HomeSource recites the boilerplate of "$5,000 in damages" [D.E. 164 ¶ 134] but does not allege a loss. While it makes conclusory references to performing an "investigation" and "damage assessment," it never alleges that it investigated or remedied *damages* to a computer, or that it incurred costs because service was interrupted. *Id.* And HomeSource never alleges "how [its] computer system was interrupted, damaged or restored." Thus it cannot satisfy the threshold requirement of 18 U.S.C. § 1030(g) for loss or damage.

## B.     For the same reasons, RWS's alleged cyber activity does not support any of the other claims alleged by HomeSource.

HomeSource alleges that RWS's "various unlawful cyber activities" also constitute Tortious Interference and common law unfair competition. D.E. 164 ¶¶ 101; 110; 118. HomeSource provides no further explanation as to how any alleged cyber activity interfered with any particular economic advantage or contract, nor how such activity was "malicious" as case law defines that term. Those allegations are completely threadbare. D.E. 164 ¶¶ 110-11, 118-19. "Interference is intentional when 'the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" *Cargill*, 706 F. Supp. 2d at 575 (*quoting Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003)). No allegation explains how any alleged cyber conduct was performed with a purpose or desire to interfere with one or more of Plaintiff's known contractual or business relationships. D.E. 164 ¶ 77. The bald recitation that RWS acted "intentionally" does not suffice. *See Iqbal*, 556 U.S. at 668; D.E. 164 ¶¶ 102, 111.

HomeSource claims that the alleged "various unlawful cyber activities" constitute

common law unfair competition. D.E. 164 ¶¶ 115-25. That tort does not expand to cover any alleged conduct the plaintiff does not like. *See e.g. SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1062 (3d Cir. 1980) (finding under New Jersey law only "two relevant torts of unfair competition, passing off one's goods or services as those of another, and unprivileged imitation"). RWS cannot locate legal authority indicating that these alleged cyber activities constitute common law unfair competition; Count V should be dismissed.

### III.   The civil conspiracy claim fails because there are no underlying torts, and no agreement.

New Jersey civil conspiracy requires "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003). "[C]onclusory and unsupported allegations of a conspiracy are insufficient to state a claim." *Tennile v. Quintana*, 443 F. App'x 670, 674 (3d Cir. 2011).

A civil conspiracy claim fails absent an underlying tort. *Banco Popular N. Am. v. Gandi*, 184 N.J. 161 (2005) ("The gist of the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action." (internal quotes omitted)). Here, HomeSource failed to state an underlying tort claim that the parties conspired to commit, and therefore failed to establish the predicate unlawful act.

HomeSource likewise fails to adequately plead an actionable agreement. It claims that Gridiron, Nationwide, and RWS worked in concert to minimize HomeSource's market share. D.E. 164 ¶ 27. HomeSource says the three entities conspired to begin a "smear campaign" to damage its reputation and business [*id.* ¶ 28], but does not define what

35

"smear campaign" means, or whether those "smears" were unflattering truths about its owners (which would be lawful). HomeSource also alleges that the three entities collectively decided to send out newsletters, and that Gridiron and Nationwide "signed off on" newsletters that HomeSource alleges contained false statements. *Id.* ¶¶ 29–30.

These allegations fail to state a conspiracy claim, which depends on the participants agreeing to undertake unlawful acts or lawful acts with an unlawful purpose. *Morganroth*, 331 F.3d at 414. Here, HomeSource simply alleges that the three entities agreed "to begin a smear campaign" (with no explanation as to what that means); agreed to minimize HomeSource's market share; and agreed to send out newsletters. D.E. 164 ¶ 27–29. But none of these are unlawful or have an unlawful purpose. And while HomeSource alleges that Gridiron and Nationwide "signed off" on RWS's newsletters that HomeSource contends had false and misleading statements, HomeSource *does not* allege that the three entities *agreed* to send out "newsletters that contained materially false and misleading statements about HomeSource." D.E. 164 ¶ 30. As such, there is no allegation of an agreement to undertake an unlawful act or act with an unlawful purpose.

## IV.    The John Doe claims are unconnected and should be severed.

The John Doe cyberattack claim (Count VII) is unrelated by fact or law to the claims against RWS or the other named defendants. It should be severed under Rules 20 and 21, or in the court's discretion to prevent prejudice and promote judicial efficiency.

