## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HOMESOURCE, CORP.<br><br>Plaintiff,<br><br>vs.<br><br>RETAILER WEB SERVICES, LLC, et al.,<br><br>Defendants. | Case No. 1:18-cv-11970 (ECR-AMD)<br><br><br>**Returnable: August 3, 2020** |

---

### MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS OF DEFENDANTS RETAILER WEB SERVICES, LLC and RETAILER WEB SERVICES II, LLC TO DISMISS AND SEVER THE SECOND AMENDED COMPLAINT

---

By:   */s/Eric R. Clendening*
      Eric R. Clendening, Esq.
      Kenneth Goodkind, Esq.
      FLASTER/GREENBERG P.C.
      Commerce Center
      1810 Chapel Avenue West
Dated: July 20, 2020      Cherry Hill, NJ 08002-4609
      *Attorneys for Plaintiff The HomeSource Corp.*

7859366 v1

## TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     PROCEDURAL AND FACTUAL BACKGROUND...................................... 2

        **A.   Procedural Background** .......................................................... 2

        **B.   Factual Background**................................................................ 3

III.    LEGAL REASONING and ARGUMENTS.................................................. 5

        A.   Legal Standard ........................................................................ 5

        B.   HomeSource Sufficiently Pled a Claim for False Advertising under the
             Lanham Act (Count I)................................................................ 5

        C.   HomeSource Sufficiently Pled a Claim for Defamation (Count II) ..................... 9

        D.   HomeSource's Tortious Interference Claims (Counts III and IV) Are
             Properly Pled, as HomeSource Is Not Required to Identify Hundreds of Its
             Customers or Potential Customers by Name in the SAC to Assert a Valid
             Claim.................................................................................... 13

             1.   Tortious Interference with Prospective Economic Advantage ................ 14

             2.   Tortious Interference with Contract........................................ 15

        E.   HomeSource Sufficiently Pled a Claim for Unfair Competition .......................... 16

        F.   HomeSource's Computer Fraud and Abuse Act ("CFAA") Claim against
             RWS (Count VI) Is Properly Pled, and this Court Has Already Rejected
             RWS's Arguments to the Contrary...................................................... 17

        G.   HomeSource's CFAA Claim against the John Doe Defendants (Count VII)
             is Properly Pled and Joined to this Action ............................................. 19

        H.   HomeSource's Civil Conspiracy Claim (Count VIII) Is Properly Pled
             Because There Is No Direct Parent-Subsidiary Relationship between the
             Defendants, and this Court Has Already Determined that This Claim Is
             Not Futile ............................................................................ 21

        I.   HomeSource's Claims Should Survive Against RWS I and RWS II. .................. 24

CONCLUSION................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*BaseProtect USA, Inc. v. SWARM, et al.*,
   No. 11-7288, 2012 WL 13032936 (D.N.J. Oct. 18, 2012) ......................................................19

*Chubb INA Holdings, Inc. v. Chang*,
   2017 U.S. Dist. LEXIS 16744, 2017 WL 499682 (D.N.J. Feb. 7, 2017) ...............................18

*D&R Communs., LLC v. Garett*,
   Civil Action No. 11-0413 (GEB), 2011 U.S. Dist. LEXIS 84658 (D.N.J. Aug.
   2, 2011) ......................................................................................................................................9

*First Time Videos, LLC, v. Does*,
   No. 12-20921, 2012 WL 12895030 (S.D. Fla. Dec. 5, 2012)...........................................20, 21

*Graco, Inc. v. PMC Glob., Inc.*,
   Civil Action No. 08-1304 (FLW), 2009 U.S. Dist. LEXIS 26845 (D.N.J. Mar.
   31, 2009) ....................................................................................................................................6

*Hamilton County Emergency Communs. Dist. v. Orbacom Communs. Integrator
   Corp.*,
   2006 U.S. Dist. LEXIS 94828 (E.D. Tenn., Jan. 30, 2006)....................................................23

*Hard Drive Productions, Inc., v. Does 1-1*,
   No. 11-1741, 2012 WL 3296582 (D.D.C. Aug. 13, 2012) .....................................................19

*In Re Mushroom Direct Purchaser Antitrust Litig.*,
   621 F. Supp.2d 274 (E.D. Pa. 2009), *affirmed* 655 F.3d 158 (3d Cir. 2011)........................23

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp.2d 709 (E.D. Pa. 2011) ......................................................................................23

*Innovasystems, Inc. v. Proveris Sci. Corp.*,
   2014 U.S. Dist. LEXIS 109228, 2014 WL 3887746 (D.N.J. Aug. 6, 2014) ...........................4

*Land v. Helmer*,
   843 F. Supp. 2d 547 (D.N.J. 2012) ..........................................................................................5

*Morganroth & Morganroth v. Norris McLaughlin & Marcus, P.C.*,
   331 F.3d 406 (3d Cir. 2003)..............................................................................................21, 22

*Mycone Dental Supply Co. v. Creative Nail Design, Inc.*,
   Civil Action No. 11-4380, 2012 U.S. Dist. LEXIS 116924 (D.N.J. Aug. 16,
   2012) ..................................................................................................................................16, 17

ii

*Nu Image, Inc., v. Does*,
No. 2:12cv109, 2012 WL 3042933 (M.D. Fla. July 15, 2012)...............................................19

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008)..............................................................................................5

*Pinker v. Roche Holdings Ltd.*,
292 F.3d 361 (3d Cir. 2002)...............................................................................................5

*Regas Christou v. Beatport, LLC*,
849 F. Supp.2d 1055 (D. Col. 2012).................................................................................23

*SK & F, Co. v. Premo Pharm. Laboratories, Inc.*,
625 F.2d 1055 (3d Cir. 1980)............................................................................................17

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
2005 U.S. Dist. LEXIS 15432, 2005 WL 1076043 (D.N.J. May 3, 2005)............................16

*United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
898 F.2d 914 (3d Cir. 1990)...............................................................................................6

**STATE CASES**

*DeAngelis v. Hill*,
180 N.J. 1, 847 A.2d 1261 (2004).......................................................................................9

*Nostrame v. Santiago*,
213 N.J. 109, 61 A.3d 893 (2013).....................................................................................15

*Patel v. Soriano*,
848 A.2d 803 (N.J. Super. 2004) ......................................................................................15

**FEDERAL STATUTES**

15 U.S.C. § 1125(a)(1)(B) of the Lanham Act ...................................................................16

18 U.S.C. § 1030(a)(2)(C) ...............................................................................................18

18 U.S.C. § 1030(e)(2)......................................................................................................18

18 U.S.C. § 1030(e)(8)......................................................................................................18

18 U.S.C. § 1030(e)(11).....................................................................................................17

Lanham Act.................................................................................................................9, 16, 17

