# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THE HOMESOURCE, CORP., <br><br>               Plaintiff, <br><br>    v. <br><br> RETAILER WEB SERVICES, LLC, et al., <br><br>               Defendants. | Civil Action No.: 1:18-cv-11970-ECR-AMD <br><br> Hon. Eduardo C. Robreno <br><br> Hon. Ann Marie Donio <br><br> MOTION DATE: JUNE 7, 2021 <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO IMPOSE DISCOVERY SANCTIONS FOR PLAINTIFF'S FAILURE TO COMPLY WITH THE COURT'S OCTOBER 2019 (ECF NO. 129) AND MARCH 2021 <u>ORDERS (ECF NO. 264)</u>**

[*SIGNATURE BLOCK ON NEXT PAGE*]

Dated: May 12, 2021                Respectfully submitted,

**FOX ROTHSCHILD LLP**

*/s/  Dominique J. Carroll*
Dominique J. Carroll
997 Lenox Drive
Lawrenceville, New Jersey 08648
Tel.: (609) 896-3600
Fax: (609) 896-1469
djcarroll@foxrothschild.com

*/s/  Adam Wolek*
Adam Wolek (*pro hac vice*)
321 N. Clark Street, Suite 1600
Chicago, Illinois 60654
Tel.: (312) 517-9299
Fax: (312) 517-9201
awolek@foxrothschild.com

*Counsel for Defendants Retailer Web Services, LLC; Retailer Web Services II, LLC*

## TABLE OF CONTENTS

I.    INTRODUCTION ..............................................................................................1

II.   BACKGROUND ..............................................................................................2

    A.   HomeSource's Allegations Placed Its Cyber-Related Claims, Database and Financials at Issue............................................................2

    B.   RWS Served Discovery Requests Targeting Documents and Information Experts Typically Use to Assess These Allegations. .......3

    C.   The Honorable Karen E. Williams Orders HomeSource to Produce Documents and to Provide RWS's Expert Access to the Mirror Image of HomeSource's Database..................................................................5

    D.   The Honorable Eduardo C. Robreno Again Orders HomeSource to Produce the Documents and to Provide RWS's Expert Access to the Mirror Image of HomeSource's Database. ...........................................7

    E.   RWS Undertakes Exhaustive, But Unsuccessful, Efforts to Resolve These Issues Without Again Having to Seek Court Intervention........8

        1.   HomeSource Fails to Produce Client Contracts. .....................10

        2.   HomeSource Fails to Produce the Necessary Financial Documents. ...............................................................................11

        3.   HomeSource Continues to Refuse to Produce Documents Showing Financial Exchanges Among HomeSource, the White Family, and Software-Support PMW, Inc................................18

        4.   HomeSource has Failed to Make the Mirror Image Available to RWS's Cyber Security Expert.................................................19

III.  APPLICABLE LAW......................................................................................26

IV.   ARGUMENT .................................................................................................28

    A.   The Court Should Exclude the Evidence HomeSource Failed to Produce Despite Two Orders for the Same Issues..............................28

    B.   HomeSource's Conduct Warrants Exclusionary Sanctions...............28

1.      The Court Should Preclude HomeSource from Relying on Evidence that Allegedly Supports HomeSource's Allegations that It "Lost Customers" Other than Those It has Already Produced. ...................................................................32

2.      The Court Should Preclude HomeSource from Introducing Evidence of Its Excessive Damages Claim. .............................33

3.      The Court Should Preclude HomeSource from Relying on Any Evidence Originating from or Reflecting Information from HomeSource's Database..........................................................35

C.      The Court Should Award RWS Its Fees and Costs. ...........................38

D.      Alternatively, the Court Should Compel HomeSource to Comply with the Orders and Award RWS Its Fees for Forcing Compliance. .........39

V.      CONCLUSION ..............................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beau Prods., Inc. v. Permagrain Prods., Inc.*,
  97 F.R.D. 50 (M.D.Pa. 1983) ................................................................. 31

*Capital Cty. Cab Serv., Inc. v. Susquehanna Area Reg'l Airport Auth.*,
  No. 1:06-cv-671, 2008 WL 4838465 (M.D.Pa. Nov. 5, 2008) ............................... 30

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ........................................................................ 27

*Clientron Corp. v. Devon IT, Inc.*,
  894 F.3d 568 (3d Cir. 2018) .............................................................. 26

*Evans v. Emp. Benefit Plan*,
  No. 03-4915, 2006 WL 1644818 (D.N.J. June 6, 2006) ...................................... 26

*In re Fine Paper Antitrust Lit.*,
  685 F.2d 810 (3d Cir. 1982) .............................................................. 30

*Jones v. DeRosa*,
  238 F.R.D. 157 (D.N.J. 2006) ............................................................. 26

*McLaughlin v. Phelan Hallinan & Schmieg, LLP*,
  756 F.3d 240 (3d Cir. 2014) .............................................................. 27

*N.J. Phys. Un. Reciprocal Exch. v. Med. Protective Co.*,
  No. 13-2286, 2017 WL 3623801 (D.N.J. Aug. 23, 2017) ..................................... 30

*Shahin v. Delaware*,
  345 Fed. App. 815 (3d Cir. 2009) ......................................................... 27

*Wachtel v. Health Net, Inc.*,
  239 F.R.D. 81 (D.N.J. 2006) .......................................................... 26, 27

*Ware v. Rodale Press, Inc.*,
  322 F.3d 218 (3d Cir. 2003) .............................................................. 30

**Statutes**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.* ................................ 2, 3, 20

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ............................................................................. 26

Fed. R. Civ. P. 37(a)(4) ............................................................................. 39

Fed. R. Civ. P. 37(a)(5) ........................................................................ 38, 39, 40

Fed. R. Civ. P. Rule 37(b)(2)(A) .................................................................. 27

Fed. R. Civ. P 37(b)(2)(A)(i)-(ii), (v)-(vi) ......................................................... 27

Federal Rule of Civil Procedure 26 ............................................................... 26

Federal Rule of Civil Procedure 37 ........................................................ 26, 27, 28

## I.    INTRODUCTION

On March 5, 2021, for the second time, this Court ordered Plaintiff The HomeSource, Corp. to produce documents to support its claim that one email's alleged defamatory statements caused it to lose customers to the tune of $46 million. The Court also ordered HomeSource to give Defendant Retailer Web Services II, LLC's ("RWS") expert access to the mirror image of HomeSource's database so RWS could defend itself against HomeSource's cyber-related allegations.  Despite the Court's renewed ruling, HomeSource has, again, flouted this Court's Orders by refusing to give RWS's expert access to the mirror image and by failing to produce key financial documents.

Indeed, out of the four categories of discovery the Court ordered, HomeSource only complied (in part) with one.  For instance, HomeSource refused to provide *any* profit-and-loss statements, financial ledgers, or other financials showing it received payments from alleged "lost customers."  These documents are necessary to rebut HomeSource's $46 million damages claim.  Instead, HomeSource provided only limited tax returns and bank balances, omitting relevant periods and key documents. And despite the Court ordering that "*Plaintiff shall make the mirror image of its database available to Defendant's expert,*" HomeSource stated "ABSOLUTELY NOT" (*sic*), after RWS requested such access.

The parties have exchanged over 50+ emails and letters over these items.  Yet

HomeSource has stonewalled and played games for over two years. Because HomeSource has defied the Court's Orders to provide the documents and the necessary access, again, RWS moves the Court to exclude any evidence that stems from HomeSource's database and that allegedly supports HomeSource's allegations that it lost customers, outside of those customers that HomeSource can show it had contracts with. RWS further requests its fees and costs for its repeated motions.