Unrelated defendants, who cause a plaintiff damages through independent acts, should not be joined. *See Pruden v. SCI Camp Hill*, 252 F.App'x 436 (3d Cir. 2007) (affirming dismissal under Rules 8, 10, and 20 where claims arose out of different events); s*ee also Toolasprashad v. Grondolsky*, 570 F. Supp. 2d 610, 653 (D.N.J. 2008) ("A buckshot [case] ...

say, a suit complaining that A defrauded the plaintiff, B defamed him [etc.] all in different transactions—should be rejected.").

Homesource alleges that an unknown number of John Does cyberattacked and hacked customer websites. D.E. ¶¶ 57, 66. These claims have no factual or logical connections to the claims against RWS, and relate to hacking and DDoS attacks, which are not asserted against any of the named defendants. As such, these claims do not arise out of the same transaction or occurrence and do not involve a common question of law or fact, so should be severed. *F.T.C. v. Endo Pharm., Inc.*, No. 16-1440, 2016 WL 6124376, at *4 (E.D. Pa. Oct. 20, 2016) (joinder requires a "logical relationship" among the claims).[11] In fact, HomeSource has no idea who the John Does are, and even pleads that it might *never* know because the purported account was compromised. D.E. 164 ¶ 64.

The Court should also sever Count VII under Rule 21. *See DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006) (district courts may remedy misjoinder by severing claims). This District considers four factors for severance: (1) whether the issues are significantly different, (2) whether the separable issues require the testimony of different witnesses and different proof, (3) whether the party opposing the severance will be prejudiced, and (4) whether the party requesting severance will be prejudiced. *Picozzi v. Connor*, No. CIV. 12-4102, 2012 WL 2839820, at *6 (D.N.J. July 9, 2012). Each factor favors severance here.

First, the John Doe claim involves hacking and cyberattacks, with no allegation plausibly tying them to RWS's alleged acts. Second, the John Does cyberattacks on HomeSource's

---

[11] The Court also may exercise its inherent powers to dismiss a claim for legal insufficiency. *Laufgas v. Speziale*, No. 04-cv-1697, 2006 WL 2528009, at *9 (D.N.J. Aug. 31, 2006). The Court should exercise that discretion here and dismiss the John Doe claim as legally insufficient.

customers' websites will require different evidence than any claim against RWS. Third, severance will not prejudice HomeSource because it can prosecute its John Doe claim in a separate action, with no work duplicated. Fourth, RWS *will* be prejudiced absent severance because it will incur fees and costs on matters unrelated to any claim against RWS and because a jury would find it confusing to distinguish between the unrelated claims. Moreover, even *if* HomeSource finds the John Does, there could be any number of parties, located anywhere in the world, each with a different defense to present; all of which would also counsel in favor of severance. *Dragon Quest Prods., LLC v. John Does 1-100*, No. CIV. 12-6611 JHR/AMD, 2013 WL 2949407, at *8 (D.N.J. June 14, 2013) (severing John Doe defendants because of potential numerosity, potential different individual defenses, and potential logistical difficulties). Finally, it would be prejudicial to the named defendants to be forced to defend their claims alongside incendiary allegations like DDoS and hacking claims against unknown hackers.

As such, the Court should exercise its discretion and sever HomeSource's claim against the John Does.

## CONCLUSION

For all these reasons, HomeSource's Defamation, Lanham Act, Unfair Competition, and Civil Conspiracy, Computer Fraud and Abuse Act, and tortious interference claims (Counts I, II, III, IV, V, VI and VIII) against RWS and the Defendants that joined this brief should be dismissed. HomeSource's John Doe CFAA claim (Count VII) is misjoined and should be severed from this action.

Dated: June 15, 2020

Respectfully submitted,

*/s/ Ethan Hougah*
Louis R. Moffa
Ethan Hougah
Alexandra S. Jacobs
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, New Jersey 08002
(856) 488-7700

Adam Wolek (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, IL 60601
Tel.: (312) 836-4063
Fax: (312) 966-8598
awolek@taftlaw.com

William C. Wagner (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
wwagner@taftlaw.com

*Counsel for Defendant Retailer Web Services II,*
*LLC; Retailer Web Services, LLC; Nationwide*
*Marketing Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2020, a true and correct copy of the foregoing was

served via via the Court's electronic filing system upon the following counsel for the

Plaintiff:

FLASTER/GREENBERG P.C.
Kenneth S. Goodkind, Esq.
Eric R. Clendening, Esq.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
Tel.: (856) 661-1900
Fax: (856) 661-1919

*Counsel for Plaintiff The HomeSource, Corp.*

/s/ Ethan Hougah
Louis R. Moffa
Ethan Hougah
Alexandra S. Jacobs

*One of the attorneys for Defendant Retailer Web
Services II, LLC*

27369754.5

40