**RULES**

FRCP 12..........................................................................................................................3, 4

7859366 v1

FRCP 12(b)(6) ..........................................................................................................................5

iv

## I.      PRELIMINARY STATEMENT

Plaintiff HomeSource is a New Jersey company that provides data, software, and technology solutions for manufacturers as well as retailers who are specifically members of four customer buying groups known as NEAG, ADC, Intercounty, and DMI. Prior to 2017, defendant RWS[1] was the only company providing these services to these groups. Once HomeSource began offering its competing services, acquired RWS's customers, and ruined RWS's monopoly, RWS and its related entities, defendants Nationwide and Gridiron, began a smear campaign against HomeSource to attempt to reacquire lost customers and otherwise damage HomeSource's reputation and business. As part of defendants' smear campaign, RWS conspired with Nationwide and Gridiron to send newsletters with false and defamatory statements about HomeSource to HomeSource's existing and potential customers, including falsely stating that HomeSource had (a) been found guilty of making negligent misrepresentations about its software, (b) failed to make payments to a vendor under court order, and (c) been using a system that contained security vulnerabilities for its customers.

HomeSource originally filed this lawsuit against RWS to enjoin its unlawful conduct, and RWS then engaged in obstructionist tactics designed to increase legal fees and prevent HomeSource from learning the truth about Nationwide and Gridiron's involvement. The Court put an end to these tactics when it granted HomeSource's Motion to Amend (ECF No. 163) and specifically rejected many of RWS's same arguments regarding insufficient claims that are currently set forth in defendants' five pending motions to dismiss. As shown herein, HomeSource's claims are all sufficiently pled against RWS in the SAC. Tellingly, RWS failed to

---

[1] "RWS" refers to both defendants Retailer Web Services, LLC ("RWS I") and Retailer Web Services II, LLC ("RWS II"). As alleged in the Second Amended Complaint, the two are related entities, and discovery is continuing as to the exact relationship between them. (Second Amended Complaint ("SAC"), ECF No. 164, at ¶ 12).

oppose many of these claims in prior motion practice. RWS's motions are not supported by the record or applicable case law. RWS ignores FRCP 12's mandate that for the purposes of a motion to dismiss, all of HomeSource's well-pled allegations are accepted as true. RWS improperly tries to introduce its own factual allegations and attaches evidence which is misleading and does not even support RWS's arguments. As demonstrated below, all of HomeSource's claims against RWS are pled sufficiently and clearly put RWS on notice of the claims for relief. Accordingly, HomeSource respectfully requests that the Court deny RWS's Motions to Dismiss in their entirety.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   Procedural Background

A brief summation of the relevant procedural history is necessary to inform the Court how defendants' five motions to dismiss are meritless and are simply just the latest tactic designed to delay this case and increase legal fees for HomeSource, a small New Jersey corporation.

HomeSource had to file multiple motions to amend its pleadings because RWS withheld relevant documents that implicated Nationwide and Gridiron through seven (7) months of discovery (and through RWS's production of over 4,000 pages of documents), and then withheld information about the corporate family ownership structure of RWS I, RWS II, Nationwide, Local Retail Solutions, LLC ("LRS"), and Gridiron for another seven (7) months, until November 7, 2019. Specifically:

- In August 2018, HomeSource served initial discovery requests asking RWS to produce internal correspondence regarding the defamatory July 2018 newsletter attached to HomeSource's initial complaint as Exhibit A (the "Newsletter"), and to identify any parties involved in drafting and sending the Newsletter.

- Seven months passed during which HomeSource: (a) was required to serve multiple discovery dispute letters and file motions to compel RWS's document

responses (ECF Nos. 24, 30, 37, 41, 43, 44, 47), (b) repeatedly requested copies of the drafts of the Newsletter, specifically questioning whether Nationwide and Gridiron drafted, revised and/or approved the Newsletter, and (c) was forced to litigate against Nationwide in the District of North Carolina, merely to force Nationwide to produce the documents that implicated Nationwide in response to a subpoena from HomeSource.[2]

- HomeSource moved for additional time to amend its pleadings in response to RWS's delays in providing discovery responses, which was heard on March 12, 2019, and granted. (ECF No. 74.) The following day, RWS produced another 8,500+ additional pages (following the previous 4,000+ pages) which finally revealed the involvement of Nationwide and Gridiron in HomeSource's claims, including their roles in drafting and sending the Newsletter.

- In March 2019, HomeSource served supplemental interrogatories requesting that RWS identify and provide with specific details the relationships between the entities relevant to this action: Nationwide, Gridiron, RWS I, RWS II, and LRS, whom RWS I initially identified as its parent.

- After another seven (7) months of delay, RWS finally revealed the corporate family and ownership structure on November 7, 2019, but only after being compelled to do so by Court Order. (ECF No. 128 at 11; ECF No. 134).

This Court agreed with HomeSource that RWS's intentional delaying tactics resulted in HomeSource having to file multiple motions to amend its Complaint, and RWS had otherwise prevented the case from moving forward expeditiously:

> HomeSource contends RWS is in fact responsible for delaying the case by refusing to cooperate in producing discovery. In fact, according to HomeSource, RWS's withholding of relevant discovery and ad hoc rolling production of key discovery is the very reason why HomeSource has had to file, withdraw, and amend the proposed SAC four times. **The Court agrees**.

(Order Granting Motion to Amend, ECF No. 163 at 31) (emphasis added).

## B.    Factual Background

HomeSource incorporates by reference the facts set forth in HomeSource's SAC, including its Exhibits. Pursuant to FRCP 12, these facts are to be accepted as true for the purposes of considering RWS's motions.

---

[2] Nationwide was ordered to produce the relevant documents around the same time that RWS finally produced the documents that implicated Nationwide.

7859366 v1

Many of RWS's counter-allegations of "facts" are untrue, and because they are outside of the four corners of the SAC, should be ignored. By way of example, RWS makes the following misrepresentations and untrue allegations in their brief. First, RWS alleged that the July 2018 Newsletter was substantially true in stating: "the White Family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them." The White family does not even own HomeSource; rather, 563 Systems, LLC does. (ECF No. 2). Previously, Gregory White was the sole owner of HomeSource, and no other member of the White family (including James White, Jr.) ever owned HomeSource as an individual. (Declaration of James White ("White Decl.") at ¶ 3). Second, RWS alleged that in 2012, Furniture Distributors, Inc. ("FDI") sued another company owned by Greg [White], James [White], Jr. and the White parents (collectively, the "White Family") called Software Support-PMW, Inc. ("Software Support"). Software Support was only ever owned by James White, Jr. (Greg's brother), and not by any other member of the White family. (White Decl. ¶ 4).

To support these and other meritless allegations, RWS attaches the complaint from *FDI v. Software Support*, which is merely a series of allegations that cannot be accepted as true (and indeed, are largely untrue).