## II.    BACKGROUND

### A.    HomeSource's Allegations Placed Its Cyber-Related Claims, Database and Financials at Issue.

In its Second Amended Complaint ("SAC," ECF No. 164), HomeSource seeks more than $46,000,000 from RWS based on specious claims of False Advertising (Count I), Defamation (Count II), Tortious Interference with Prospective Economic Advantage (Count III), Tortious Interference with Contractual Relationships (Count IV), Federal and Common Law Unfair Competition (Count V), and Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.* ("CFAA") (Count VI).[1]

RWS summarized in detail the substance of HomeSource's claims and the factual background allegedly supporting those claims in its Motion to Dismiss and

---

[1] The Court dismissed HomeSource's claims against Nationwide Marketing Group, LLC and Gridiron Capital LLC for lack of personal jurisdiction and severed HomeSource's claims against anonymous John Does. ECF No. 242.

Sever the SAC. *See* ECF No. 194-1. In sum, HomeSource and RWS provide some similar services to independent appliance dealers. Both parties' customers are smaller "mom and pop" appliance dealers who sell refrigerators, stoves, dishwashers, and other such wares.

On July 20, 2018, RWS emailed one of its newsletters to some members of an appliance dealer industry group that contained (1) truthful statements and opinions about past lawsuits involving the White Family, owners of HomeSource and their predecessor companies, and (2) puzzling over certain of HomeSource's website security choices (the "Newsletter"). ECF No. 1 at ¶ 33.

HomeSource sued RWS the next business day, and claimed $46 million in damages for defamation, false advertising, tortious interference with contractual relationships and opportunities, and unfair competition. It added the CFAA claim in the SAC. The unsupported allegations include that RWS (1) viewed websites without permission, (2) used customers' usernames and passwords to view unidentified proprietary information, and (3) used cyber "spiders" or "web crawlers" on HomeSource's customers' publicly accessible websites. SAC at ¶¶ 74-84.

**B.    RWS Served Discovery Requests Targeting Documents and Information Experts Typically Use to Assess These Allegations.**

On August 27, 2018, over 2½ years ago, RWS served HomeSource with interrogatories and document requests ("Discovery Requests"). *See* Exhibit 1 &

Exhibit 2, respectively.[2]   RWS tailored the Discovery Requests to relevant documents and information necessary to defend against HomeSource's cyber-related allegations and exorbitant damages claim.   The requested documents and information are of the kind that experts generally consider and rely on in assessing the types of claims HomeSource asserts here.

RWS's Discovery Requests included:

- Interrogatory No. 11: "[i]dentify each customer HomeSource claims to have lost due to Defendant's statements."

- Request for Production No. 21: All documents relating to customers allegedly lost by HomeSource as a result of Defendant's conduct as described in the Complaint.

- Request for Production No. 22: All documents relating to contracts and other agreements between HomeSource and any customer identified in response to Interrogatory No. 11.

- Request for Production No. 23: All documents relating to the payment histories of any customer identified in response to Interrogatory No. 11, including but not limited to invoices, account statements, balance sheets, receivables, returned checks, and receipts.

- Request for Production No. 24: All documents relating to the revenue of HomeSource from January 1, 2016 to date, including but not limited to balance sheets, profit-loss statements, bank accounts, accounts receivable, accounts payable, and correspondence related thereto.

*See* Exs. 1 & 2.

RWS also requested documents showing payments made between

---

[2] All exhibits referenced in this brief are attached to the Declaration of Dominique J. Carroll, Esq. ("Carroll Decl.") submitted herewith.

HomeSource and other persons or entities referenced in the Complaint.  *Id.*, Ex. 2, at RFP 7.  And RWS requested documents relating to the security vulnerabilities in HomeSource's website, which relate to the statements HomeSource claimed were actionable in the Newsletter.  *Id.* at RFP 19.

HomeSource failed to supply meaningful responses to the majority of RWS's Discovery Requests.  RWS tried to resolve the disputes regarding HomeSource's discovery deficiencies through the meet-and-confer process.  RWS's efforts proved unsuccessful.  HomeSource left RWS no choice but to seek court intervention.  *See* RWS's Requests for Leave to File a Motion to Compel, ECF Nos. 76-1 & 104.

### C.    The Honorable Karen E. Williams Orders HomeSource to Produce Documents and to Provide RWS's Expert Access to the Mirror Image of HomeSource's Database.

After the Honorable Karen M. Williams, U.S.M.J. held an in-person discovery conference on October 7, 2019 (ECF No. 127), she found HomeSource's discovery responses deficient and compelled HomeSource to do, among other things, the following:

- "[I]dentify each customer it allegedly lost and the purported damages HomeSource incurred as a result of each lost customer."

- "[P]roduce any and all documents and records that form the basis of its experts' damages calculations."

- "[P]roduce each executed contract of the customers it contends were lost to RWS based on the conduct RWS allegedly engaged in that forms the basis of the instant lawsuit."

- Provide an affidavit or certification that HomeSource provided all information

regarding potential HomeSource customers that remained customers of RWS based on the Newsletter and/or HomeSource customers that left HomeSource and became RWS's customers based on the Newsletter.

- "[M]ake the 'mirror image' of the database available to defendant's expert."

- "[P]rovide an affidavit or certification detailing all information" HomeSource possess regarding the alleged hacking and/or cyber-attacks and/or denial of service and/or distributed denial of service attacks.

Oct. 16, 2019 Order ("First Order"), ECF No. 129, pp. 3-4, at ¶¶ 1-6.

The First Order does not place any limitations on the type and scope of searches RWS's expert can run with respect to her review of the mirror image. *Id.* In fact, Judge Williams stated that RWS's expert is entitled to *run her own searches*:

> THE COURT: …[W]hat is the role of the expert? Let me get there. Not only to say the search that you ran was wrong, but that a proper search would have done this, and had a proper search been done, these are the results that would have been had. That's the—that's the nature of expert testimony. ***And so I've got to allow this expert to run the search that—that she believes is the proper search to determine whether or not RWS did whatever it did on your website***. Right? But I want to see what this looks like.[3]

Oct. 7, 2019 Disc. Conf. Tr., at 119:16-25.

Given parties' obligations to comply with Court orders, RWS fully expected HomeSource to comply with the mandates of the First Order. HomeSource did not.

---

[3] Judge Williams temporarily sealed the transcript of the October 7th hearing pending the filing of a motion to seal. ECF No. 127. Neither party filed a motion to seal regarding the transcript. Regardless, the quoted language does not include any information that even arguably qualifies as confidential pursuant to the parties' Confidentiality Order, as entered by the Court. ECF No. 22.

**D.    The Honorable Eduardo C. Robreno Again Orders HomeSource to Produce the Documents and to Provide RWS's Expert Access to the Mirror Image of HomeSource's Database.**

For over a year, HomeSource failed to comply with the First Order, offering RWS excuse after excuse for why HomeSource had not provided the financial documents or RWS's expert with access to the mirror image.  RWS diligently engaged in meet-and-confer efforts to secure HomeSource's compliance.  These efforts included, without limitation, letters to HomeSource's counsel dated August 15, 2019 (ECF No. 105-1), August 22, 2019 (ECF No. 110-1), additional letters dated January 10, 23, 28, February 2 and November 4, 2020, and a telephonic meet and confer on November 23, 2020.  Despite RWS's efforts, HomeSource spent over a year evading its Court-imposed obligations and, again, forcing RWS to bring these issues to the Court for intervention.

RWS filed a second Motion to Compel in December 2020.  ECF No. 254. After the parties' written submissions and a video-hearing before the Court, the Honorable Eduardo C. Robreno issued an Order granting, in part, RWS's Motion to Compel Discovery on March 5, 2021 (the "Second Order").  ECF No. 264.