In sum, RWS seeks to blur the facts this Court is required to accept for purposes of FRCP 12 by arguing counterfactual allegations concerning "the White Family" generally, when in actuality, James and Greg each owned separate companies, and any legal cases involving Software Support have nothing to do with HomeSource. For the purposes of the instant motion to dismiss, these types of allegations, unsupported by documents contained within the four corners of the SAC, must be ignored. *See generally Innovasystems, Inc. v. Proveris Sci. Corp.*, 2014 U.S.

Dist. LEXIS 109228, *15, 2014 WL 3887746 (D.N.J. Aug. 6, 2014) (stating that court must limit itself to four corners of pleading when evaluating motion to dismiss).

## III.   LEGAL REASONING and ARGUMENTS

### A.   Legal Standard

RWS's Motions to Dismiss ignore the heavy burden they must satisfy under FRCP 12(b)(6) at this stage of the case. When evaluating a Rule 12(b)(6) motion to dismiss "the Court accepts as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom." *Land v. Helmer*, 843 F. Supp. 2d 547, 550 (D.N.J. 2012). A complaint need only contain sufficient factual allegations for each claim to show that it is facially plausible. *Id.* This Court looks to the face of the SAC and decides, taking all of the allegations of fact as true and construing them in a light most favorable to HomeSource, whether HomeSource's allegations state any legal claim, and "determine whether, under any reasonable reading of the complaint, [HomeSource is] entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002)).

Evaluating the SAC in accordance with the foregoing, and for the reasons stated more fully below, the Court should deny RWS's Motions to Dismiss because HomeSource's claims state facially plausible claims for relief.

### B.   HomeSource Sufficiently Pled a Claim for False Advertising under the Lanham Act (Count I)

The SAC establishes a false advertising claim, making the required showing that: (1) the defendant made false or misleading statements about the nature, characteristics, qualities, geographic origins of its or another's goods, services, or commercial activities in commercial advertising or promotion; (2) there is actual deception or a tendency to deceive a substantial

portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff. *Graco, Inc. v. PMC Glob., Inc.*, Civil Action No. 08-1304 (FLW), 2009 U.S. Dist. LEXIS 26845, at *83-84 (D.N.J. Mar. 31, 2009) (citing *United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922-23 (3d Cir. 1990)). HomeSource met its burden, having alleged:

- On or about July 20, 2018, RWS's CEO Jim Kane and COO Jennie Gilbert emailed the Newsletter (with input and approval from Nationwide and Gridiron) containing materially false and misleading statements about HomeSource to HomeSource's actual and potential customers. SAC ¶ 33.

- Under the heading: "Has HomeSource ever done anything like this before?" the Newsletter stated, "The White family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them. They were found guilty of making **negligent misrepresentations about the capabilities of their software in a federal lawsuit** (Civil Action NO. 3:12-CV-0090)." *Id.* at ¶ 34.

- The text "Civil Action NO. 3:12-CV-0090" contains a hyperlink to Judge Graham Mullen's Order (the "Graham Order") on a motion for attorney's fees in *Furniture Distributors, Inc. v. Software Support-PMW, Inc.* (the "Furniture Lawsuit"). *Id.* at ¶ 35.

- HomeSource was not a party in the Furniture Lawsuit, and as such could not have been found "guilty" of making negligent misrepresentations about the capability of its software. Likewise, no member of the White family was a party in the Furniture Lawsuit, and thus no member of the White family was found "guilty" of making negligent misrepresentations about the capability of their software. *Id.* at ¶¶ 36-37.

- RWS further misrepresented: "The judge later deemed the counter-claims they alleged along the way 'totally meritless' and ordered them to pay Furniture Distributors, Inc. fifty thousand dollars to reimburse attorney fees in addition to the four hundred fifty thousand dollars already awarded them at trial." *Id.* at ¶ 38.

- RWS's use of "they" implies, as undoubtedly intended, that HomeSource and the White family filed these counterclaims, but that is plainly false since, as noted, they were not even parties to the Furniture Lawsuit. It was actually Software Support-PMW, Inc. who filed those counterclaims. The Graham Order does not mention HomeSource or the White family at all. *Id.* at ¶¶ 39-40.

6

- RWS, Nationwide, and Gridiron's Newsletter misleadingly and falsely implies that HomeSource and/or its owners were found "guilty" of negligent misrepresentations, but they are not even parties to the Furniture Lawsuit, and the Graham Order deals only with a motion for attorney's fees. *Id.* at ¶ 41.

- The Newsletter continues: "Despite the ruling, **Furniture Distributors Inc sued Homesource again when Homesource failed to make any of the payments ordered** (Case 3:15-CV-00313)." *Id.* at ¶ 42.

- It is self-evident that the Newsletter falsely states that HomeSource was sued for a second time by Furniture Distributors, since HomeSource was not a party to the original Furniture Lawsuit. The Newsletter falsely states that HomeSource failed to make any of the payments ordered, but HomeSource could not have been ordered to make any payments since it was not a party to the prior lawsuit. *Id.* at ¶ 45.

- In order to intentionally disparage HomeSource's business and damage its relationship with its customers and potential customers, the Newsletter misrepresented that HomeSource failed to make payments. *Id.* at ¶ 46.

- The Newsletter further misrepresented that Martin Salas was a consultant hired by HomeSource, but HomeSource never hired or entered into any contract with Martin Salas directly. *Id.* at ¶ 47.

- The Newsletter falsely implied that HomeSource "stole" images from a third party (Plessers), without any understanding of the relationship between HomeSource and Plessers. *Id.* at ¶ 48.

- On July 20, 2018, RWS emailed the Newsletter to HomeSource's customers, also stating: "Our investigation unearthed a possible major security concern with HomeSource sites." *Id.* at ¶ 51.

- There was no such major security concern, and the Newsletter contained a link to a short video where Jim Kane of RWS explains how he believes one could hack into HomeSource's system, and he provides the steps one could take in order to do it. *Id.* at ¶¶ 52-53.

- The video misrepresents the security of customers' files and alleges that they are publicly available, when in fact HomeSource does not store customer information or files in this "bucket" or online folder. *Id.* at ¶ 54.

- The Newsletter's use of "HomeSource" in connection with materially false and misleading statements about HomeSource's reputation, legal history, security, and the quality of its goods and services, constitutes commercial advertising that misrepresents the nature, characteristics, and qualities of HomeSource's goods, services, and commercial activities. *Id.* at ¶ 87.

7

- RWS's conduct in disseminating emails and newsletters and placing phone calls to HomeSource's actual and potential customers with materially false and misleading statements about HomeSource constitutes false advertising and unfair competition. As a result of RWS's conduct, HomeSource has been damaged. *Id.* at ¶¶ 88 and 91.