The Second Order stated that the "motion seeks to compel compliance with [Judge] Williams' October 16, 2019 discovery order … [and] [u]nless expressly modified by this order, the terms of the October 16, 2019 order remain in effect." *Id*. at p. 1 n.1.  Judge Robreno compelled HomeSource to do, among other things,

the following:

- Produce ten samples of client contracts that were previously produced redacted in an unredacted form;

- "[P]roduce all documents and records that underlie its experts' damages calculation, whether or not the experts considered or reviewed the actual documents."[4]

- "[P]roduce all documents showing financial transfers between HomeSource, the White family, Software Support, and PMW, Inc."

- "[M]ake the mirror image of its database available to Defendant's expert."

*Id.*, pp. 1-3, at ¶¶ 1-4.[5]

Given that HomeSource had now been ordered not once, but twice, to produce the identified documents and to provide RWS's expert with access to the mirror image, RWS expected HomeSource's compliance so that the case could progress. Incredibly, HomeSource again failed to abide by the Court's Orders.

### E. RWS Undertakes Exhaustive, But Unsuccessful, Efforts to Resolve These Issues Without Again Having to Seek Court Intervention.

Despite the entry of not one, but two Orders regarding the same exact issues, HomeSource remains deficient in its discovery obligations. Out of the four categories of discovery the Court ordered, HomeSource complied only in part with

---

[4] During the March 5th video-hearing, Judge Robreno specifically ruled that RWS's requests for documents related to HomeSource's revenue, including, without limitation, tax returns, balance sheets, profit-loss statements, bank statements, accounts receivable, and accounts payable were "pretty reasonable." *See* March 5th Hearing Transcript, at 20:8-14.

[5] RWS hereinafter refers to the First and Second Orders collectively as the "Orders."

one.  For example, HomeSource refused to provide *any* profit-and-loss statements, financial ledgers, or other financials showing it received payments from alleged "lost customers."  These documents are necessary to rebut HomeSource's $46 million damages claim.  Instead, HomeSource provided only limited tax returns and bank balances, omitting relevant periods and key documents. And despite the Court ordering that "*Plaintiff shall make the mirror image of its database available to Defendant's expert*," HomeSource stated, "ABSOLUTELY NOT" (*sic*), after HomeSource requested such access.

RWS attempted to resolve the current discovery disputes through emails and letters to HomeSource's counsel sent on March 18 and 30, April 2, 8, 12, 16, 21, 27, and 29, and May 3 and 5, 2021.  Carroll Decl., at ¶ 5.  HomeSource simply refused to produce the identified documents and refused to provide RWS's cybersecurity expert with the necessary access for her to review and search the mirror image.

In a recent email to Judge Robreno's Chambers,[6] HomeSource seemingly implied that RWS failed to meet and confer with HomeSource in good faith, but that does not comport with the facts.  As noted above, RWS exhaustively attempted to

---

[6] HomeSource's counsel sent the May 6 email to Judge Robreno's Chambers without any prior notification to RWS's counsel, seemingly in an effort to short circuit RWS's efforts to bring this Motion before the Court.  Indeed, HomeSource only sent the email to Chambers after RWS's counsel notified HomeSource's counsel that RWS would be filing this Motion before the end of the week.

get access to the mirror image and provided HomeSource with RWS's expert's availability—HomeSource simply did not permit it.  *See* Ex. 14.  Ultimately, RWS requested the access and documents on at least ***12 occasions after*** the Second Order.

        1.     HomeSource Fails to Produce Client Contracts.

HomeSource was ordered to "produce each executed contract of the customers it contends were lost."  First Order, at pp. 3, at ¶ 3.  It previously produced four such documents, and the remainder of its claimed "lost contracts" it produced as wholly-redacted documents.  The Second Order ordered HomeSource to provide a sample of unredacted versions so that RWS could assess if the redacted documents could, in fact, be contracts between HomeSource and its customers.

Remarkably, while HomeSource had maintained that the wholly-redacted documents were its "lost customer" contracts, after reviewing the unredacted versions, it became clear that many of the documents HomeSource produced ***post-dated*** the Newsletter, and, thus, could not have been lost *due to* the Newsletter.[7] Furthermore, the sample, unredacted versions further revealed that these "lost customer" contracts were indeed not subscription contracts that indicated any

---

[7] Per Paragraph 1 of the Second Order, RWS requested ten sample contracts by bates number to see in unredacted form.  *See* Ex. 3.  HomeSource produced nine.  *See* Ex. 4.  In an April 29, 2021 deficiency letter to HomeSource, RWS reminded HomeSource of its failure to produce the tenth contract, HomeSource 014806.  *See* Ex. 5, at pp. 2-3.

relevant contractual terms, like payments, timeframe or durations.  Due to these and other disparities, RWS requested that HomeSource produce the remaining redacted documents because they are relevant to support or rebut HomeSource's claim that the documents were actually "contracts" and "lost" due to RWS's Newsletter.

As before, HomeSource refused to produce them. Its counsel responded by misstating the record that RWS's counsel "requested … jpeg122KR"; it was not HomeSource's counsel's "job to guess what [RWS] meant by that," and that RWS should have "simply correct[ed]/amend[e]d [its] request." *See* Ex. 6.  However, RWS specifically requested HomeSource 014806, as shown by the parties' correspondence.  *See* Exs. 3 & 5.  HomeSource has still failed to produce the unredacted version of HomeSource 014806 and the remaining redacted documents.

Plainly stated, while pursuing "damages" of $46 million, HomeSource continues to withhold proof of its alleged damages and "lost contracts."

2.    HomeSource Fails to Produce the Necessary Financial Documents.

HomeSource has not complied with Paragraph 2 of the Second Discovery Order, and refused to provide ***any*** profit-and-loss statements, financial ledgers, or other financials showing it received payments from alleged "lost customers."  These documents are necessary to rebut HomeSource's $46 million damages claims. RWS's RFP No. 23 requested production of "*all documents relating to the payment histories of any customer identified in response to Interrogatory No. 11, including*

11

*but not limited to invoices, account statements, balance sheets, receivables, returned*

*checks, and receipts.*"  *See* Ex. 2.  RWS's RFP No. 24 requested production of "*all*

*documents relating to the revenue of HomeSource from January 1, 2016, to date,*

*including but not limited to balance sheets, profit-loss statements, bank statements,*

*accounts receivable, accounts payable, and correspondence related thereto.*"  *Id.*

Relating the financials, Judge Robreno stated:

[N]umber two, documents related to plaintiff's revenues.  During the time it claims that defendant caused damages including tax returns, balance sheets, profit loss statements, bank statements, accounts receivable and accounts payable.  That seems to me to [be a] pretty reasonable request….

Mar. 5, 2021 Hearing Tr., at 20:9-14.

In response, HomeSource's counsel argued that HomeSource is a "start up"

company and does not generate these types of documents, despite being in business

for over 15 years, and previously conceding that it had profit-loss statements.

Judge Robreno ultimately ruled that:

[T]he defendants don't have to accept your theory, they can have their own theory, and I think that what they're seeking these documents for . . . So, I'm going to agree with defendants and I'm going to require that they, that they be produced in accordance actually with the magistrate judge's earlier ruling.

*Id.* at 24:9-23.

Judge Robreno then ordered HomeSource to "produce all documents and

records ***that underlie its experts' damages calculations, whether or not the experts***

*considered or reviewed the actual documents*."  Second Order, at ¶ 2 (emphasis added).

However, HomeSource has not produced any profit-and-loss statements, financial ledgers, or other financials showing it received payments from alleged lost customers, but instead attempted to limit the scope of the financial documents it was ordered to produce.  It continues to hide its cards.  For instance, in response to RWS's demands that it comply with the Second Order, HomeSource provided bank balances covering only the period of July 2018–March 2019.