HomeSource sufficiently stated a false advertising claim by alleging that RWS disseminated emails and newsletters to HomeSource's actual and potential customers with materially false and misleading statements concerning HomeSource's reputation, legal history, and the quality of its goods/services that it provides to consumers in interstate commerce. As a result of RWS's deceptive conduct, HomeSource was damaged and lost customers.

In response, RWS argues that the Newsletter statements were either true or opinions, and even if a reader "badly misconstrued" the Newsletter, it provided links to dozens of pages of legal documents to sort through – implying that a layman reading legal documents would understand a legal decision different and beyond what is stated in the Newsletter. Obviously, this strained argument does not hold water, and when examining the actual words used in the Newsletter, the deception is clear. The heading reads "Has **HomeSource** ever done something like this before?" and the Newsletter goes on to say: "**they** were found guilty of making negligent misrepresentations about the capabilities of **their** software in a federal lawsuit," and then further down, states: "Furniture Distributors sued HomeSource **again** when HomeSource **failed to make any of the payments ordered**." (emphases added.).

RWS actually tries to argue that an average reader would not think HomeSource was a party to the first lawsuit and had been found "guilty" when the Newsletter goes on to say that the same plaintiff from the first lawsuit sued HomeSource **again**. This is just one example of RWS's disingenuous attempt to twist words and rearrange the truth in order to attempt to evade liability for the Newsletter's falsehoods. RWS also alleges that its misstatements were not about a product, service, or commercial activity of HomeSource. Again, RWS disseminated the

Newsletter which misrepresented a security vulnerability that HomeSource purportedly had for maintaining its customers' data, which did not exist, and falsely stated that HomeSource, an e-commerce company, failed to pay a vendor under a court order. RWS also lied about HomeSource being found guilty of negligent misrepresentations concerning its software. Accordingly, RWS's meritless argument that the statements were not about a product, service, or commercial activity is flatly untrue.

Moreover, RWS is well aware that HomeSource has met its burden to allege a claim for false advertising under the Lanham Act, because RWS did not move to dismiss this claim or oppose it on futility grounds despite having **three prior** opportunities to do so in this case: (1) RWS's original Answer (ECF No. 6); (2) its first motion to dismiss (ECF No. 19-1); and (3) its opposition to HomeSource's motion for leave to file the SAC (ECF No. 144).

Accordingly, HomeSource has sufficiently pled a false advertising claim under the Lanham Act against RWS, and the Motion to Dismiss Count I should be denied with prejudice.

### C. HomeSource Sufficiently Pled a Claim for Defamation (Count II)

Again, as a threshold issue, RWS also failed to move to dismiss or oppose HomeSource's defamation claim under a theory of futility on **three** prior occasions: (1) RWS's original Answer (ECF No. 6); (2) its first motion to dismiss (ECF No. 19-1); and (3) its opposition to HomeSource's motion for leave to file the SAC (ECF No. 144).

The SAC establishes a defamation claim, making the required showing of: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *DeAngelis v. Hill*, 180 N.J. 1, 13, 847 A.2d 1261, 1267-68 (2004). Words that subject a business to ridicule, contempt, or that harm its reputation in its business and the community in general are defamatory on their face. *See id.* at 13-14; *see also D&R Communs., LLC v. Garett*,

9

Civil Action No. 11-0413 (GEB), 2011 U.S. Dist. LEXIS 84658, at *26 (D.N.J. Aug. 2, 2011)

(finding defamatory statements that accused business of theft and unlawful behavior).

Here, HomeSource alleged that RWS made numerous false and defamatory statements about HomeSource:

- The Newsletter, under the heading, "Has HomeSource ever done anything like this before?" states: "The White family, owners of HomeSource and similar other businesses, appear to have a history of their business relationships ending in lawsuits against them. They were found guilty of making **negligent misrepresentations about the capabilities of their software in a federal lawsuit** (Civil Action NO. 3:12-CV-0090)." *Id.* at ¶ 34.

- HomeSource was not a party in the Furniture Lawsuit and thus was not found "guilty" of making negligent misrepresentations about the capability of its software. *Id.* at ¶¶ 36-37.

- The Newsletter further misrepresented: "The judge later deemed the counter-claims they alleged along the way 'totally meritless' and ordered them to pay Furniture Distributors, Inc. fifty thousand dollars to reimburse attorney fees in addition to the four hundred fifty thousand dollars already awarded them at trial." *Id.* at ¶ 38.

- The use of "they" implies that HomeSource and the White family filed these counterclaims, but once again, that is false because they were not even parties to the Furniture Lawsuit. It was actually Software Support-PMW, Inc. who filed those counterclaims. The Graham Order does not mention HomeSource or the White family at all. *Id.* at ¶¶ 39-40.

- RWS, Nationwide, and Gridiron's Newsletter misleadingly and falsely implies that HomeSource and/or its owners were found "guilty" of negligent misrepresentations, but that has to be false because they are not even parties to the Furniture Lawsuit, and the Graham Order deals only with a motion for attorney's fees. *Id.* at ¶ 41.

- The Newsletter goes on to state: "Despite the ruling, Furniture Distributors Inc **sued Homesource again when Homesource failed to make any of the payments ordered** (Case 3:15-CV-00313)." *Id.* at ¶ 42.

- The Newsletter falsely states that HomeSource was sued for a second time by Furniture Distributors, Inc., when HomeSource was not a party to the original Furniture Lawsuit. The Newsletter falsely states that HomeSource failed to make any of the payments ordered, but HomeSource was not a party to the prior lawsuit and thus could not have been ordered to make any payments. *Id.* at ¶ 45.

10

- In order to intentionally disparage HomeSource's business and damage its relationship with its customers and potential customers, the Newsletter misrepresented that HomeSource failed to make payments. *Id.* at ¶ 46.

- The Newsletter falsely implied that HomeSource "stole" images from a third party (Plessers), without any understanding of the relationship between HomeSource and Plessers. *Id.* at ¶ 48.

- On July 20, 2018, RWS emailed the Newsletter to HomeSource's customers, also stating: "Our investigation unearthed a possible major security concern with HomeSource sites." *Id.* at ¶ 51.

- There was no such major security concern, and the Newsletter contained a link to a short video where Jim Kane of RWS explains how he believes one could hack into HomeSource's system, and he provides the steps one could take in order to do it. *Id.* at ¶¶ 52-53.

- The video misrepresents the security of customers' files and alleges that they are publicly available, when in fact HomeSource does not store customer information or files in this "bucket" or online folder. *Id.* at ¶ 54.

- The statements contained in the emails and newsletters have caused and will continue to cause substantial pecuniary and reputational harm to HomeSource. *Id.* at ¶ 96.