In its April 16, 2021 deficiency letter, RWS objected to HomeSource's production, noting "the period of time covered by the bank statements and invoices produced is…insufficient" because "[t]he documents cover only the period occurring *after* RWS purportedly made the alleged defamatory statements at issue." *See* Ex. 7, at p. 3 (emphasis in original).  RWS also reminded HomeSource of its prior representation that it possesses profit-loss statements and tax returns.  *Id*. Further, given HomeSource's claim that it does not use QuickBooks, RWS requested that HomeSource "identify what accounting software it uses to track its financials, and that Plaintiff produce a copy of Plaintiff's accounting ledger."[8]  *Id.*

---

[8] RWS also requested that HomeSource "state whether the information requested in Document Request #24 is available in electronic form in a database such that Plaintiff can retrieve it and, if so, whether Plaintiff is withholding such information solely because the information does not currently exist in document form."  *See* Ex.

On April 23, 2021, HomeSource's counsel sent an email claiming that, as to Paragraph 2 of the Second Discovery Order, HomeSource "provid[ed] tax returns for 2017-2020, along with trial balances for the last three years." *See* Ex. 8, at p. 1. HomeSource's purported compliance with Paragraph 2 was short-lived.

Less than two hours later, HomeSource sent an email to RWS's counsel attempting to clawback its production and stating that it "will resend the correct version in a few minutes." *Id.* at p. 3. Shortly thereafter, HomeSource's counsel sent three additional emails titled: "Part 1 of 3;" "Part 2 of 3;" and "Part 3 of 3." *Id.* at pp. 5-7.

The "Part 1 of 3" email did not include attachments. "Part 2 of 3" attached one PDF containing part of HomeSource's 2019 tax return, and part of the 2020 tax return for *563 Systems, LLC*. And "Part 3 of 3" was a single PDF, containing (1) additional parts of the 2020 tax return for 563 Systems, LLC, (2) and trial balance reports[9] for HomeSource from 2018, 2019 and 2020. HomeSource has provided no explanation for why the production contained only part of HomeSource's 2019 tax

---

7, at p. 3. HomeSource has failed to respond to this request.

[9] A trial balance is a bookkeeping worksheet in which the balance of all ledgers are compiled into debit and credit account column totals that are equal. A company prepares a trial balance periodically, usually at the end of every reporting period. The general purpose of producing a trial balance is to ensure the entries in a company's bookkeeping system are mathematically correct.

return, and *no* tax returns for HomeSource for 2017, 2018 or 2020.

However, the Second Order requires Plaintiff to "produce all documents and records *that underlie its experts' damages calculations, whether or not the experts considered or reviewed the actual documents*." Second Order, at ¶ 2 (emphasis added). The scant and incomplete documents HomeSource produced do not comply with this mandate and are insufficient for RWS's damages expert to assess HomeSource's $46 million damages claims.

RWS's damages expert, Michal Malkiewicz, evaluated HomeSource's production and determined that limited non-native invoices from select months in 2018 and 2019, limited bank balance statements from select months in 2018 and 2019, the partial 2019 tax return for HomeSource, the 2020 tax return for 563 Systems, LLC, and the documents labeled "trial balances" for HomeSource for the years 2018-2020 "are insufficient for RWS to assess HomeSource's damages claims." Declaration of Michal Malkiewicz, ("Malkiewicz Decl.") attached hereto at ¶¶ 18-19. HomeSource's deficiencies are underscored by:

- HomeSource failed to produce any financial documentation for the years 2016 and 2017 (thereby precluding RWS from "using a common damages methodology—the before-and-after approach—to assess whether the alleged conduct had an effect … on HomeSource's business and finances").

- HomeSource's production of financial documents "cover[ing] only select portions of the years 2018 and 2019 … provide RWS with an incomplete picture of HomeSource's finances during the years following the alleged conduct at issue" and precludes the common benchmarking method of analyzing "contemporaneous financial performance of business lines

unaffected by the alleged bad act."

- HomeSource has not produced the transactional information for the bank statements it did produce, and did not provide proof of payments from each of the customers, documentation to link bank statement information with individual customer contracts or invoices, or documentation to support its claim that RWS's alleged conduct caused the losses HomeSource claims.

- The handful of non-native invoices, purportedly reflecting purchases of HomeSource products by its alleged customers, "lack dates and other identifiable information necessary to confirm that the fees listed in … HomeSource015116-015124 were paid by the referenced customers."

- The non-native invoices fail to set forth the damages HomeSource claims as to each customer and lack other pertinent information such as payment histories for its allegedly lost customers, when the customers were billed, and when the payments occurred.

Malkiewicz Decl. at ¶¶ 20-28.

In short, the financial information HomeSource failed to provide "is relevant to a damages expert's ability to conduct or verify, for example, a discounted cash flow analysis." *Id.* at ¶ 25. Further, HomeSource's extremely limited production prevents Mr. Malkiewicz from "assess[ing] HomeSource's financial position prior to the alleged bad acts in this case." *Id.* at ¶ 26.

Even more incredibly, HomeSource makes the curious representation that it does not generate profit-loss statements, maintain an accounting ledger, or use any type of accounting software. Yet, as Mr. Malkiewicz explains, even if those representations are true, "HomeSource must still track or provide to its accountant information about its revenues and expenses in some form because such information

forms the basis of income, deductions, and tax credits information reported by HomeSource on its tax returns." Malkiewicz Decl. at ¶¶ 30-31.

Further, IRS regulations require HomeSource (or its accountant) to maintain the financial documentation supporting the information in the tax returns for a specific period of time. *Id.* at ¶ 32. Thus, as Mr. Malkiewicz notes:

> HomeSource cannot reasonably claim that it no longer possesses such information and/or documentation. Further, in my experience, companies servicing or selling products to other business—*i.e.*, companies such as HomeSource—typically maintain and rely on detailed customer-level financial information beyond the time period required by IRS regulations to, for example, identity profitable customers and target particular customers to develop long-lasting relationships.

*Id.*

Mr. Malkiewicz also explains that trial balance reports (which HomeSource has produced) only list the ending balance in each general ledger account.[10] *Id.* at ¶ 33. So, "it is ***highly improbable***, because it would depart from standard business norms, that HomeSource and/or its accountant do not maintain records of such

---

[10] RWS's expert further opined that HomeSource's Excel workbooks "do not appear to contain accounting records, financial information, or other economic evidence likely kept by HomeSource and/or its accountant in the normal course of business." Malkiewicz Decl., at n.1. Notably, "the underlying sources calculations in these Excel workbooks are not identified" and "it is not documented in these Excel workbooks what accounting records, financial information, or other economic evidence kept by HomeSource and/or its accountant in the normal course of business, if any, the calculations in these Excel workbooks are based on." *Id.*

individual general ledger credit and debit transactions for the purposes of calculating general ledger account balances, trial balances, as well as certain aggregate entries included on HomeSource's tax returns."  Malkiewicz Decl. at ¶ 34 (emphasis added).

Plainly put, HomeSource has the financial information at issue.  For some unknown reason, HomeSource simply does not want to produce it, and has merely piled on unreasonable excuses as its proffered justification for its "inability" to produce the financial documentation as ordered.

If HomeSource does not comply with the Court's Orders and produce all required financial information, "RWS cannot properly and fully assess HomeSource's damages claims" and RWS's ability to challenge Plaintiff's $46 million claim will be "severely handicapped."  *Id.* at ¶ 37.

3.   HomeSource Continues to Refuse to Produce Documents Showing Financial Exchanges Among HomeSource, the White Family, and Software-Support PMW, Inc.