HomeSource alleged a claim for defamation and that RWS defamed HomeSource by directly publishing and distributing emails and newsletters to actual and potential customers that contained statements that were defamatory in nature and character causing special harm to HomeSource by virtue of such publications. *Id.* at ¶¶ 93-97. Since the statements impute both civil offenses and business and professional misconduct to HomeSource, they are defamatory on their face. RWS was clearly at fault in publishing these statements because they attached the very court documents to the Newsletter that RWS was misrepresenting and falsifying to HomeSource's customers and other third parties.

In response, RWS argues that the statements are true, and even if they are not true, they are protected as opinion. As set forth above, this is simply untrue. Statements imputing civil offenses and professional misconduct to a business are defamatory on their face. By way of just

one example, in the infamous Newsletter, under the heading "Has HomeSource ever done anything like this before?", and after stating that "**they** were found guilty of making negligent misrepresentations about the capabilities of their software," the Newsletter goes on to say: "**Furniture Distributors Inc sued Homesource *again* when Homesource failed to make any of the payments ordered**." (Emphasis added). Putting aside all of RWS's linguistic gymnastics about what the word "guilty" could mean, the Newsletter clearly said that HomeSource was sued by FDI **twice**, and that HomeSource failed to make payments to FDI under a court order.

Neither statement is true, and both statements are defamatory on their face. Stating that a company involved in e-commerce failed to make payments under a court order is immensely damaging to its reputation. Stating that FDI commenced a second lawsuit against HomeSource after HomeSource was "found guilty" in an earlier proceeding when HomeSource was not even a party is immensely damaging to its reputation. This also directly refutes RWS's false and misleading argument that HomeSource is trying to make defamation claims on behalf of the White family. RWS chose to use the term "they" repeatedly when discussing the White family, HomeSource, and Software Support. These are distinct legal entities and individuals, yet RWS chose to defame HomeSource by imputing alleged activities of the White family and Software Support to HomeSource, despite having no basis to do so, in order to defame and disparage HomeSource so that RWS could try to win back the customers that RWS was losing to HomeSource due to its technologically superior products and services. The statements in the Newsletter speak for themselves and clearly serve as proper underlying bases for HomeSource's claim for defamation.

The remaining allegations concerning defamation also provide bases for HomeSource's claim, but in the interest of judicial economy and to avoid repeating arguments set forth above, they will not be repeated.

Accordingly, HomeSource has sufficiently pled a defamation claim against RWS, and the Motion to Dismiss Count II should be denied with prejudice.

> **D.  HomeSource's Tortious Interference Claims (Counts III and IV) Are Properly Pled, as HomeSource Is Not Required to Identify Hundreds of Its Customers or Potential Customers by Name in the SAC to Assert a Valid Claim**

As an initial matter, it is again notable that RWS did not oppose HomeSource's Tortious Interference Claims (Counts III and IV) in its (1) original Answer; (2) first motion to dismiss; and (3) opposition to HomeSource's prior Motion to Amend, despite the claims being identical. (ECF Nos. 6, 19-1, and 87-88). Now, RWS claims that they are inadequately pled because they do not name any lost customer or business opportunity, show RWS acting with malice, or plead damages. It is curious that RWS previously had no issue with these claims and now alleges that every single element of them has not been pled sufficiently. As with RWS's other litigation tactics, this motion is nothing more than an attempt to run up legal fees and harass HomeSource. For the reasons that follow, HomeSource has sufficiently pled its tortious interference claims.

In the SAC, HomeSource pled:

- In July 2018, RWS, Nationwide, and Gridiron conspired to begin a smear campaign against HomeSource in order for RWS to attempt to regain customers that it lost to HomeSource, and to otherwise damage HomeSource's reputation and business. SAC ¶ 28.

- On July 20, 2018, RWS emailed the Newsletter to HomeSource's actual and potential customers, which contained materially false and misleading statements about HomeSource. *Id.* at ¶ 33.

- Following RWS's, Nationwide's and Gridiron's joint decision to advertise HomeSource's alleged "security vulnerabilities" on the Internet, HomeSource was the victim of two different types of cyberattacks. *Id.* at ¶ 56.

- The only HomeSource customers that have been victimized by these attacks were all former customers of RWS; HomeSource's remaining customers were not targeted. *Id.* at ¶ 62.

- Three HomeSource customer websites were hacked on August 13, 2018, and HomeSource was scheduled to meet with one of RWS's largest customers the next day on August 14, 2018. RWS was aware that this meeting was going to occur. *Id.* at ¶ 67.

- Around the time of the August 13, 2018 hacks, RWS ran a cyberattack known as a spider script against the three hacked websites. In the days just prior to August 13, 2018, RWS was monitoring those three websites in a manner that would alert RWS when the websites were altered. HomeSource believes that RWS was aware that the websites were going to be hacked, before those websites were actually hacked on August 13, 2018, and at the very least, encouraged such hacks with RWS's internet post. *Id.* at ¶¶ 68-70.

- On September 26, 2018, HomeSource was scheduled to meet with and pitch its services to RWS customers located in the Pittsburgh area. Around the time of the meeting, HomeSource was a victim of more cyberattack attempts. These cyberattack attempts failed, but HomeSource continues to note that these attempts occur shortly before HomeSource is scheduled to meet with and pitch RWS customers. Failed cyberattacks have occurred before multiple additional events such as trade shows and meetings in 2019 where HomeSource was pitching its services to RWS customers. *Id.* at ¶¶ 71-74.

- RWS damaged HomeSource's websites, and its customers' websites, by designing and deploying "spiders" or "web crawlers" to monitor and download information from websites which slow the functionality of those customer websites. *Id.* at ¶¶ 78-84.

- RWS further intentionally interfered with HomeSource's prospective economic advantage with potential customers by engaging in various unlawful cyber activities and logging into HomeSource's websites using other companies' usernames and passwords, without authorization from HomeSource. *Id.* at ¶ 102.

- RWS was fully aware of the contractual relationships existing between HomeSource's customers and HomeSource, including the fact that valid and enforceable contracts existed between these parties, and that RWS was not a party to those contractual relationships. *Id.* at ¶ 108.

1.    <u>Tortious Interference with Prospective Economic Advantage</u>

The SAC establishes a tortious interference with a prospective economic advantage claim

by showing: (1) HomeSource had a reasonable expectation of advantage from a prospective

14

contractual or economic relationship(s); (2) the defendant interfered with this advantage intentionally and without justification or excuse; (3) the interference caused the loss of the expected advantage; and (4) the injury caused damage.  *See Patel v. Soriano*, 848 A.2d 803, 832 (N.J. Super. 2004). For tortious interference with prospective economic advantage, the "protected interest" does not need to be an enforceable contract but rather, it is sufficient to allege that there was a reasonable probability HomeSource would have received the economic benefit but for the interference. *See Patel v. Soriano*, 848 A.2d 803, 832 (N.J. Super. 2004).