HomeSource has also attempted to improperly narrow the scope of the Second Order for documents showing financial exchanges among HomeSource, the White family, and Software-Support PMW, Inc.  HomeSource's efforts are evidenced by the Revised Declaration of James White, HomeSource's CEO.

First, HomeSource claims the Second Order requires only disclosure of payments **HomeSource** made to the White family or Software-Support PMW, Inc. *See* Ex. 9.  The Second Order is not so limited: it broadly stated "Plaintiff shall

produce all documents showing financial transfers between HomeSource, the White family, Software Support, and PMW, Inc." Second Order, at ¶ 3.

Second, HomeSource attempts to evade disclosure of these financial transactions by claiming disclosure is limited only to *direct* financial transactions. For example, HomeSource withheld disclosure of payments to the White brothers because "Gregory and [James White] receive regular payments of our annual salaries from a professional employer organization and not HomeSource directly…" *See* Ex. 10, at ¶ 5. Just because HomeSource uses a payment service to pay Gregory and James White, that does not render the information outside the scope of the Second Order. If HomeSource paid the White brothers or their companies through a service, that is still in HomeSource's possession, custody and control.

Third, HomeSource has even failed to produce the documents for the financial transactions to the White brothers that it has admitted.

> ### 4. HomeSource has Failed to Make the Mirror Image Available to RWS's Cyber Security Expert.

HomeSource continues to block access to its mirror image to RWS's expert, Dr. Jennifer Bayuk. HomeSource first argues that the mirror image is "no longer relevant because our hacking claims with respect to the John Does have been dismissed, so this entire database is no longer an issue." Mar. 5, 2021 Hearing Tr. at 28:24-29:3. But HomeSource's argument that the mirror image is "no longer relevant" was rejected by the Court, and the Second Order expressly states that

"Plaintiff shall make the mirror image of its database available to Defendant's expert." Second Order, p. 2 at ¶ 4.

RWS met-and-conferred with HomeSource so it would make the mirror image available for RWS's expert. In response, HomeSource stated that it would withdraw the CFAA claim against RWS provided that RWS agreed that such withdrawal would render Paragraph 4 of the Second Order moot. *See* Ex. 16.

While HomeSource offering to withdraw its CFAA claim (Count VI) is helpful, RWS explained that that HomeSource's cyber-related allegations are not confined to only the CFAA claim. *Id.* at Ex. 11. To that end, RWS stated that it would agree to forego reviewing the mirror image of HomeSource's database if it agreed not use it as evidence for its other non-CFAA allegations. But if it did, RWS would then have the chance to review it. *See* Ex. 12. Thus, contrary to HomeSource's contention, because HomeSource was still using printouts from its database to help prove other allegations, simply withdrawing the CFAA claim would not render the need to access the mirror image moot. HomeSource rejected RWS's proposal.[11] *See* Ex. 13.

RWS's counsel then again provided HomeSource's counsel with Dr. Bayuk's availability to review the mirror image. *See* Ex. 14, p. 1. RWS's counsel also

_____

[11] Notably, HomeSource's counsel did not provide any counterproposal.

provided HomeSource's counsel with a description of the type of access and permissions Dr. Bayuk required to conduct the necessary review of the mirror image—namely, access to the mirror image at the operating system level, and a login that includes permissions adequate to examine all operating system and application logs, files, and configurations. *Id*. at p. 2.

In a May 3, 2021 email, HomeSource's counsel responded to Dr. Bayuk's request by stating "ABSOLUTELY NOT." *See* Ex. 15 (emphasis in original). HomeSource's counsel then took the position that Dr. Bayuk's review of the mirror image is limited solely to one search. Specifically, HomeSource's counsel contends Dr. Bayuk is "LIMITED TO THE 'SAME SEARCH' THAT [HOMESOURCE'S] CONSULTING EXPERT HAD DONE, ALTHOUGH DR. BAYUK COULD PROPOSE A DIFFERENT SEARCH PROTOCOL."[12] *Id.* (emphasis in original).

HomeSource similarly rejected Dr. Bayuk's request to view the structure and organization of the mirror image before preparing her search protocol. *Id.* Instead, HomeSource indicated an intent to further limit Dr. Bayuk's access to the mirror image, stating its presumption that HomeSource's expert "WILL SHOW [DR. BAYUK] HOW THE RELEVANT PORTIONS OF THE DATABASE ARE SET UP AND ORGANIZED." (*sic*). *See* Ex. 15.

---

[12] The capitalization is directly from opposing counsel's May 3rd communication.

HomeSource's positions directly conflict with the plain language of the Second Order and further evidence HomeSource's ongoing efforts to limit Dr. Bayuk (and RWS) access to only what HomeSource wants her to see.  Restraining Dr. Bayuk to view only those portions of the mirror image that ***HomeSource*** deems relevant and denying Dr. Bayuk access to conduct her own searches undermines the very purpose for reviewing the mirror image—to allow RWS an unbiased view of HomeSource's database as it relates to its allegations.

As Dr. Bayuk explains, only the mirror image "could provide evidence that activity on a given system was the source of logs that could fairly be used to evaluate HomeSource's Cyberattack claims."  *See* Declaration of Jennifer Bayuk, Ph.D. ("Bayuk Decl."), attached as hereto, at ¶ 29.  For example:

> [E]xamination of the system's memory allocation and a corresponding statistical analysis of logs in the mirror image could be expected to show whether or not system performance was impacted by voluminous traffic emanating from a small set of Internet addresses.  System logs are one piece of the puzzle, but a few strings on a printed paper are meaningless without such corresponding context.

*Id.*

Further, Dr. Bayuk also requires access to the mirror image to "assess the extent to which RWS's alleged 'spiders' or 'web crawlers' existed and allegedly impacted HomeSource's customers' website performance, and to assess the veracity of HomeSource's claim that RWS misrepresented the security of HomeSource's website in the referenced newsletter."  *Id.* at ¶ 30.

But HomeSource attempted to limit Dr. Bayuk to only search the mirror image for specific IP addresses, even though their allegations are not so limited. Further, HomeSource will not allow Dr. Bayuk to run searches of the mirror image to assess HomeSource's allegations that (1) RWS misrepresented the security of HomeSource's website, (2) RWS employed spider scripts and web crawlers to disrupt HomeSource's business, and/or (3) RWS's spider scripts and web crawlers caused damage to HomeSource's websites.

Yet again, the Orders do not limit Dr. Bayuk's review of the mirror image solely to searches for IP addresses. *See* First Order, at p. 4, at ¶ 5; Second Order, at ¶ 4. Moreover, information contained in the mirror image (if it exists) would be the best evidence to assess the validity of HomeSource's claims for the three issues above. Bayuk Decl., at ¶¶ 29-35.

Without access and the chance to conduct the necessary searches to assess the truth of HomeSource's cyber-related allegations, RWS cannot prepare its defense. HomeSource is attempting to control the scope of Dr. Bayuk's searches by denying her the opportunity to review the structure and organization of the mirror image before she develops her search protocol. Instead, HomeSource claims it is sufficient for HomeSource's expert to explain to the Dr. Bayuk the structure and organization of those portions of the mirror image that ***HomeSource's expert*** deems relevant.

RWS is not required to accept HomeSource's self-serving representations at

face value. RWS is entitled to run its own searches to assess the veracity of HomeSource's claims. HomeSource has not offered a reasonable justification for its refusal to allow Dr. Bayuk to review the structure and organization of the mirror image so that she can develop the appropriate search protocol, so long as she agrees not to run the actual search protocol before conferring with HomeSource's expert on the search protocol she intends to use.