HomeSource has clearly alleged that there was a reasonable probability it would have gotten more RWS customers to switch to HomeSource's platform, but RWS then began the smear campaign against HomeSource and disseminated materially false statements about HomeSource to its current customers and HomeSource's prospective customers. SAC ¶¶ 99-105. HomeSource also alleged that RWS deployed spiders and web crawlers to cyberattack HomeSource's websites at key times when HomeSource was set to meet with RWS's current customers. RWS's smear campaign involving defamatory statements against HomeSource that was targeted at HomeSource's actual and potential customers constitutes intentional malicious interference that is without justification or excuse. Finally, HomeSource alleged that as a result of RWS's misconduct, HomeSource was damaged.

### 2.  Tortious Interference with Contract

The SAC establishes a tortious interference with contract claim by showing: (1) RWS intentionally and improperly interfered with the performance of at least one contract between HomeSource and a third party (2) by inducing or otherwise causing the third party not to perform the contract; and (3) damages resulted from the third party failing to perform under the contract. *Nostrame v. Santiago*, 213 N.J. 109, 122, 61 A.3d 893, 901 (2013). HomeSource clearly alleged that RWS interfered with HomeSource's existing contractual relationships with its customers,

15

and as a result, HomeSource has been damaged by loss of business with some of these customers. (SAC at ¶¶ 107-114). Moreover, RWS's unlawful conduct which caused HomeSource to lose customers as has been set out at length above.

HomeSource has produced a list of its customers to RWS in discovery, as well as the consumer contracts. Federal practice only requires notice pleading, and a party is not required to spell out the name of each and every customer that it lost in a claim for tortious interference with contract. *See Syncsort Inc. v. Innovative Routines Int'l, Inc.*, 2005 U.S. Dist. LEXIS 15432, *36, 2005 WL 1076043 (D.N.J. May 3, 2005) ("[T]he Court has already determined [that] defendant is not required to plead the facts of such contract with the particularity that plaintiff would require"). There is no requirement that HomeSource list every customer by name in the SAC, which appears to be what RWS is arguing. Moreover, HomeSource already identified the four customer groups that HomeSource and RWS enter into contracts with for their competing technology services: NEAG, ADC, Intercounty, and DMI. (SAC ¶ 19).

Accordingly, HomeSource has sufficiently pled tortious interference claims against RWS, and the Motion to Dismiss Counts III and IV should be denied with prejudice.

### E.   HomeSource Sufficiently Pled a Claim for Unfair Competition

Just like HomeSource's false advertising claim under the Lanham Act, RWS did not move to dismiss this claim or oppose it on futility grounds despite having **three** opportunities to do so throughout this case: (1) RWS's original Answer (ECF No. 6); (2) its first motion to dismiss (ECF No. 19-1); and (3) its opposition to HomeSource's motion for leave to file the SAC (ECF No. 144).

In New Jersey, common law unfair competition claims are analyzed the same way as false advertising claims under 15 U.S.C. §1125(a)(1)(B) of the Lanham Act, and they both contain the same elements except for the interstate commerce requirement. *See Mycone Dental*

*Supply Co. v. Creative Nail Design, Inc.*, Civil Action No. 11-4380 (JBS/KMW), 2012 U.S. Dist.

LEXIS 116924, at *18-20 (D.N.J. Aug. 16, 2012); *SK & F, Co. v. Premo Pharm. Laboratories,*

*Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980). Because HomeSource has successfully pled a claim for

false advertising under the Lanham Act in Count I, HomeSource has also sufficiently pled a

claim for unfair competition in Count V.

### F.    HomeSource's Computer Fraud and Abuse Act ("CFAA") Claim against RWS (Count VI) Is Properly Pled, and this Court Has Already Rejected RWS's Arguments to the Contrary

As a threshold matter, the Court already thoroughly examined Count VI and ruled that

the SAC sets forth a cognizable claim for relief. (ECF No. 163 at 35-37). Nevertheless, RWS

repeats its same arguments. Inexplicably, in an attempt to mislead this Court, RWS once again

ignores HomeSource's allegations that set out the damages HomeSource has suffered. RWS

makes the following arguments:

- "HomeSource alleges neither 'damage' or 'loss' as defined by the CFAA." RWS II's Brief, ECF No. 194-1, at 32.

- "[T]he term 'loss' means any reasonable cost to the victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* at 33 (citing 18 U.S.C. § 1030(e)(11)).

Paragraph 134 of HomeSource's SAC reads:

> As a direct result of RWS's conduct, HomeSource has suffered at least $5,000 in damages in the past year through analyzing, investigating, and responding to RWS's unlawful access of its system and RWS's unlawful crawling of its websites, including by having to conduct a damage assessment and determine the extent of the breach after each unlawful act by RWS.

RWS is not entitled to ignore HomeSource's factual allegations simply because RWS disagrees

with them, and then misrepresent to the Court that HomeSource's claims are deficient.

7859366 v1

RWS also tries to impute a damage requirement that does not exist within the CFAA or case law – namely, that the costs must be attributed to specific damage caused to the computer system or data from RWS's misconduct. RWS alleges: "While HomeSource alleges that RWS obtained business information, it did not allege that its data was unavailable or impaired, as required to establish damage under 18 U.S.C. § 1030(e)(8)." (RWS's Brief at 33). The District of New Jersey does not recognize any such nexus between "loss" and "damage."

> The thrust of Defendants' argument is that, under the CFAA, "the plaintiff must allege costs relating to an investigation of *damage caused to the computer system or data* resulting from the defendants' conduct." . . . . the Court does not read the CFAA quite as narrowly as Defendants . . . . The SAC alleges that, because of Defendants' actions, Plaintiffs have had to expend more than $5,000 to respond to the breach, including conduct a damage assessment to determine the extent of the breach and of the damage to Plaintiffs' files and hardware. . . . The Court finds these allegations are sufficient to state a claim under the CFAA.

*Chubb INA Holdings, Inc. v. Chang*, 2017 U.S. Dist. LEXIS 16744, *20-21, 2017 WL 499682 (D.N.J. Feb. 7, 2017).

HomeSource's Count VI CFAA claim is based on a violation under 18 U.S.C. § 1030(a)(2)(C), which prohibits a party from intentionally accessing a computer without authorization and thereby obtains information from a protected computer. A "protected computer" is defined as any computer used in or affecting interstate commerce. *See* 18 U.S.C. § 1030(e)(2). The SAC alleges:

- RWS logged into HomeSource's website using at least one HomeSource customer's username and password and gained access to HomeSource's non-publicly available, proprietary information, without HomeSource's knowledge and without permission from HomeSource. *Id.* at ¶¶ 74-77.