Conversely, Dr. Bayuk explained, "it would be exceedingly difficult and potentially impossible to provide a detailed search protocol for review of the mirror image without first having an opportunity to examine how HomeSource's server/database is set up and organized." Bayuk Decl. at ¶ 32. She provided further reasons for the need to access the mirror image at the operating system level and for her to execute the search commands herself:

> Without the ability to type commands and queries myself, I will be limited in my ability to collect enough information to determine how the technology actually works and thereby be able to endorse the validity of the search results. Databases are designed to capture data from multiple sources over long periods of time. I will need to step through the process by which logs are generated, captured, stored, and displayed to be able to testify that a given screenshot display of data indicates a high or low probability that a given system event occurred. I will also need to evaluate the integrity of the mirror image chain of custody from the time of the event through the time of examination. For example, as per Discovery Order, [Dkt. No. 81], at 1, ¶2. "The Mirror Image shall have a hashvalue as it is beyond cavil that 'hashing' guarantees the authenticity of the original data set." A chain of custody evaluation necessitates that I independently perform a hash calculation to verify that it produces the same value as that derived from the mirror image at the time of its archive.

*Id.* at ¶ 34.

Dr. Bayuk further notes, "Without the capability to examine a system by executing commands and data searches myself, a system evidence evaluation is like 'viewing' a crime scene through a single blurry picture taken from one angle; you cannot see all of the evidence and formulate a complete understanding as to what actually occurred." *Id.* at ¶ 35.

Whereas HomeSource claims it cannot provide the requested access to Dr. Bayuk because she cannot "run amok" or search HomeSource's database "willy nilly." *See* Ex. 15. HomeSource did not provide any support for this position. In contrast, Dr. Bayuk already agreed that HomeSource's expert could observe her searches.

Nevertheless, Dr. Bayuk's searches of the mirror image will not disrupt or effect HomeSource's business, or alter the information contained in HomeSource's database, because *the mirror image is not HomeSource's actual system*; it is merely a copy of it. A mirror image. A duplicate. Bayuk Decl., at ¶ 46. Moreover, the mirror image is frozen in time (ostensibly from 2018) and would not affect HomeSource's current content. *Id.* at ¶ 47. Finally, any concerns regarding confidentiality of information in the mirror image are adequately addressed by the parties' Protective Order, which Dr. Bayuk has reviewed and signed. *Id.* at ¶ 48.

HomeSource has spent over one and one-half years employing obstructionist

tactics and stonewalling to avoid doing what it has already been ordered to do, *i.e.*, make the mirror image available to Dr. Bayuk. The limitations HomeSource attempts to impose on Dr. Bayuk's review of the mirror image are not part of the Orders and are a poorly-disguised attempts to restrain RWS's access to relevant data.

## III.   APPLICABLE LAW

Federal Rule of Civil Procedure 26 provides that a party is entitled to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Courts have construed [Rule 26] liberally, creating a broad range for discovery which would encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Jones v. DeRosa*, 238 F.R.D. 157, 163 (D.N.J. 2006). "This liberal approach permits parties 'to scrutinize all relevant evidence so that each will have a fair opportunity to present its case at trial.'" *Evans v. Emp. Benefit Plan*, No. 03-4915, 2006 WL 1644818, at *4 (D.N.J. June 6, 2006).

Federal Rule of Civil Procedure 37 "governs sanctions against a party who fails to provide discovery as required by the discovery rules or a court order." *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006). Under Rule 37, this Court "possess[es] the authority to impose…sanctions" and "'[i]f a party…fails to obey an order to provide or permit discovery…, the court…may issue further just orders' sanctioning the offending party." *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d

568, 577 (3d Cir. 2018).  In other words, "[t]he Court has inherent power to police

litigant misconduct and impose sanctions on those who abuse the judicial process."

*Wachtel*, 239 F.R.D. at 84 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).

Rule 37 provides for both case-dispositive and non-dispositive sanctions,

including, without limitation:

> (i) [D]irecting that the matters embraced in the order or other designated
> facts be taken as established for purposes of the action, as the prevailing
> party claims; (ii) prohibiting the disobedient party from supporting or
> opposing designated claims or defenses, or from introducing designated
> matters in evidence;…(v) dismissing the action…in whole or in part;
> [and] (vi) rendering a default judgment against the disobedient party.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(ii), (v)-(vi).

Moreover, "Rule 37 requires 'the court [to] order the disobedient party, the

attorney advising that party, or both to pay the reasonable expenses, including

attorney's fees, caused by the failure." *McLaughlin v. Phelan Hallinan & Schmieg,*

*LLP*, 756 F.3d 240, 249 (3d Cir. 2014).

The Third Circuit has recognized that "[d]istrict court judges, confronted with

litigants who flagrantly violate or ignore court orders, often have no appropriate or

efficacious recourse other than dismissal of the complaint with prejudice." *Shahin*

*v. Delaware*, 345 Fed. App. 815, 816 (3d Cir. 2009).  Under Rule 37(b)(2)(A), "a

district court [is authorized] to dismiss an action should a party fail to obey an order

to provide or permit discovery." *Id.* (citation omitted).

## IV.   ARGUMENT

### A.   The Court Should Exclude the Evidence HomeSource Failed to Produce Despite Two Orders for the Same Issues.

HomeSource's stonewalling and failure to comply with this Court's Orders warrants exclusion under Rule 37 of the evidence it failed to produce.  Despite two Court Orders to do so, HomeSource failed to produce: (1) "lost customer contracts," including any proofs of its "lost customers" payments, terms or durations, (2) profit-and-loss statements, financial ledgers, and financials showing its customer payments, and (3) financial exchanges among HomeSource, the White family, and Software Support-PMW, Inc.  It also failed to make the mirror image of its database available to RWS's expert without attempting to impose unreasonable restrictions on her access and searches.

### B.   HomeSource's Conduct Warrants Exclusionary Sanctions.

This case does not involve an isolated failure to comply with discovery obligations.  Nor does it simply involve a party's failure to comply with a single Court Order.  This case involves repeated discovery abuses and the failure to comply with *two* Orders addressing the *same* discovery disputes.

HomeSource forced RWS to seek the Court's intervention not once, not twice, but three times on the same issues.  *See* ECF Nos. 104-105 & 254.  Judge Williams and Judge Robreno both ruled that the financial documents and information RWS seeks are relevant to the parties' claims and defenses.  *See* Orders, *generally*.  Both

Judges further compelled HomeSource to produce its "lost customer contracts" and financials, and to provide RWS's cybersecurity expert with access to the mirror image of HomeSource's database.  First Order, pp. 3-4, at ¶¶ 1-5; Second Order, at ¶ 1-4.  Indeed, both stated that RWS is entitled to examine all relevant documents and information to formulate a clear picture of what actually happened, and to pursue its own legal theories.

These rulings stemmed from HomeSource placing its finances and database at issue by asserting claims of over $46 million in damages and a multitude of cyber-related allegations.  However, HomeSource refuses to comply with the Orders, citing purported limitations that do not appear in or directly conflict with the Orders. HomeSource has no reasonable justification for its repeated failure to comply with the Orders.

To date, HomeSource has not produced most of its relevant tax returns, *any* transactional statements and ledgers, or other financial documents.  HomeSource refuses to produce many of the documents claiming it does not use standard tracking of its account payables, accounts receivable, and other financial information, and further refuses to produce what it does have.  HomeSource cannot assert outrageous damages claims and then obstruct RWS's opportunity to address the factual underpinnings and bases for such claims.