- RWS used a spider to crawl HomeSource's websites in violations of the websites' Terms of Use, which prohibit crawling, and for the purpose of disrupting HomeSource's business in order to gain an unfair competitive advantage. *Id.* at ¶¶ 78-84.

18

HomeSource alleges that RWS's actions caused more than $5,000 in damages, because HomeSource was required to spend more than that amount investigating and mitigating the damages resulting from RWS's misconduct. *Id*. at ¶ 134.

Based on the allegations in the SAC, which must be accepted as true at this stage, HomeSource has established a claim for a CFAA violation against RWS.

### G.   HomeSource's CFAA Claim against the John Doe Defendants (Count VII) is Properly Pled and Joined to this Action

HomeSource's CFAA claim against the John Doe Defendants is directly related to the conduct of RWS, Nationwide, and Gridiron, and RWS's allegation that there are no "factual or logical connections" between the CFAA claim and the alleged misconduct is yet another example of RWS ignoring well-pled factual allegations, which must be accepted as true for the purposes of this motion.

As a threshold matter, a motion to dismiss or to sever claims against John Doe Defendants is premature, unless and until the John Doe Defendants are actually identified through discovery and served. As the Court stated in *BaseProtect USA, Inc. v. SWARM, et al.*, No. 11-7288, 2012 WL 13032936 (D.N.J. Oct. 18, 2012):

> Complaints about improper joinder are not ripe for determination unless and until [Plaintiff] names the movants as actual defendants . . . . Additionally, unless and until [Plaintiff] names these movants as actual defendants, their motions to dismiss on the merits are premature.

*Id*. at *2-3 (denying motion to sever and dismiss claims against John Doe defendants). *See also Hard Drive Productions, Inc., v. Does 1-1*, No. 11-1741, 2012 WL 3296582 (D.D.C. Aug. 13, 2012) ("Complaints about improper joinder can hardly be justiciable before plaintiff even names the movants as actual defendants" and a "defense, one which speaks to the merits of the plaintiff's claim, may be asserted at a later point in time, if and when the movant is named as an actual defendant."); *Nu Image, Inc., v. Does,* No. 2:12cv109, 2012 WL 3042933, *5 (M.D. Fla.

July 15, 2012) ("The Doe Defendants have not been served in this case, and therefore, the motions to dismiss and sever are premature."); *First Time Videos, LLC, v. Does*, No. 12-20921, 2012 WL 12895030 (S.D. Fla. Dec. 5, 2012) ("As a number of courts both within and beyond this jurisdiction have agreed, considerations of personal jurisdiction and joinder are premature when discovery is sought before the plaintiff has named a defendant and the discovery is targeted to identify unknown individuals associated with the IP addresses for computers, which were used to engage in allegedly illegal infringing activity") (collecting cases). Accordingly, RWS's request to sever this action is premature and should be denied.

HomeSource's CFAA claim against the John Doe Defendants is also properly pled and joined to this action. Following the joint decision of RWS, Nationwide, and Gridiron to advertise HomeSource's alleged "security vulnerabilities" on the internet, HomeSource was the victim of two different types of cyberattacks. SAC ¶ 56. From July to September 2018, HomeSource was the victim of hacking attacks, DDoS attacks, fake customer complaints, and the defamatory Newsletter published by RWS. One hacking attack occurred the night before HomeSource had a meeting to show a new potential (and current RWS) customer its platform. SAC ¶¶ 66-67. The only HomeSource customers targeted by the hacking Doe Defendants were HomeSource customers that were former RWS customers. *Id.* at ¶ 62.

HomeSource noticed that an exponentially disproportionate amount of website traffic was coming from Scottsdale, Arizona, within a mile of RWS's office. *Id.* at ¶ 59. In addition, attempted attacks have continued to occur just before HomeSource is set to meet with RWS's customers to pitch HomeSource's products and services. *Id.* at ¶¶ 67-73.

RWS has repeatedly argued that the claims bear no logical or factual connection to RWS, unsuccessfully, in an attempt to limit the discovery that HomeSource can obtain related to the

John Doe defendants. Nevertheless, RWS has admitted that some of its IP addresses from July to September 2018 have been destroyed because its ISP only retained information for a few months, and RWS did not preserve that information as it was required to do. (ECF No. 107 at 8-11).

RWS has further admitted that its intern was crawling HomeSource's websites from a Verizon hotspot as far back as January 2018. All of the data associated with that activity was never preserved by RWS, and is now lost because RWS did not reveal that it was using a Verizon hotspot until April 2019, despite that information being repeatedly sought by HomeSource in discovery beginning in August 2018. *Id.*

RWS's position that the timing of these attacks is a coincidence is not credible. In addition, the cyberattacks were conducted with non-public information that would have been known to RWS. Quite simply, the smear campaign and cyberattacks against HomeSource are all related actions, and HomeSource has already uncovered that RWS is responsible for at least one CFAA violation. RWS's request to sever the John Doe CFAA claims from this action is nothing more than an attempt to try to evade potential future liability if it is confirmed through discovery that RWS was behind  these attacks.

**H.    HomeSource's Civil Conspiracy Claim (Count VIII) Is Properly Pled Because There Is No Direct Parent-Subsidiary Relationship between the Defendants, and this Court Has Already Determined that This Claim Is Not Futile**

HomeSource's Count VIII sufficiently alleges civil conspiracy against RWS, Nationwide, and Gridiron for coordinating a smear campaign against HomeSource. The SAC establishes this claim by showing: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth &*

*Morganroth v. Norris McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003). As stated in the SAC, RWS, Nationwide, and Gridiron agreed to begin a smear campaign against HomeSource in order to unlawfully acquire HomeSource's customers and regain lost customers by posting false and defamatory statements about HomeSource in newsletters and emails that were sent to actual and potential HomeSource customers. RWS, Nationwide, and Gridiron exchanged emails to coordinate the wording of the Newsletter and other communications that would defame and disparage HomeSource. As a result of the smear campaign, HomeSource lost customers and suffered pecuniary damages. (SAC at ¶¶ 142-151).

In response, RWS makes half-hearted arguments about the phrase "smear campaign" being too ambiguous to constitute an unlawful purpose, despite the fact that the SAC sets forth precisely how the conspiracy was designed to regain lost customers by publicly disparaging HomeSource with false and defamatory statements. (SAC at ¶¶ 28-49). Additionally, it is evident that the underlying torts of false advertising, defamation, tortious interference, and unfair competition have all been adequately pled.

HomeSource also notes that this Court rejected RWS's prior argument that RWS, Nationwide, and Gridiron are related entities incapable of conspiring with one another, and already ruled that HomeSource's conspiracy claim is not futile. (ECF No. 163 at 38-39).