RWS respectfully submits that, in view of HomeSource's conscious decision

to flout the Court's two prior Orders, a third Order to compel will prove just as ineffective.   HomeSource has demonstrated it has no qualms about defying the Court's Orders or discovery requests.   Each time it does, the progress of this litigation is further delayed and RWS is forced to incur significant attorneys' fees and costs in seeking relief.  HomeSource's conduct rises to willfulness and bad faith. Further, any lesser sanction will effectively endorse everything that HomeSource has done during the nearly three years that this litigation has been pending.

There is ample precedent in this Circuit for precluding a disobedient party from introducing or relying on evidence that was withheld in contravention of a court order.  *See*, *e.g.*, *Ware v. Rodale Press, Inc.*, 322 F.3d 218 (3d Cir. 2003) (affirming exclusion of damages evidence plaintiff failed to timely produce, which resulted in defendant filing two motions, and recognizing that prejudice "include[s] the burden that a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary."); *In re Fine Paper Antitrust Lit.*, 685 F.2d 810, 823 (3d Cir. 1982) (affirming a discovery order precluding evidence that "bears a direct relation to the evidence sought under the discovery order" because of party's failure to comply); *N.J. Phys. Un. Reciprocal Exch. v. Med. Protective Co.*, No. 13-2286, 2017 WL 3623801 (D.N.J. Aug. 23, 2017) (granting defendant's motion to strike plaintiff's expert reports because plaintiff failed to produce damages discovery despite the Court's two Orders compelling production); *Capital Cty. Cab Serv., Inc.*

*v. Susquehanna Area Reg'l Airport Auth.*, No. 1:06-cv-671, 2008 WL 4838465, at *4 (M.D.Pa. Nov. 5, 2008) (plaintiffs' disobedience of court orders for production of damages and lost profits discovery warranted excluding such); *Beau Prods., Inc. v. Permagrain Prods., Inc.*, 97 F.R.D. 50, 55-56 (M.D.Pa. 1983) (precluding litigant "from submitting evidence at trial of its damages" for failure to comply with discovery orders and permitting prevailing party to file affidavit of "attorney's fees and expenses" incurred for its motion practice).

Stronger sanctions are warranted to protect RWS and to deter HomeSource from continuing its obstructionist conduct. Thus, given HomeSource's repeated refusal to produce the discovery materials at issue, RWS moves the Court for an Order excluding (1) any evidence that originates from or reflects information from HomeSource's database, (2) any evidence that allegedly supports HomeSource allegations it "lost customers," other than those customers for whom HomeSource has already produced actual contracts, and (3) all evidence of monetary damages.[13][14]

---

[13] As stated by Judge Williams, "if it's not produced in discovery, it does not exist." Oct. 7, 2019 Disc. Conf. Tr., at 74:14-15.

[14] The Court should also again compel HomeSource to identify all financial exchanges among HomeSource, the White family, and Software Support, and PMW, Inc. *See* Background, at Section II.E, *supra*.

1.   The Court Should Preclude HomeSource from Relying on Evidence that Allegedly Supports HomeSource's Allegations that It "Lost Customers" Other than Those It has Already Produced.

RWS requested copies of contracts for all customers HomeSource allegedly lost due to RWS's conduct, and that HomeSource identify each customer allegedly lost and the purported damages incurred as a result. Ex. 1, at 11; *id.*, Ex. 2, at RFPs 21-23. The Court compelled HomeSource to produce the customer contracts and information, as well as an affidavit certifying and confirming that HomeSource has provided all materials regarding lost customers. First Order, pp. 3-4, at ¶¶ 1, 3-4; Second Order, at ¶ 1.

HomeSource has not complied, but only produced a sample of "lost customer" contracts, and only a few that show any terms like payment, timeframe, or duration. Background, at Section II.B, *supra*. Nor has HomeSource produced any financial documents that show it *received* any payments from its alleged customers. Surely if they were once its customers, HomeSource would have been able to show a financial ledger or bank statement showing it received contractual payments. But despite the Court Orders to "produce each executed contract of the customers it contends were lost to RWS based on the conduct of RWS," "to identify each customers it allegedly lost and the purported damages" associated with each customer, "produce all documents and records that underlie its experts' damages calculations, whether or not the experts considered or reviewed the actual documents," HomeSource chose

not to produce any such documents or information.  First Order, at p. 3, at ¶¶ 1-3; Second Order, at ¶ 2.

After RWS was forced to move on the documents and complained that most were wholly-redacted, HomeSource produced a portion of the sample it was ordered to provide.  But even many of those documents *postdated* the Newsletter, and so could not have been "lost" *due to* the Newsletter.  *Id.*  Because HomeSource did not produce other "lost customer contracts," RWS requested the remaining unredacted documents as relevant to support or rebut HomeSource's claim that the redacted documents were actually "contracts" and "lost" due to RWS's Newsletter. HomeSource, without explanation, refused to produce them.

Given HomeSource's refusal, the Court should preclude HomeSource from relying on, or introducing in motions or at trial, any evidence allegedly supporting HomeSource's claim that it lost any customers, *other than those customers for whom HomeSource has already produced actual contracts*.

> **2.    The Court Should Preclude HomeSource from Introducing Evidence of Its Excessive Damages Claim.**

The Court Orders also compelled HomeSource to produce financial documents to substantiate its $46 million claim.  First Order, p. 3, at ¶¶ 1-2; Second Order, at ¶ 2.  HomeSource has not complied with the Orders or the Court's directives.  These orders stemmed from RWS's requests for HomeSource's revenue from January 1, 2016 to date, including, balance sheets, profit-loss statements, bank

accounts, accounts receivable, and accounts payable.  *See* Ex. 2, at RFP 24.  Despite the Court's Orders, HomeSource refused to produce transactional statements, prior tax returns, ledgers, and other financial documents. Indeed, other than a small smattering of documents, HomeSource refused to produce any financial documents predating the Newsletter, produced no accounts payable or accounts receivable, and withheld most tax information.

The Court should accordingly prohibit HomeSource from introducing evidence to support its damages claims because its refusal, among other things, precludes RWS from "using a common damages methodology—the before-and-after approach—to assess whether the alleged conduct had an effect…on HomeSource's business and finances."  Malkiewicz Decl., at ¶ 20-21.  As RWS's damages expert Mr. Malkiewicz explains, RWS cannot assess HomeSource's damages claims without information regarding HomeSource's finances *prior to* the alleged conduct at issue.  *Id.* HomeSource, however, has refused to produce such information, despite the Court Orders directing HomeSource to do so.  *Id.*

Further, HomeSource has produced only a paucity of financial documents postdating the alleged conduct.  Background, at Section II.B, *supra*.  Even those financial documents only cover portions of 2018 and 2019.  Moreover, none of the documents include transactional information showing alleged customer payments. This missing information "is relevant to a damages expert's ability to conduct or

verify, for example, a discounted cash flow analysis." Malkiewicz Decl., at ¶ 25.

Additionally, HomeSource's assertion that it does not possess the financial documents and information requested is simply not credible. The documents and information requested form the basis of the information included in HomeSource's tax returns. The IRS requires HomeSource and/or its accountant to maintain the underlying financial information and documents for a certain period of time. *Id.*, at ¶ 32. And as Mr. Malkiewicz notes, that information is necessary to assess the information on the trial balance reports that HomeSource produced. *Id.* at ¶ 31.

There is no reasonable explanation for HomeSource's conduct except that HomeSource cannot support its claimed damages. HomeSource cannot reasonably claim damages over $46 million on the one hand, while simultaneously claiming it possesses no financial documents or information to support that claim.

Because HomeSource refuses to provide RWS with the financial documents and information necessary to assess HomeSource's damages claims, the Court should preclude HomeSource from pursuing such claims.

   3. The Court Should Preclude HomeSource from Relying on Any Evidence Originating from or Reflecting Information from HomeSource's Database.