> Specifically, the Court considered the certified statements of Jim Kane, the CEO of RWS and RWS II, which provides persuasive information demonstrating there is no direct parent-subsidiary relationship between the proposed defendants. Moreover, there is nothing in the record establishing that the entities at issue operate under a single unity of control. To the contrary, the present records shows that management of RWS and Nationwide operate independently with separate spans of control.

*Id.* at n. 9.

Courts have concluded that related entities <u>can</u> conspire when there is not 100% parent-subsidiary ownership, and in addition, the percentage of ownership and the entire corporate

structure <u>is relevant</u> to the analysis. For example, in *In Re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp.2d 274, 289-90 (E.D. Pa. 2009), *affirmed* 655 F.3d 158 (3d Cir. 2011), the Court found that a conspiracy can exist between related entities within the same corporate family when there is not a 100% parent-subsidiary relationship:

> While some overlap existed in ownership between the affiliated [entities], they were not under common control in the same sense as is a corporation and its wholly-owned subsidiary, a corporation and its divisions or as are two corporations owned in identical proportions by the same set of investors. The affiliated distributors do not have 100% ownership or a de minimis deviation from complete ownership and there is no indication that the overlapping owners would have control independent of their co-owners. The varying ownership between the affiliated entities shows they are not controlled by a single decision-maker…since ownership is neither complete nor a *de minimis* deviation from 100% there can be no unity of interest between the [entities] in this case."

*Id*. In *Mushroom*, the ownership percentage at issue was 50%. *Id*. The Court concluded that the reasoning behind the "Copperweld Rule," which holds that parent entities and their wholly-owned subsidiaries cannot conspire, is inapplicable where two corporations do not operate as a "single economic unit." *Id*. at 289.

Other federal courts have reached the same conclusion. *See, e.g., Regas Christou v. Beatport, LLC,* 849 F. Supp.2d 1055, 1073 (D. Col. 2012) ("Although some common ownership exists [], it is not sufficient in this case to warrant dismissal of plaintiffs' antitrust conspiracy claims under *Copperweld*."); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp.2d 709, 749 (E.D. Pa. 2011):

> [T]he entities merely are alleged to have individuals in overlapping ownership or controlling roles, and it cannot be said these allegations plausibly suggest that the entities are under common ownership or control such that a single decision-making source exercises definitive control over each of them.

*Hamilton County Emergency Communs. Dist. v. Orbacom Communs. Integrator Corp.*, 2006 U.S. Dist. LEXIS 94828 (E.D. Tenn., Jan. 30, 2006)

> Defendants assert OCI and OSI are so closely related they could not have conspired with each other… In *Copperweld*, the Supreme Court applied the doctrine of intracorporate conspiracy immunity in the antitrust context and held a parent corporation and its wholly owned subsidiary are incapable of conspiring under Section 1 of the Sherman Act…Defendants' reliance on *Copperweld* is misplaced because OSI is not the parent company of OCI.  Although OCI and OSI are related, they cannot be considered a single corporation for purposes of the doctrine of intracorporate conspiracy immunity.

In sum, related entities that do not have a 100% parent-subsidiary relationship and that do not have a single decision-making source exercising definitive control over all of them can conspire, and the percentage of ownership as well as the amount of control that one entity can assert over another entity within the alleged family is relevant to the analysis.

RWS has still not yet produced complete discovery as to all facts relevant to whether the defendant entities are functioning as one economic unit. At this early stage, the facts must be construed in HomeSource's favor. Absent evidence of overlapping owners and lack of independent control of the corporations (as to which there is none), the intracorporate conspiracy doctrine fails because these three entities (RWS, Nationwide, and Gridiron) operate independently and conspired with one another to defame and tortiously interfere with HomeSource's business. *See* SAC at ¶¶ 142-141.

Thus, HomeSource's conspiracy claim is appropriately pled and is not futile.

## I.     HomeSource's Claims Should Survive Against RWS I and RWS II.

From the outset of this case, RWS has taken conflicting and deceptive positions regarding the roles of RWS I and RWS II in relation to the facts alleged. HomeSource originally filed its complaint against RWS I on July 23, 2018. (ECF No. 1). On August 14, 2018, RWS I filed a corporate disclosure statement identifying Local Retail Solutions, LLC ("LRS") as its parent corporation. (ECF No. 7).

At the time, RWS told HomeSource that there was an error in its corporate disclosure statement, and it would file a corrected statement shortly. Despite repeated requests to update its corporate disclosure statement, it was not until November 7, 2019, over one year later, and under Court Order (ECF No. 128 at 11) that RWS finally disclosed to the Court and HomeSource that LRS is the parent corporation of RWS II, not RWS I, and RWS I is an investor in LRS. (ECF No. 134). Therefore, RWS's statement that "RWS II informed the Plaintiff and the Court of this corporate structure throughout the litigation" is disingenuous. (ECF No. 195-1 at 6, n.2).

On February 19, 2019, in RWS's prior opposition to HomeSource's motion for leave to amend its complaint and add RWS II to the case, RWS argued that there is no basis to add LRS and RWS II to the case because they are not liable for any of the alleged misconduct. (ECF No. 59 at 25-26). Yet RWS I's instant motion to dismiss filed on June 16, 2020 states:

> While HomeSource treats RWS I and RWS II interchangeably, the companies are distinct and RWS I is not a proper party to this case. Before the events giving rise to HomeSource's SAC, RWS II became the active business entity. While RWS I still exists, it conducts no operations other than passively holding shares. All business activities are now handled by RWS II. As a result, RWS II is the entity that sent the newsletters and made the video identified in the SAC, and is the real party in interest.

(ECF No. 195-1 at 5). In other words, in 2019, RWS I argued that RWS II was not a proper party to this case, and now in 2020, RWS I argues that RWS I is not a proper party to the case, and the Court should voluntarily dismiss it from this action based on its changed representation. It took HomeSource over a year to uncover the true corporate relationship between RWS I, RWS II, LRS, Nationwide, and Gridiron, and now, before depositions have even been taken, RWS asks for one of its entities to be dismissed based on its own representation that it is merely a holding company.

This is not an acceptable legal basis to dismiss a party. HomeSource alleged its claims against RWS I and RWS II in the SAC in equal and full force, and those allegations are accepted

as true for the purposes of the pending motions. Accordingly, HomeSource's claims should survive against both RWS I and RWS II.

## **CONCLUSION**

For the foregoing reasons, HomeSource respectfully requests that RWS I's Motion to Dismiss (ECF No. 195) and RWS II's Motion to Dismiss (ECF No. 194) be denied in their entirety with prejudice.

Respectfully submitted,

Dated: July 20, 2020

*/s/ Eric R. Clendening*
Eric R. Clendening, Esq.
Ken Goodkind, Esq.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
Fax:  (856) 661-1919
ken.goodkind@flastergreenberg.com
eric.clendening@flastergreenberg.com
*Attorneys for Plaintiffs*