Both Orders compelled HomeSource to make the mirror image of its database available to Dr. Bayuk. First Order, p. 4, at ¶ 5; Second Order, at ¶ 4. Yet HomeSource has refused to provide access to Dr. Bayuk to the mirror image,

unreasonably attempted to restrict the scope of the searches Dr. Bayuk needs to conduct, denied Dr. Bayuk the login access and permissions necessary for Dr. Bayuk to execute the searches herself, and to confirm chain of custody and validate the search results.  HomeSource's refusals are unreasonable; Dr. Bayuk needs access the mirror image to understand its structure and organization in order to properly formulate her search protocols, so she can in turn make her assessments and provide RWS the ability to defend itself against HomeSource's claims.  Oct. 7, 2019 Disc. Conf. Tr., at 119:16-25.  Without such access for its expert, RWS's loses its ability to review the purported evidence against it.

Further, the mirror image of HomeSource's database is the "best evidence" of whether there is support for all of HomeSource's cyber-related allegations.  Bayuk Decl., at ¶¶ 29-35.  Indeed, HomeSource's CEO previously conceded so.  Decl. of J. White, ECF No. 153, Ex. G, ¶ 5.  Without it, HomeSource's cyber-related allegations would remain unchallenged.

Nor do anything in the Orders limit Dr. Bayuk's reviews of the mirror image solely to searches for IP addresses, as HomeSource contends.  First Order, p. 4, at ¶ 5; Second Order, at ¶ 4.  HomeSource is simply attempting to restrain Dr. Bayuk's searches by denying her the opportunity to review the structure and organization of the mirror image before she develops her search protocol.  HomeSource can offer no reasonable justification for its refusal to allow Dr. Bayuk to review the structure

and organization of the mirror image so that she can develop the appropriate search protocol.  As Dr. Bayuk explains, "[I]t would be exceedingly difficult and potentially impossible to provide a detailed search protocol for review of the mirror image without first having an opportunity to examine how HomeSource's server/database is set up and organized."  Bayuk Decl., at ¶ 32.[15]

HomeSource's apprehension for its withholding are further unfounded as Dr. Bayuk has offered for HomeSource's expert to observe her searches and review. Nor will Dr. Bayuk's searches disrupt or effect HomeSource's business or alter any information in the database: the searches will be on the mirror image and *not* HomeSource's actual system.  Again, she would merely be reviewing a copy.  *Id.* at ¶ 46.  Finally, any confidentiality concerns are adequately addressed by the Protective Order, which Dr. Bayuk has reviewed and signed.  *Id.* at ¶ 48.  Because of the seriousness of HomeSource's cyber-related allegations and HomeSource's refusal to provide Dr. Bayuk with the necessary access and permissions to assess the validity of HomeSource's claims, the Court should preclude HomeSource from citing, referencing, or relying on any evidence that originates from or reflects

---

[15] Additionally, HomeSource's refusal to provide Dr. Bayuk access to the mirror image at the operating system level and a login that includes permissions adequate to examine all operating system and application logs, files, and configurations, is yet another unreasonable effort to restrict the flow of relevant information to RWS.

information or data from HomeSource's database.  To hold otherwise would require RWS to defend against the cyber-related allegations with both hands tied behind its back.

### C.      The Court Should Award RWS Its Fees and Costs.

RWS further requests that the Court order HomeSource to pay all attorneys' fees and costs RWS has incurred since August 27, 2018, the date on which RWS served the Discovery Requests, through any oral argument for this Motion.[16]  *See* Fed. R. Civ. P. 37(a)(5).

It is no exaggeration that the vast majority of the time and expense expended on this case relates to RWS chasing HomeSource for discovery compliance. HomeSource's refusal to adhere to the Orders has severely prejudiced RWS's ability to assess and defend against the claims in the SAC.  HomeSource's actions have caused years of delay, undermined the expeditious resolution of litigation, and have caused this matter to linger on the Court's docket, wasting vast judicial resources.

This Court and RWS have given HomeSource every opportunity to participate in good faith to fulfill its discovery obligations.  That has not occurred, and future compliance is improbable.  For these reasons, RWS respectfully requests that the Court enter exclusionary and monetary sanctions against HomeSource.

---

[16] RWS respectfully reserves the right to provide the Court with the total amount in fees and costs through post-hearing submissions.

**D.      Alternatively, the Court Should Compel HomeSource to Comply with the Orders and Award RWS Its Fees for Forcing Compliance.**

If the Court does not to impose the exclusionary sanctions detailed above, RWS respectfully requests that the Court enter all appropriate lesser sanctions against HomeSource, including an Order compelling HomeSource to Comply with the Orders and to pay RWS's fees and costs in seeking compliance. HomeSource's long overdue responses to RWS's Discovery Requests are evasive or incomplete such that they "must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). Thus, the Court should again order HomeSource to fully and completely respond to each of RWS's Discovery Requests within 7 days of the order, and to immediately make the mirror image available to Dr. Bayuk, without imposing limitations on her ability to review and search the mirror image.

Further, the Court should also order HomeSource to pay all fees and expenses RWS incurred in the preparation of this Motion. Fed R. Civ .P. 37(a)(5). Finally, RWS requests the Court include a warning to HomeSource that any further violations of Court orders will result in the immediate dismissal of HomeSource's claims.

As discussed above and in the attached Carroll Decl., RWS's counsel has repeatedly attempted to secure responses to the Discovery Requests without Court intervention for years, more than adequately satisfying the good faith consultation requirements of Fed. R. Civ. P. 37(a)(5) and L.R. 37.1.

## V.   CONCLUSION

For the foregoing reasons, RWS asks the Court to enter an Order excluding (1) any evidence that originates from or reflects information or data from HomeSource's database, (2) any evidence that allegedly supports HomeSource allegations that it "lost customers" other than those customers for whom HomeSource has already produced actual contracts, and (3) all evidence of monetary damages.  RWS further requests that the Court order HomeSource to pay RWS's attorney's fees and costs that it has incurred since August 27, 2018, the date on which RWS served the Discovery Requests, through any oral argument, if necessary.  RWS respectfully reserves the right to submit its fees and costs through post-hearing submissions.

Alternatively, RWS requests that the Court compel HomeSource to fully comply with the terms of the Orders within 7 days and order HomeSource and/or its counsel to pay all fees and expenses RWS incurred in the preparation of this Motion, as determined through post-hearing submissions.

Dated: May 12, 2021                Respectfully submitted,

<u>*/s/ Dominique J. Carroll*</u>
Dominique J. Carroll
FOX ROTHSCHILD LLP
997 Lenox Drive
Lawrenceville, NJ  08648
Tel.: (609) 896-3600
Fax: (609) 896-1469
djcarroll@foxrothschild.com

Adam Wolek (*pro hac vice*)
FOX ROTHSCHILD LLP
321 N. Clark Street, Suite 1600
Chicago, IL  60654
Tel.: (312) 517-9299
Fax: (312) 517-9201
awolek@foxrothschild.com

*Counsel for Defendants Retailer Web Services, LLC; Retailer Web Services II, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 12, 2021, a true and correct copy of the foregoing

was served via electronic mail upon the following counsel for the Plaintiff:

FLASTER/GREENBERG P.C.
Kenneth S. Goodkind, Esq.
Eric R. Clendening, Esq.
Arthur R. Armstrong, Esq.
Daniel C. Epstein, Esq.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
Tel.: (856) 661-1900
Fax: (856) 661-1919

*Counsel for Plaintiff The HomeSource, Corp.*

*/s/ Dominique J. Carroll*
Dominique J. Carroll

*One of the attorneys for Counsel for Defendants Retailer Web Services, LLC; Retailer Web Services II, LLC*